**FILED**

DEC 2 8 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

MOMS AGAINST MERCURY, 55 Carson's Trail, Leicester, NC 28748;  )
CONNECTICUT COALITION for ENVIRONMENTAL JUSTICE, 10        )
Jefferson St., Hartford, CT 06145; OREGONIANS for LIFE, 1301 Hwy  )
99W, McMinnville, OR 97128; CONSUMERS for DENTAL CHOICE,    )
316 F St., N.E., Suite 210, Washington DC 20006; Michael BENDER,   )
1420 North St., Montpelier, VT 06520; Karen JOHNSON, 1700 West    )
Washington, Phoenix, AZ 85007; Karen PALMER, 1314 West Union Blvd.)
Bethlehem, PA 18018; Corrie CROWE, 10640 Windsor Ct., Orlando,    )
FL 32821; Anita Vazquez TIBAU, P.O. Box 664, Newport Beach, CA    )
92661; R. Andrew LANDERMAN, 145 Pleasant Hill Ave. North,        )
Sevastopol, CA 95472; Linda BROCATO, 940 East Old Willow Rd. #112,)
Prospect Heights, IL 60070;                                       
Plaintiffs,                                                       
v.                                                            
Andrew von ESCHENBACH, Commissioner, Food and Drug              
Administration ("FDA"); Randall LUTTER, Deputy Commissioner, FDA;)
Norris ALDERSON, Associate Commissioner, FDA: Dan SCHULTZ,        )
Director, Center for Devices and Radiological Health ("The Center"),   )
FDA; Chiu LIN, Director, Anesthesiology, General Hospital, Infection   )
Control and Dental Devices, The Center, FDA; and Mary Susan RUNNER,)
Director, Dental Devices Branch, The Center, FDA,                 )
         5600 Fishers Lane, Rockville, Maryland 20847             )
Mike LEAVITT, Secretary, Department of Health and Human Services; )
Defendants.                                                       )

Case: 1:07-cv-02332
Assigned To : Huvelle, Ellen S.
Assign. Date : 12/28/2007
Description: Admn. Agency Review

## Complaint

### Introduction

A. Encapsulated amalgam ("silver fillings") arrives at a dentist's office with affixed

next to the words "POISON, CONTAINS METALLIC MERCURY."  Mercury, the

warning states, is a "potentially hazardous substance" with "neurotoxic/nephrotoxic

effects"; "a chemical known to the state of California to cause birth defects or other

reproductive harm."  Amalgam makers advised dentists in writing not to place amalgam

in pregnant women, nursing mothers, children under six, and anyone with kidney disease.

B. Neither the U.S. Food and Drug Administration ("FDA") nor its independent scientists

claim that mercury amalgam is safe.  In September 2006 two FDA Scientific Advisory

Committees voted 13 to 7 that an FDA staff "white paper's" conclusion that mercury amalgam is safe is incorrect. In February 2007 FDA admitted five times in a brief to the Court of Appeals, in an earlier version of this case, that <u>FDA doesn't know if mercury</u> <u>fillings are safe or unsafe</u>: "there is a lack of conclusive evidence regarding the health effects of mercury fillings"; "complex issues and intense disagreement [exist] about the scientific evidence regarding mercury and its potential health effects."

C. Yet FDA has for 31 years ignored its duty to classify this device, and worse, allows untrammeled sales and no warnings about the mercury. In 2002 FDA actually launched a campaign to <u>conceal</u> the mercury, even from pregnant women, via a subterfuge warning that "amalgam contains zinc" (zinc is a nutrient, mercury a neurotoxin).

D. Time and again, a rogue bureaucracy inside FDA sabotages pronouncements from the Commissioner's office that FDA will act on amalgam. FDA leaders repeatedly promise to classify – to litigants (1997), to Congressman Burton (2002), to Senator Kennedy (2005), to the Court of Appeals (February 2007). In June 2007, facing a lawsuit by these plaintiffs, FDA promised to announce an Advanced Notice of Proposed Rulemaking. The promise was a sham to buy more time to keep mercury fillings on the market. Meanwhile, in the style of the British Queen, Commissioner Eschenbach chooses to reign but not rule, allowing this bureaucracy to set policy while he and Deputy Commissioner Lutter blithely ignore repeated warnings of lawlessness beneath.

## I. JURISDICTION

This action arises under the provisions of 21 U.S.C. §360c, and is filed pursuant to the judicial review provisions contained in 5 U.S.C. §§ 701 to 706. The Court has jurisdiction

under 28 U.S.C. §§ 1331 and 1361, and venue lies in this Court by virtue of the provisions of 28 U.S.C.A. § 1391(e).

## II. PLAINTIFFS

A.  Moms Against Mercury, a North Carolina nonprofit corporation (*at* www.momsagainstmercury.org), represents children suffering substantial neurological harm from mercury exposure and their families, and works to end those risks in the future, with amalgam being one such major exposure of mercury.

B.  Connecticut Coalition for Environmental Justice, a Connecticut nonprofit corporation (*at* www.environmental-justice.org), is a state-based group representing the needs of lower-income and minority citizens.  Its central mission is to address the disproportionate impact of toxins on the poor, the urban, and minorities, and it has been active in trying to end the use of mercury amalgam.

C.  Oregonians for Life, an Oregon nonprofit corporation (*at* www.oregoniansforlife.org), has a mission to protect the unborn from harm, whether via abortion or toxins.  Its mission to protect human life from conception includes a major focus on toxins that harm unborn babies, and its work has included a focus on mercury from dental fillings as a risk to such babies.

D.  Consumers for Dental Choice, a Delaware nonprofit corporation (*at* www.toxicteeth.org), has as its sole mission to end the use of mercury in dentistry.  The group has petitioned FDA several times, held meetings with FDA officials, written letters to officials at all levels of leadership, assisted with Congressional oversight hearings,

organized submissions by injured consumers and mercury-free dentists, and otherwise taken steps to invite FDA to comply with the Food Drug and Cosmetic Act.

E.   Michael Bender was appointed by the Governor of Vermont to the state Advisory Committee of Mercury Pollution (*at* www.mercvt.org/acmp/index.htm).  Plaintiff Bender enters this case on his own behalf, and is neither representing nor speaking for any other Member of the Committee nor for the Committee as a whole.  His statutory duties, including to "advis[e] the general assembly, the executive branch, and the general public on matters relating to the prevention and cleanup of mercury pollution, and the latest science on remediation of mercury pollution," cannot be done effectively or efficiently with FDA's policy of covering up the impact of mercury amalgam and disseminating incorrect information about it.

F.   Karen Johnson is a Member of the Arizona Senate and chairs the Children and Families Committee.  Senator Johnson has a constitutional and statutory duty to regulate the dental profession, and a delegated role to lead efforts to protect children and families from dangers such as neurotoxins.  She has been active in efforts to limit the use of mercury amalgam.

G.   Karen Palmer, Certified Dental Assistant, is disabled because of mercury exposure from working at dental offices.  The risk of mercury exposure was hidden from her, a fact due to defendants' cover-up of the mercury and its risks.

H.   Corrie Crowe, D.D.S., practices mercury-free dentistry in a public health clinic, but other dentists in that same clinic do not.  Due to FDA's failure to warn, dental personnel

have employed imprudent practices that led to much greater mercury exposure for Dr. Crowe. Due to such mercury exposure, she has suffered two tragic miscarriages.

I. R. Andrew Landerman, DDS, a practicing general dentist, does not implant mercury fillings, but he and his staff are constantly exposed to such mercury in the workplace because of its continued use.

J. Linda Brocato is an advocate in her state of Illinois to abolish mercury amalgam fillings. As a young woman, she suffered such severe neurological problems that she was diagnosed with Multiple Sclerosis and confined to round-the-clock care, due to the impact of the mercury on her neurological system.

K. Anita Vazquez Tibau, who lives in Rio de Janeiro, Brazil, as well as in the state of California, is an international advocate for abolishing mercury-based fillings. Because of the placement of amalgam two decades ago, she suffered substantial and life-threatening symptoms of asthma.

L. Plaintiffs are interested persons suffering legal wrong as contemplated by 5 U.S.C. §702 and 21 C.F.R. §10.45

## III. DEFENDANTS

A. The six defendants from the Food and Drug Administration (FDA) are sued in their official capacities only – pending discovery regarding whether they engaged in their nonfeasance and misfeasance in a malicious, bad faith, or reckless manner.

5

B. Andrew von Eschenbach, M.D., is Commissioner of FDA. He is aware that FDA staff classified all dental filling materials but will not classify mercury amalgam, but he refuses to follow through when his orders are ignored. For example, he promised Senator Enzi in August 2006, during his confirmation hearings, that the Scientific Advisory Panels convening in September "will be asked to answer specific questions concerning any possible adverse health effects of dental amalgam." Such questions never took place; defendant Alderson sabotaged the order, turning the hearings instead into a referendum on a mysterious staff "white paper" (a vote Alderson lost). No record exists of Eschenbach taking corrective action when he broke that confirmation promise to Senator Enzi – either an apology to Enzi or discipline within the agency. Eschenbach remains indifferent on whether FDA complies with its legal duty to classify mercury amalgam.

C. Randall Lutter, Ph.D., is Deputy Commissioner of FDA for Policy, and is charged with classifying devices. He has repeatedly been warned – at a meeting he presided at in 2005, at a meeting where he directed his assistant Williams McGonagha to preside in 2007, and via receiving a plethora of letters – of lawlessness at the Center for Devices and Radiological Health. He is indifferent to whether FDA complies with its statutory duties on mercury amalgam, or whether directives to the bureaucracy are complied with.

D. Norris Alderson, Associate Commissioner for Science, who presided at the meeting of the two Scientific Advisory Committees in September 2006, sabotaged the confirmation promise from the Commissioner to Senator Enzi. Rather than ask the scientists questions about the toxicity of mercury amalgam, Alderson orchestrated a "white paper," promoted it to the press as if it were an official FDA position, then

6

presented it to the Panels on a take-it-or-leave-it vote. When not only the "white paper" but also staff's methodology to propagandize for mercury amalgam were rejected by twin 13 to 7 votes, Alderson acted again to sabotage orders. Aligning with defendants Schultz and Runner, he embarked on a disinformation campaign to claim they won the vote they actually lost – astonishingly, they actually claim the scientists voted favorably to the white paper claim that amalgam is safe. First they caused this false information to be posted on the Center's website in 2006, then Alderson testified to Congress deceptively about the vote of the Panels.

E. Daniel Schultz, M.D., Director, Center on Devices and Radiological Health ("the Center"), conspired with his deputy director, Linda Kahan, to keep dentists in charge of decision-making on amalgam, despite knowing that the damage from mercury toxicity is neurological, not tooth decay, hence dentists are not nearly so qualified to decide the issue – plus dentists have a colossal conflict of interest. Schultz and Kahan conspired further to keep toxicologists and neurologists out of policy-making. He approved the website posting in 2006 that falsely claimed the Scientific Advisory Committees voted that amalgam is safe.

F. Chiu Lin, Ph.D., Director, Anesthesiology, General Hospital, Infection Control and Dental Devices, The Center, conspires with defendant Runner to approve encapsulated mercury amalgam, with no limits and no warnings, despite no legal authority to do so. He has assumed the power to rule on substantial equivalence when he lacks the authority to do so; the impact is to allow mercury amalgam to enter the market unclassified and without controls or warnings, creating a health risk to children and unborn children.

7

G. Mary Susan Runner, D.D.S., Director, Dental Devices Branch, Center, sabotaged a 2002 order from former Center Director David Feigal to contract for an "independent literature review" of mercury amalgam's toxicity issues. Instead, working with dentists in other agencies, she handpicked an unqualified meetings planning company in order to avoid competitive bidding, directed that company to appoint a Beltway tobacco consultant to do the study with whom she or her conspirators had conducted secret meetings to obtain an agreed-upon result. Fully aware that mercury can permanently harm the fetus or the developing brain of a child, Runner nevertheless led the effort in 2002 to conceal forever from dental patients (even pregnant women and parents of young children) the presence of the mercury, via a subterfuge of naming zinc as the controversial product. This outrageous conspiracy to use zinc to cover up the mercury has been joined by defendants Alderson and Schultz.

I. The final defendant, in case required for the remedy, is the Honorable Mike Leavitt, Secretary, Department of Health and Human Services.

## IV. PATTERN OF LAWLESSNESS

A. Operating under a collectivist theory of unaccountability, where if everyone does it no one may be held to task, defendants Alderson, Lin, Runner, and Schultz have abused their high-ranking positions by willfully and wantonly defying their statutory duty to regulate mercury amalgam. They have engaged in, or supported the others within the cabal, by engaging in the following acts and practices:

    i.    Conceal the mercury content from patients, including even pregnant women and parents, most notably by trying to put into effect a 2002 proposal by defendant

Runner mandating that all warnings be banned except the specious one that
amalgam contains (the nutrient) zinc;

ii.   Conceal the mercury content from patients even though all defendants are aware
      that most Americans do not know that amalgam is mainly mercury (a fact
      confirmed by a 2006 Zogby poll), most notably by conspiring with organized
      dentistry to allow its marketing under the deceptive term "silver fillings";

iii.  Sabotage directives from the Commissioner's Office, most notably a 2003 deal
      initiated by Runner to do a "literature review," enlisting a patently unqualified
      consultant (a meetings planning company), and appending a tobacco consultant
      with whom Runner's group had held secret meetings as subcontractor, who in
      turn flipped the contractual research question to give Runner the result she sought;

iv.   Falsely represent via website, Congressional testimony, and other means that two
      Scientific Advisory Committees voted to support the safety of mercury fillings,
      when in fact the scientists took just two votes: (1) to condemn FDA's conclusion
      that mercury fillings are safe, and (2) to condemn the methodology used by FDA
      staff;

v.    Block any meaningful role by real scientists in decision making, most notably, a
      decision by defendants Schultz and his deputy Kahan to keep dentists in control
      of making neurological decisions;

vi.   Illegally block an Environmental Assessment on regulating dental mercury, the
      largest source of mercury in the wastewater, the third largest use of mercury, and
      the largest source of mercury currently in products -- in flagrant disregard of the
      National Environmental Policy Act;

vii.    Illegally block requesting a legitimate and timely classification recommendation
by the Scientific Advisory Committee, because defendants Alderson, Schultz, and
Runner are fully aware that the Committee would likely recommend a III
Classification and effectively put mercury fillings out of business;

viii.    Repeatedly approve mercury amalgam for sale, without limits or warnings, under
a sham "substantial equivalence" test, one condemned (in *dicta*) by the Court of
Appeals in *Moms against Mercury v. FDA* (2007).

ix.    Repeatedly promise in bad faith that they intend to classify mercury amalgam
when in fact they have no such intention, most notably to plaintiffs in June 2007
for the specific purpose of avoiding getting sued, a step that caused plaintiffs to
assume defendants acted in good faith and hence which delayed this lawsuit for
six months.

## V.  MERCURY AMALGAM CONTROVERSY

*A. The Simultaneous Emergence of Mercury Amalgam and Organized Dentistry*

i. To understand why organized dentistry and its advocates inside FDA fight to
protect the marketing of a product that is 50% mercury, two fundamental points must be
borne in mind.  First, mercury-based amalgam has been the cornerstone of the world's
most powerful dental trade association since the middle of the 19th century.  Second,
dentistry and medicine began to follow separate – and in many ways opposite – tracks in
the 20th century.

ii. Efforts in the first half of the 19th century to establish dentistry as a research-
based branch of medical practice appeared promising.  In 1840, Dr. Chapin Harris, a
staunch opponent of the use of mercury in medical or dental procedures, formed the first

national dental organization, the American Society of Dental Surgeons, which was dedicated to the advancement of scientific methods. This led to the founding of America's first school of dentistry, the Baltimore College of Dental Surgery. But the development of mercury-based amalgam fillings changed all that.

iii. Unlike Dr. Harris, a significant percentage of the dentists of that time had no medical background and little training. They were often barbers or blacksmiths who filled teeth, or pulled them, on the side. In 1859, an enterprising group of these dentists formed the American Dental Association (ADA) — not to advance the science of dentistry, but for the specific purpose of promoting the commercial use of "silver amalgam-mercury use in dentistry."

iv. Since then, the ADA has marched in lock step with mercury producers and amalgam manufacturers, marketing the fillings as "silver" to an unsuspecting public (no mention of mercury) and never wavering from the company line that amalgam was "safe." The product caught on quickly. It was cheap, easy to place, and immensely profitable. The demand for "silver" fillings eventually forced the American Society of Dental Surgeons out of business; membership in the ADA soared.

v. For 150 years, the very existence of organized dentistry has depended on suppressing any suggestion that implanting mercury in the mouth might create health problems. Today, the ADA remains the only national trade group of health professionals to endorse the use of a product that is primarily mercury.

*B. The Abandonment of Mercury by All Health Professions except Dentistry*

i. Physician criticism of the use of mercury in medicine – such as by Boston physician / poet Oliver Wendell Holmes Sr. – led to a re-thinking by the medical

11

profession.  By the early 20th century, the use of mercury in medicine was on an irreversible decline.  While the Merck Manual listed numerous uses for mercury to treat illnesses in 1899, it lists none today.  Teething powder containing mercury was banned at mid-century because it was causing "pink disease" in infants – the disease disappeared after the product was banned.  Contact lens manufacturers, in cooperation with ophthalmologists and optometrist, pulled mercury preservatives out of contact lenses.

ii. FDA banned Mercurochrome more than a decade ago and, under the "precautionary principle," ordered mercury removed from most – but unfortunately not all – childhood vaccines.

iii. The ADA has experienced no such scientific awakening.  Despite mounting scientific evidence to the contrary, it has continued to insist that mercury fillings are safe, based on the 19th century standard of <u>length of use</u> – the same argument that enabled the tobacco industry to keep Federal regulators at bay for decades.  The ADA has adopted a similar *modus operandi*.

*C. The Role of the ADA as Deceptive Promoter of Mercury Amalgam*

i. Unlike the American Medical Association, the ADA has long been in the business of promoting specific products, the most prominent of which is mercury-based amalgam.  The American Medical Association's position on promoting commercial products is unequivocal: "The AMA does not sanction, endorse, approve, or disapprove products, procedures, hospitals, or clinics."  By contrast, every amalgam patent that has been awarded for decades has been produced according to ADA specifications.

ii. Since the 1930s, the ADA has continuously promoted a wide variety of amalgam products as "safe and effective" through its Seal of Acceptance, paid for historically by the amalgam companies that the ADA represents.

iii. Although the ADA advises dentists and the public that it has state-of-the-art laboratories to determine whether a product is safe, the claim has no apparent foundation. The ADA has never done a single test that it will reveal on the safety of amalgam. The ADA publishes promotional brochures describing the possibility of "rare allergic reactions" and making the scientifically absurd comparison of toxic mercury to substances like pollen or dust.

iv. Due to its three-tiered mandatory membership system, the ADA has much greater market power over dentistry than the AMA has over medicine. No dentist may join a local dental society affiliate or the state dental association without also joining the ADA. Thus, the ADA claims almost 70% of U.S. dentists as members, a percentage greatly exceeding that of physicians in the AMA or lawyers in the American Bar Association. The ADA has used this control to block the emergence of criticism by dentists trying to communicate concerns to patients and the public. In 1988, in a move that protected the power of its existing patents on amalgam, the ADA promulgated within its "Code of Ethics" the infamous gag rule, forbidding dentists from volunteering information to patients about the toxicity of mercury. The gag rule is under challenge in a case pending in the Supreme Court of California, *Kids Against Pollution* v. *California Dental Association.*

13

*D. Control by Dentistry Over Federal Regulation of Amalgam*

    i. In the period during and after World War I, the ADA began developing a partnership with the National Institute of Standards in the area of dental materials. Over the decades, members of the ADA and an ADA spin-off organization, the pro-amalgam American Association of Dental Research, have moved on to fill the dental research and regulatory leadership positions at the dental arm of the National Institutes of Health (NIH) and at FDA.

    ii. Today, all Federal government-funded research on the health risks of amalgam is run by dentists or other representatives of organized dentistry. The Dental Devices Branch at FDA routinely collaborates with the National Institute of Dental and Craniofacial Research at NIH. Some Members of Congress have voiced strong criticism, pointing out that research and regulation of amalgam's toxicity is controlled by dentists – professionals whose training does not qualify them to determine the impact of mercury on the body and who have an inherent conflict of interest due to the ADA's endorsement of amalgam. The pro-amalgam dentists at NIH run the research, and the pro-amalgam dentists at FDA make the rules.

    iii. It should come as no surprise that all government literature reviews on amalgam's toxicity have been managed by groups composed mainly of dentists. For example, a multimillion dollar grant to study amalgam was given to a dentist sitting on the ADA's Council of Scientific Affairs; that person chose a defenseless group – institutionalized Portuguese orphans – on which to experiment with mercury, <u>without disclosures of health risks</u>. The Secretary's Office of Human Research Protections, the watchdog charged with stopping unethical medical experimentation, found that this

14

experiment denied the children and their guardians the basic disclosures of risks required in all research on human beings – making it both unethical and immoral.

## VI. STEPS TO EXHAUSTION, MATCHED BY
## FDA's CASCADE OF FALSE PROMISES TO CLASSIFY

A. In 1976, Congress, via passage of the Medical Devices Amendments Act, required FDA to classify all devices, not just new ones coming into the marketplace (post-amendment devices), but also those already on the market (pre-amendment devices). The Commissioner ruled that dental fillings are implants, a more heavily regulated kind of device than those which are not placed inside the body.

B. From the start, FDA staff – with dentists in charge of the decision -- was determined to avoid classifying the one controversial dental material, encapsulated amalgam. In the 1980s, FDA classified all other dental filling materials but did not classify encapsulated mercury amalgam – even though it was then, by far, the most heavily used dental material by dentists. In February 2002 FDA staff speciously claimed the failure to classify encapsulated mercury amalgam was "inadvertent," but when questioned by Congressman Burton at a Congressional hearing in November 2002, Center Director David Feigal withdrew the claim that the failure to classify was "inadvertent."

C. Classification of pre-amendment devices requires a number of procedural steps, including seeking and receiving a recommendation from one of FDA's Scientific Advisory Committees. FDA sought such a recommendation in 1993, but the Scientific

15

Advisory Committee failed to comply with the statute, issuing a recommendation without stating the reason(s) it recommended departing from a Class III.

D. A variety of consumer groups and anti-mercury dental societies, led by undersigned counsel Robert E. Reeves and James Turner, later counsel for plaintiff Consumers for Dental Choice, tried to get FDA to classify mercury amalgam; rebuffed, they filed a mandamus. In 1994, the Court of Appeals denied the mandamus on the grounds of exhaustion, whereupon Reeves, Turner, and others filed a petition to FDA to classify. After sitting on the petition for three years, FDA wrote Reeves and Dr. Michael Baylin of Baltimore, in separate letters, promising to classify encapsulated mercury amalgam.

E. With the heat off – having made the promise to classify and therefore being able to duck court review --- FDA did nothing. Nothing, for five years. By that time, a movement had begun in the states to pass fact sheets to be given to consumers about the health risks of mercury; four states passed such laws, and a dozen more were considering it. The government of Canada in 1996 advised dentists to stop placing mercury amalgam in (1) pregnant women, (2) children, and (3) persons with kidney ailments. Manufacturers quickly issued contraindications to U.S. dentists for all three categories. Faced with a movement against mercury, FDA staff acted --- to protect amalgam and to block warnings. FDA proposed a rule to block those manufacturer warnings, to pre-empt state laws, and to tell consumers one thing: that amalgam contained zinc. Since zinc is a nutrient and exists only in minute amounts if at all in amalgam, and since mercury is a neurotoxin that is 50% of amalgam (and the reason for the controversy in the first place),

the move was a patent effort to cover up the mercury on behalf of dentists and manufacturers. The proposal was accompanied by a "consumer alert" that so full of braggadocio about amalgam that FDA later had to revoke it for being untrue.

F. Public comment against this cover-up proposal was so severe that FDA backed off, promising an "independent" literature review – a promise that morphed into the notorious contract defendant Runner engineered with a meetings planner and a tobacco consultant, with pre-cooked results.

G. In 2005, at his confirmation hearing, Commissioner-designate Lester Crawford promised Senator Kennedy that FDA would classify mercury amalgam. Later in 2005 Consumers for Dental Choice petitioned FDA to change its policies, including to discard the 2002 regulation and start over.

H. In 2006 FDA convened the Scientific Advisory Committees, but cleverly not to ask for a classification recommendation. FDA continues to refuse to convene the panels for a recommendation, obviously fearing a repeat of this panels' vote condemning the FDA staff position that mercury amalgam is safe.

I. In April 2006, plaintiffs sought an order from the Court of Appeals to declare mercury amalgam unregulated and therefore not validly sold. In its brief filed in February 2007, FDA said it was right in the midst of classifying mercury amalgam and simply needed some time to act.

17

J. In April 2007 plaintiffs were rebuffed on jurisdictional grounds, the Court stating the

District Court was the proper forum (*Moms Against Mercury, et al., v. FDA*).

Immediately notified that plaintiffs would sue in the District Court, FDA counsel asked

for a meeting with plaintiffs' counsel instead, a meeting held in May. Plaintiffs

announced they would wait just 30 days, so FDA promised prompt attention to the issue.

In June 2007, FDA counsel promised that FDA would issue an Advanced Notice of

Proposed Rulemaking. FDA also told reporters for two professional publications, *FDA*

*Week* and the Bureau of National Affairs' *Medical Device Reporter*, that it would

promptly issue an Advanced Notice of Proposed Rulemaking.


K. A Congressional subcommittee chaired by Congressman Kucinich convened a hearing

in November 2007, where defendant Alderson said FDA will not agree to do an

Environmental Assessment. Alderson in his testimony refused to indicate whether

FDA's promise in June to issue an Advanced Notice of Proposed Rulemaking is still

operative. Instead of promising to move forward, Alderson stonewalled, indicating that

FDA was under no obligation to take any steps on mercury amalgam.


L. Thirty-one years after Congress ordered all pre-amendment devices to be classified,

20 years after FDA classified all other dental fillings except this controversial one, 15

years after winning a mandamus based on exhaustion of remedies, ten years after

promising in writing to classify mercury amalgam, five years after a sequence of

meetings began between plaintiffs and FDA officials that have continued year after year,

five years after promising a House committee it will classify, two years after promising a Senate confirmations committee it will classify, two years after plaintiff Consumers for Dental Choice filed a sequence of petitions for FDA to act, one year after two Scientific Advisory Committees voted decisively that FDA's claim of mercury amalgam's safety is mistaken, ten months after FDA conceded to the Court of Appeals that it does not know if amalgam is safe or unsafe ... FDA refuses to classify mercury amalgam.

M. But FDA staff has adopted yet another "safeguard" to ensure it cannot classify mercury amalgam in the near future. To ensure that if any directive (from the Courts, from Congress, or from the Secretary) will take years and years, <u>defendants refuse to do even the conditions precedent to classifying</u>: request a valid and timely recommendation from the scientists, and conduct an environmental assessment on the mercury damage. Refusal to begin even the requisite steps to classify is proof of bad faith by defendants, suggesting a belief that they are somehow above the law when it comes to making product decisions.

## VII. STATEMENT OF ALLEGATIONS:  VIOLATIONS OF THE FEDERAL FOOD, DRUG, AND COSMETIC ACT

(i) 21 U.S.C. §360g(a)(8):  Encapsulated amalgam is being marketed via a deceptive, unlawful, and sham classification.

(ii) 21 U.S.C. §360g(a)(4):  Encapsulated amalgam is being marketed despite never having been classified, and this failure to classify, far from being inadvertent, represents a calculated FDA decision to keep selling amalgam with no safety review.

19

(iii) 21 U.S.C. §351:  Encapsulated amalgam is an adulterated device, as its major component is mercury, a recognized neuro-toxin, but the classification under which it was sold, §872.3050, may not, by definition, contain mercury.

(iv) 21 U.S.C. §352:  Encapsulated amalgam is a misbranded device, as its major component is mercury, a recognized neuro-toxin, but the classification under which it was sold, §872.3050, may not, by definition, contain mercury.

(v) 21 U.S.C. 379(o):  With the National Environmental Policy Act applicable to FDA, defendants must do an environmental assessment, followed by an environmental impact statement.

(vi) 21 U.S.C. §393: Encapsulated amalgam has never been regulated despite a statutory mandate that FDA "promote the public health by promptly and efficiently" reviewing the safety of amalgam and "protect[ing] the public health by ensuring that" there is a reasonable assurance that amalgam is safe as a filling material.

## VIII. REMEDY

Defendants have unlawfully withheld and unreasonably delayed the classification of encapsulated mercury and amalgam alloy.  As FDA has done so many times before, it predictably will come before this Court and announce it intends to classify, but simply needs more time.  FDA has had 31 years to classify mercury amalgam, and classified all other filling materials – that is, the noncontroversial ones – 20 years ago.

For ten years, FDA has been promising to classify – it has told the Court of Appeals, litigants, petitioners, Congressman Burton, and Senator Kennedy that it is on the

20

verge of classifying. It promised plaintiffs six months ago it would take the first step toward classifying, a ruse that held plaintiffs off from filing this suit six months ago.

For a device that is 50% toxic mercury; for a device about which FDA confessed to the Court of Appeals it no longer knows if it is safe or unsafe; for a device that two panels of distinguished outside scientists voted overwhelmingly against the staff position that amalgam is safe -- and for a device about which FDA is immobilized from classifying – there is but one fair, equitable, and proper remedy:

Pursuant to 5 U.S.C. §706, this Court should remove encapsulated mercury amalgam from the marketplace and order that FDA comply forthwith with its statutory duty to assemble a classification panel and request a classification recommendation, to publish said recommendation with comments, to publish a proposed rule, and finally – after 31 years – to classify mercury amalgam.

The alternative – to allow FDA to weasel out of this case with <u>yet another promise to classify, when FDA refuses even to the conditions precedent to classifying</u> – would be an injustice to plaintiffs, allow a continued concealment of the mercury, and send a message that FDA has no accountability to the American people. Plaintiffs also request attorneys fees and other remedies permitted by law and as are just and equitable.

*Respectfully submitted by counsel for plaintiff this 28th day of December 2007*

_____
Charles G. Brown D.C. Bar #930-248
316 F Street, N.E., Suite 210
Washington, DC 20006
202-544-6333
charlie@toxicteeth.org
Member, U.S. Dist. Ct., District of Columbia

Robert E. Reeves, Kentucky Bar # 57,358
REEVES LAW OFFICE
167 West Main St., Suite 1310
Lexington, KY 40507
859-226-0700
robertereeves@aol.com
U.S. Ct. App., District of Columbia, 2/10/93

21

*07-2332 ESH*

JS-44
(Rev.1/05 DC)

*Andrew Von Eschenbach*

**I. (a) PLAINTIFFS**

*Moms Against Mercury et al*

**DEFENDANTS**

*US Govt is Defendant*
*FDA is in Maryland*

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
(EXCEPT IN U.S. PLAINTIFF CASES)

*North Carolina*   *88888*

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

*Charles G Brown, 316 F St NE #210*
*Wash DC 20002  202.544.6333*

Case: 1:07-cv-02332
Assigned To : Huvelle, Ellen S.
Assign. Date : 12/28/2007
Description: Admn. Agency Review

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government
　　Plaintiff

☐ 3 Federal Question
　　(U.S. Government Not a Party)

☒ U.S. Government
　　Defendant

☐ 4 Diversity
　　(Indicate Citizenship of Parties
　　in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV.  CASE ASSIGNMENT AND NATURE OF SUIT**
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

**☐ A.** *Antitrust*

☐ 410 Antitrust

**☐ B.** *Personal Injury/ Malpractice*

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**☒ C.** *Administrative Agency Review*

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☒ 890 Other Statutory Actions (If Administrative Agency is Involved)

**☐ D.** *Temporary Restraining Order/Preliminary Injunction*

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**☐ E.** *General Civil (Other)* **OR** **☐ F.** *Pro Se General Civil*

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

Federal Tax Suits
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

Other Statutes
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

*9*

| ☐ G. *Habeas Corpus/* *2255* | ☐ H. *Employment Discrimination* | ☐ I. *FOIA/PRIVACY ACT* | ☐ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student<br>Loans (excluding veterans) |
| ☐ K. *Labor/ERISA* *(non-employment)* | ☐ L. *Other Civil Rights* *(non-employment)* | ☐ M. *Contract* | ☐ N. *Three-Judge Court* |
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting<br>Rights Act) |

**☒ ORIGIN**

| ☒ 1 Original<br>Proceeding | ☐ 2 Removed<br>from State<br>Court | ☐ 3 Remanded from<br>Appellate Court | ☐ 4 Reinstated<br>or Reopened | ☐ 5 Transferred from<br>another district<br>(specify) | ☐ Multi district<br>Litigation | ☐ 7 Appeal to<br>District Judge<br>from Mag.<br>Judge |
|---|---|---|---|---|---|---|

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

21 USC 360 (Food Drug Cosmetic Act)

**VII. REQUESTED IN**    CHECK IF THIS IS A CLASS         **DEMAND $**    Check YES only if demanded in complaint
**COMPLAINT**      ☐     ACTION UNDER F.R.C.P. 23                 **JURY DEMAND:** ☐ YES     ☐ NO

**VIII. RELATED CASE(S)**    (See instruction)
**IF ANY**             ☐ YES   ☐ NO    If yes, please complete related case form.

DATE 12-28-07    SIGNATURE OF ATTORNEY OF RECORD   *Charles J Brown*

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.       COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.     CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.     CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.     CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

N:\forms\js-44.wpd