UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MOMS AGAINST MERCURY,  CONNECTICUT COALITION | ) |
| for ENVIRONMENTAL JUSTICE,  OREGONIANS for LIFE, | ) |
| CONSUMERS for DENTAL CHOICE,  Michael BENDER, | ) |
| Karen JOHNSON,  Karen PALMER,  Corrie CROWE, Anita | ) |
| Vazquez TIBAU,  R. Andrew LANDERMAN, Linda BROCATO, | ) |
| Plaintiffs, | ) |
| v. | ) |
| Andrew von ESCHENBACH, Commissioner, Food and Drug | ) Case # 1:07- |
| Administration; Randall LUTTER, Deputy Commissioner; | )   cv002332-ESH |
| Norris ALDERSON, Associate Commissioner; Dan SCHULTZ, | ) |
| Director, Center for Devices and Radiological Health ("The Center") | ) |
| Chiu LIN, Director, Anesthesiology, General Hospital, Infection | ) |
| Control and Dental Devices, The Center; Mary Susan RUNNER, | ) |
| Director, Devices Branch, The Center;  Mike LEAVITT, Secretary, | ) |
| Department of Health and Human Services; | ) |
| Defendants. | |

## Motion for Preliminary Injunction

Plaintiffs move the Court for a preliminary injunction to order the removal of

encapsulated mercury amalgam (i.e., "silver fillings") from commerce until the earlier of

when the U.S. Food and Drug Administration classifies this device or when this litigation

is completed.

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MOMS AGAINST MERCURY,  CONNECTICUT COALITION | ) |
| for ENVIRONMENTAL JUSTICE,  OREGONIANS for LIFE, | ) |
| CONSUMERS for DENTAL CHOICE,  Michael BENDER, | ) |
| Karen JOHNSON,  Karen PALMER,  Corrie CROWE,  Anita | ) |
| Vazquez TIBAU,  R. Andrew LANDERMAN, Linda BROCATO, | ) |
| Plaintiffs, | ) |
| v. | ) |
| Andrew von ESCHENBACH, Commissioner, Food and Drug | ) Case # 1:07- |
| Administration; Randall LUTTER, Deputy Commissioner; | )   cv002332-ESH |
| Norris ALDERSON, Associate Commissioner; Dan SCHULTZ, | ) |
| Director, Center for Devices and Radiological Health ("The Center") | ) |
| Chiu LIN, Director, Anesthesiology, General Hospital, Infection | ) |
| Control and Dental Devices, The Center; Mary Susan RUNNER, | ) |
| Director, Devices Branch, The Center;  Mike LEAVITT, Secretary, | ) |
| Department of Health and Human Services; | ) |
| Defendants. | ) |

## Memorandum in Support of Motion for Preliminary Injunction
## To Block Sale of Mercury Amalgam

Because (a) FDA must classify all devices, 21 U.S.C. §360c; (b) FDA in bad faith has repeatedly promised Congress, the courts, and myriad petitioners, 1994-2008, that it will classify encapsulated mercury amalgam, but does not; (c) two Scientific Advisory Panels decisively rejected FDA staff's claim that amalgam is safe; and (d) FDA admitted five times to the Court of Appeals that it does not know if amalgam is safe … this Court should temporarily block mercury amalgam sales until either FDA classifies or until the completion of this action.

A rogue bureaucracy inside the U.S. Food and Drug Administration, bowing to political pressure from organized dentistry, refuses to classify the highly controversial device known to FDA as encapsulated mercury amalgam, and to the public as "silver fillings."   Due to a rubber-stamp mentality inside the organization, and complete indifference by the Commissioner, the device remains unregulated, 32 years after

Congress directed that all devices be classified and 20 years after FDA classified all other dental filling materials (e.g., resin, gold, porcelain).

FDA will promise everyone and anyone – undoubtedly including this Honorable Court – that for the 21st consecutive year it is working on rule-making. The promise to classify amalgam by FDA has been made to the United States Court of Appeals (1994 and 2007), to petitioners (1997), to Representatives (2002), to Senators (2005), and to the media (2007). Each time, FDA leaders hand the issue back to the Center for Devices, who buries it. It's time to call these unrequited promises what they are: a sham on the American people. Less than a month ago, FDA's lead scientist, Norris Alderson explained to a group of scientists asking for a ban on mercury amalgam that the agency was frozen into equipoise on the subject, and that it could only move forward if the American Dental Association (a trade group and the leading proponent of mercury fillings) gives FDA the green light. Indeed, while saying FDA had no plans to classify, to ban for children, or even to give warnings, Alderson did not dispute the toxic concerns they raised about mercury amalgam, and even indicated he is angry that a dentist placed mercury fillings into his tot grandson.

The safety of mercury amalgam was resolutely rejected by two FDA Scientific Advisory Committees in 2006. After a two-day hearing with dozens of witnesses and thousands of pages of written testimony, FDA's Neurological and Dental panels voted 13 to 7 to reject the staff position that mercury fillings are safe. The staff not only ignored the vote, but Alderson falsely told a Congressional hearing a year later that the panel voted to ask the staff to study the issue further, rather than rejecting the staff position.

If we were talking about rhubarb or chewing gum, it would be one thing.  But we are talking about a material that is composed 43 to 54% of the most toxic nonradioactive material, the most volatile heavy metal (hence highly vaporous), and a neurotoxin for which the World Health Organization announces there is no safe level.[1]  FDA agrees – it is resolutely against mercury in all other products – even banning it in all animal products and warning pregnant women not to eat tuna.  Standing alone, unclassified, unregulated, and not even warned about, are mercury fillings.

While allowing untrammeled sales of mercury amalgam, FDA no longer vouches for its safety.  Five times, the agency conceded in its brief-in-chief to the United States Court of Appeals in the first *Moms Against Mercury v. FDA* case, that it does not know if amalgam is safe or not.  *http://www.toxicteeth.org/natcamp_fedgovt_fda_admits_Mar07.cfm*

How could this oddity occur at FDA, what its admirers call the World's Gold Standard for drug and food protection?  First, the bureaucracy in charge is the most obscure within the agency; the Supreme Court, in a 1996 opinion, called the Center for Devices "FDA's Neglected Child."  *Medtronic, Inc. v. Lohr,* 518 U.S. 470 (1996).  Its penchant to rubber-stamp whatever product comes before it is illustrated by defendant Chiu Lin's approval of a mercury amalgam application for all uses and no warnings despite the manufacturer itself saying the product is banned for children and pregnant women in the United Kingdom.  Second, the person in charge of the classification decision, defendant Mary Susan Runner, is a dentist whose zealousness to guard the mercury secret is such that she advocates a warning that amalgam contains zinc, a nutrient, in order that dentists be allowed to cover up the mercury (its main component).

---

[1] 1991, Environmental Health Criteria 118, Inorganic Mercury, WHO, Geneva

Third, the culture at the Center for Devices appears to forbid objective review of each other's work.   The director of the Center, defendant Dan Schultz, apprised that the issue on mercury amalgam is neurological and not dental, refused to change control of the process away from dentists, suggesting that he, a physician, values professional courtesy above effective regulating.

Irreparable harm exists, because every time this mercury product is implanted in a child or a pregnant woman or a nursing baby, the risk of permanent neurological harm exists to the child's developing brain.  Such is the risk of any and all mercury exposure. Plaintiffs' members suffer such irreparable harm.

## I. FDA Carves Privileged Status for Just This One Mercury Product

Encapsulated mercury amalgam occupies a unique, privileged – and illegal – regulatory status at FDA.  Known deceptively as "silver" fillings, it is primarily (43-54%) mercury, an acute neurotoxin.  Each filling contains as much mercury as a thermometer; dumping just one in a 10-acre lake would make it off-limits to fishermen.  Mercury's well-known health and occupational risks – plus the fact that non-toxic filling options are readily available to fill any cavity – divides dentistry into vociferous pro-and-con camps. Under pressure to choose, <u>FDA ducked</u>[2] – defying its statutory duty to classify "all devices"[3] "in a timely manner."[4]  After classifying all other fillings in the 1980s, FDA used a back-door scheme to keep amalgam on the market "temporarily," then in four

---

[2] Hearing before the Committee on Government Reform, Nov. 14, 2002, "Mercury in Dental Amalgams," Serial No. 107-159, www.house.gov/reform; at p. 125

    "Mr. Burton [Chairman, Committee on Government Reform]: Is that a correct statement, <u>the FDA classified all dental filling materials except encapsulated mercury amalgams?</u>

    "Dr. Feigal [Director, Center on Devices and Radiological Health, FDA]: <u>That is correct.</u>"
[3] 21 U.S.C. §360c(b).
[4] 21 U.S.C. §393.

cycles of false promises and stall tactics – with a potential fifth beginning April 3, 2006 –

acted to protect this illegal status quo.

Encapsulated dental amalgam arrives at a dentist's office with  affixed next

to the words "POISON, CONTAINS METALLIC MERCURY."   Mercury, the warning

states, is a "potentially hazardous substance" with "**neurotoxic/nephrotoxic effects**"[5]; "a

chemical **known to the state of California to cause birth defects** or other reproductive

harm."  The major amalgam manufacturers -- Kerr, Dentsply, and Vivadent -- tell dentists

in writing, **Do not place amalgam in pregnant women, nursing mothers, children**

**under six, and anyone with kidney disease**. [6] [7] [8]

---

[5] Neurotoxic: poison to the brain and nervous system; nephrotoxic: poison to the kidneys.

[6] Kerr, the largest mercury amalgam manufacturer in the American market:  "The health authorities of the various countries, including Canada, Germany, France, the United Kingdom, Norway and Austria have recommended against the placement or removal of an amalgam in certain individuals such as pregnant and nursing women and persons with impaired kidney function."  (Emphases added.)

[7] Dentsply/Caulk, the second largest mercury amalgam manufacturer:

"Contraindication  [*N.B.*: "Contraindication" is a directive to forbid, not just a "warning."]

- In proximal or occlusal contact to dissimilar metal restorations.
- In patients with severe renal [*i.e., kidney*] deficiency.
- In patients with known allergies to amalgam.
- For retrograde or endodontic filling.
- As a filling material for cast crown.
- In children 6 and under.
- In expectant mothers.

"Side Effects/Warning:  Inhalation, Chronic: … In severe cases, hallucinations, loss of memory, and mental deterioration may occur.  Concentrations as low and (sic "as") 0.03 mg/m3 have induced psychiatric symptoms in humans.  Renal involvement may be indicated by proteinuria, albuminuria, enzymuria, and anuria. … Intrauterine exposure may result in tremors and involuntary movements in the infants.  Mercury is excreted in breast milk. … The fact that Dentsply/Caulk has placed this information on the Internet, available to the public and professionals alike, has a vital impact on various aspects of the current controversy over the safety of mercury/silver amalgam dental fillings."  (Emphases added.)

[8] Vivadent, the third largest mercury amalgam manufacturer:

"Contraindication:

- If proximal or occlusal contacts with other metal restorations are present.
- If the patient suffers from impaired renal function.
- If the patient is known to be allergic to amalgam.

Minority-led organizations have expressed grave concern that pregnant women and children, especially at the lower end of the socioeconomic scale, still receive mercury fillings – without even a warning.[9]  Indeed, in this age of widespread awareness and concern about avoiding mercury exposure, the overwhelming majority of Americans don't even know the fillings are mercury!  A 2006 Zogby International poll shows that 76% of voters cannot identify the main component of amalgam.  When told the truth, fully 92% said dentists should be required to disclose the mercury in "silver" fillings, and to tell patients they have a choice to get non-mercury fillings.

*www.zogby.com/search/ReadClips.dbm?ID=12662*

In response, FDA … does nothing[10]:

1) Rather than correct misinformation that amalgam is "silver," FDA does the opposite: its "Consumer Updates" cover up the fact that amalgam exposes patients to mercury;

2) Rather than classify amalgam, as the Food Drug and Cosmetic Act ("FDCA") requires, FDA has "delayed" the decision for 20 years (see Part II);

3) Rather than require proof of safety, as the FDCA requires, FDA keeps amalgam on the market without such proof via a Byzantine regulatory scheme even its staff cannot explain the same two times in a row (see Part III):

---

- For retrograde or endodontic restorations
- As a material for core build-ups under crowns or inlays.
- For children under six years of age.
- For pregnant or nursing women."  (Emphases added.)

[9] Resolution of national NAACP (2002),
  Resolution of National Black Caucus of State Legislators (2001),.

[10] FDA does not have the discretion to do nothing; it has choices on how to classify, but it must classify.  *Norton* v. *Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004).

It is a credit to tens of thousands of men and women in the dental profession that they refuse to follow the company line.  To protect their patients, their employees, their environment, and themselves from unnecessary mercury exposure, these U.S. dentists implant alternatives like resin; polls show the number of "mercury-free" dentists growing dramatically.  *www.toxicteeth.org/natCamp_grassroots_May2007.cfm*.  **Modern dentists no longer place mercury amalgam**; that's the good news.  The sad news: the mercury users in dentistry are the assembly-line profiteers who serve the working poor, minorities, and children.[11]  Polls show a majority of dentists anticipate the demise of mercury fillings, but a plurality still use them because, well, because they've always done it that way.   As documented in the attached sworn statements from the presidents of three national dental societies, any cavity of any size or type, child or adult, may now be filled with alternative, non-toxic dental materials, such as resin or porcelain.

In its regulation of other products – drugs, vaccines, food, and even animal medications – **FDA adamantly opposes mercury exposures**.  In 1998, FDA banned Mercurochrome, once a popular disinfectant, solely because it had mercury.  Four years later, FDA acted to get mercury out of childhood vaccines, based on medicine's Precautionary Principle.  Two years after that, FDA issued warnings to pregnant women and parents of young children about mercury in fish.  The reason for the privileged status for mercury fillings is not FDA ignorance – when pressed (e.g., by Congress), the agency admits that amalgam constitutes an exposure to mercury for the whole body, and that mercury from amalgams enters the brain.[12]

---

[11] See prefatory language to H.R. 4011, a bipartisan bill with over a dozen sponsors.
[12] "Mr. Burton [Chairman, Committee on Government Reform]: You do agree though that mercury vapors leech out of the tooth?
   Dr. Feigal [Director, FDA Center on Devices]: Yes, we agree with that.

Extending its reach to stop mercury exposures, **FDA bans mercury in all veterinary medicines**.[13]  FDA ordered Miracle Leg Paint, a salve used for horse blisters, recalled for the sole reason it contained mercury.  Contrast FDA's felicitous <u>concern</u> with the traces of mercury on the <u>outside of a horse's leg</u> with its <u>indifference</u> about literally grams of mercury <u>implanted three or four inches from a child's brain</u>.  International and United States health agencies recognize the biggest bear in the woods when it comes to mercury – for indeed amalgam is that.  It is the greatest source of mercury vapor in non-industrialized settings, says the World Health Organization,

*http://www.cdc.gov/exposurereport*; it is the largest source of human mercury exposure, says the government of Canada,   *http://www.mercurypoisoned.com/health_canada.html*

In a seminal report on mercury, the U.S. Public Health Service[14] says amalgams contribute up to 75% of a person's mercury exposure.  The Centers for Disease Control[15] warns amalgam constitutes a "major exposure" of mercury.  The Environmental Protection Agency issued grim news urging young women to avoid all unnecessary mercury exposures, because one American woman of childbearing age in seven has so much mercury in her body she is at risk of having a brain-damaged child.

Although proclaiming itself the world's "gold standard" in consumer protection, FDA sits on the bottom rung on mercury fillings.  One might think the Kerr

---

Mr. Burton: And that it is ingested into the body?
Dr. Feigal: Yes, we do agree.
Mr. Burton: And that it gets into the bloodstream?
Dr. Feigal: Yes.
Mr. Burton: <u>And it goes to the brain and other organs of the body</u>?
Dr. Feigal: <u>Yes, we agree with that</u>."
Congressional hearing, "Mercury in Dental Amalgams," *op. cit*. fn 1, at pp. 127-8.
[13] http://www.fda.gov/ora/about/enf_story/archive/2002/ch5/cvm1.htm
[14] http://www.atsdr.cdc.gov/toxprofiles/phs46.html
[15] http://www.cdc.gov/exposurereport/

manufacturer's warning listing a half dozen other countries which forbid amalgam for

pregnant and nursing women would embarrass FDA into action. A Swedish government

report authored by World Heath Organization researcher Dr. Maths Berlin, citing

hundreds of scientific studies, concludes,

> "The safety factor thought to exist with respect to mercury exposure from
> amalgam has been erased… . For medical reasons, amalgam should be eliminated
> in dental care as soon as possible."[16]

Health Canada (our northern neighbor's FDA equivalent) wrote every dentist in that

nation to stop placing mercury fillings in pregnant women and children under six – not

this year or last, but ten years ago.

How could this happen? How could FDA protect even **horses** from mercury

exposure from a **salve** on the **outside of their legs** while being the world's slacker in

protecting **children and pregnant women** from an **implant** of mercury in the **inside of

their heads**? The answer is twofold: dentist control, and absolutely no oversight.

FDA hands regulatory control not to toxicologists or physicians but to persons

unqualified to determine the impact of mercury on the fetus, the child's brain, and the

adult's kidney – dentists. These dentists – even in formal documents like FDA's 2002

feigned rulemaking – cover up the emerging scientific studies and replace it with pseudo-

scientific rhetoric. A prime example: FDA absurdly claims that amalgam's longevity

proves its safety![17] Contrast the rear-guard action of dentistry with that of medicine: the

---

[16] Full text -- www.social.regeringen.se/inenglish/publications/index.htm. (Scroll down cover
page to "health and medical care," then open the first item, by Maths Berlin.) FDA's Consumer
Update on Amalgam falsely claims that Sweden's concerns are environmental. The National
Institutes of Health asked defendant Runner to make a correction; she refused, choosing instead
to keep this false information in FDA's Consumer Update for the past four years.

[17] The "most notabl[e]" "scientific evidence" in favor of amalgam, FDA asserted as recently as
2002, is "the significant human experience with amalgam for over 100 years." 67 Fed. Reg.
7626-27 (Feb. 20, 2002). No bona fide scientist would equate longevity of use with absence of
risk – much less, as FDA does, make it the lead argument.

California Medical Association's House of Delegates passed a resolution in 2002 calling

for a ban on all mercury products used in health care.  Here, then, is dentistry's hapless

reality:  mercury amalgam is this nation's last remnant of pre-Civil War medicine.

## II. FDA's Twenty Years of Refusing to Classify Amalgam.

Starting in 1976, Congress directed FDA to start classifying all devices,[18]

including those already on the market.[19]  Class I and Class II devices may be sold by the

manufacturer merely notifying FDA.[20]  Class III devices, however, require "premarket

approval" by FDA, whereby the manufacturer must prove the device is safe.  Implants,

such as dental fillings, are presumptively Class III; they may be moved up the safety

chain to II or I only under proof of "reasonable assurance of safety."[21]  So while device

regulation used different terminology than drug regulation, the conceptual starting point

(especially for implants) is the same: manufacturers prove safety before the product is

allowed to enter commerce.

Thus, **the very act of classifying will mean the demise of mercury amalgam**.[22]

Under today's rigorous concern about mercury exposure, manufacturers of a device 50%

mercury implanted inside the head emitting mercury vapors could never, repeat never,

prove "reasonable assurance of safety."  The amalgam advocates inside FDA realize the

only way to keep mercury fillings legal is not to classify them.

---

[18] Until 1976, devices were unregulated.  Hence the regulatory statute for FDA is known as the Food Drug and Cosmetic Act, covering the areas assigned to FDA decades earlier.

[19] Devices on the market before 1976 are "preamendment devices.  21 U.S.C. §360e(b).

[20] 21 U.S.C. §360c(a)(1)(B).

[21] 21 U.S.C. §360c(a)(1)(C)(i).

[22] Kazantzis G., Mercury exposure and early effects: an overview, Med Lav. 2002 May-Jun;93(3):139-47 (As mercury can give rise to allergic and immunotoxic reactions which may be genetically regulated, in the absence of adequate dose-response studies for immunologically sensitive individuals, it has not been possible to set a level for mercury in blood or urine below which mercury related symptoms will not occur).

Between 1986 and 1989 FDA duly classified all dental filling materials – that is, all but the controversial one, encapsulated amalgam; see fn 1, *supra*.  Further proof they were working around amalgam:  the agency even classified the accoutrements of amalgam (the capsule itself and the equipment to titrate it).[23]  FDA has never sought to justify, or even explain, the privileged status accorded amalgam for 20 years.[24]

Ever since, in predictable three-to-six year cycles, FDA promises to classify amalgams, then pulls back, finding an excuse to do nothing and start over.  Perhaps if the issue were how to classify band-aids, the routine would be comical -- like cartoon character Lucy pulling up the football each autumn.  But FDA is playing games with the most toxic nonradioactive element and the most volatile heavy metal, a virulent neurotoxin that can permanently damage the brain, the nervous system, or the kidneys.

First cycle of deception (1986-92):  FDA classifies all filling materials except the most common one, amalgam, then adopts a clever scheme to keep amalgam on the market (see Part III, *infra*).  After watching and waiting, the Foundation for Toxic-Free Dentistry and others, with the undersigned Robert E. Reeves as counsel, file a mandamus to classify before this Honorable Court.  FDA wins on procedural grounds in January 1993.[25]

Second cycle of deception (1993-96):  Per the ruling by the D.C. Circuit, Plaintiffs – as well as other citizens, dentists, and nonprofit organizations – file

---

[23] Dental fillings are <u>implants,</u> which – since they remain in the body undissolved for more than 30 days – have a stricter system of scrutiny than devices which remain outside the body.  Dental fillings, including amalgam (43 Fed. Reg. 32988 (1978)), are implants.

[24] When asked at a Congressional hearing why FDA refused to classify amalgam in the 1980s while classifying all other fillings, the Director of its Center on Devices replied, "To be honest, <u>we do not know</u> …"  "Mercury in Dental Amalgams," *op. cit.* fn 1, at p. 125.

[25] *In Re Foundation for Toxic-Free Dentistry*, 1993 Westlaw 1415 (D.C. Cir. 1993).  Relief denied based on exhaustion of administrative remedies, so Plaintiffs went back to FDA.

petitions to FDA to classify. FDA responds by doing a "literature review" (1993)
– by a dentist-controlled group – and by throwing the issue to the Dental Products
Panel (1994), which used the illegal procedure of recommending departure from
Class III without stating any reason.

Third cycle of deception (1997-2000): Lawyers Reeves and James Turner press
FDA to respond to the myriad petitions. FDA does a second "literature review" –
by the same group. In November 1997 Deputy Director Elizabeth Jacobson,
Center on Devices, writes Reeves and Turner with two unequivocal promises:

> "FDA [1] intends to classify encapsulated dental amalgam alloy and dental
> mercury [and] [2] intends to require certain warnings.

That was nine years ago**. FDA broke its promise to classify. FDA broke its
promise to issue warnings.**

Fourth cycle of deception (2001-05): A movement to ban mercury amalgam
ignites activism around the country. California, Arizona, Maine, and New
Hampshire either enact or begin to enforce consumer disclosure statutes about
health and environmental risks. Lawmakers in Congress and ten states introduce
ban bills. To quash the movement, FDA proposes a sham regulation to **reduce**
public awareness -- directing manufacturers to stop issuing warnings, trying to
thwart state disclosure bills, and (to divert attention away from the mercury)
audaciously directing a bold warning that amalgam contains (only) zinc![26] [27] A
public outcry erupts; thousands of submissions come in against the rule. In

---

[26] http://www.fda.gov/cdrh/ode/guidance/1192.pdf
[27] No better evidence exists of FDA's intent to deceive the public than the fact the agency
proposed patients be warned about the small amount of zinc in amalgam but not the 43 to 54%
mercury. Mercury is always toxic, in the tiniest doses, and is many, many times more toxic that
zinc. Zinc is considered beneficial in small doses, provided limits are observed.

October 2002, FDA retreats.  Director Feigal of the Center on Devices tells a House Committee that the proposed regulation is on hold pending – *no surprise here* – a <u>third</u> "literature review."[28]

<u>Fifth cycle of deception, 2006-2008</u>:  FDA Commissioner nominee, defendant Von Eschenbach, promises Senator Enzi, during the confirmation hearings in August 2006, "The September [2006 Scientific Advisory] panel will be asked to answer specific questions concerning any possible adverse health effects of dental amalgam."  FDA refuses to ask such questions were, reneging on its promise to Senator Enzi.  Instead, FDA unveils a problematic "white paper" to the media, then demands that the scientific panels vote up-or-down vote on the white paper, without bothering to ask them "to answer specific questions concerning any possible adverse health effects of dental amalgam."  To the dismay of defendant Alderson, who was FDA's MC for the event, the panels resoundingly votes NO on the white paper's conclusion that amalgam is safe.  FDA staff is not deterred; instead of admitting defeat, the Center for Devices re-writes history, claiming on its website (in contradiction to parent FDA's website!) that the vote was to continue to study the issue.  Confronted with answering to the Court of Appeals on the issue, however, FDA is forced to admit, in February 2007, that it <u>does not know if mercury amalgam is safe or unsafe</u>.  Then in June 2007, using duplicitous tactics to avoid another lawsuit by plaintiffs, FDA promises to issue an Advanced Notice of Proposed Rulemaking.  It is another false promise, but it works; plaintiffs hold off a lawsuit until December, believing that government officials tell the truth.

---

[28] *FDA Week*, Nov. 22, 2002.

### III. How FDA Illegally Keeps Mercury Amalgam on the Market

FDA's Center on Devices used the following legerdemain to keep amalgam on the market while evading the triple mandates of classifying, proof of safety, and environmental impact statement: it invoked a "substantially equivalent"[29] claim – doing so in secret and with no factual finding of equivalence. The classified device is "amalgam alloy," a material defined as having no mercury, which dentists once mixed in their offices.[30] So FDA said a substance that is <u>non-mercury</u>, <u>non-encapsulated</u> and <u>not even a completed dental material</u> (and, not incidentally, <u>obsolete</u>), is "substantially equivalent" to an encapsulated completed dental material that is 50% mercury.

"Amalgam alloy" refers to a 19th-century technique: Dentists, like pharmacists of old, created the filling in their office, mixing the powdered alloy with liquid mercury. Since a handful of old-fashioned dentists still used this system a generation ago, FDA classified the alloy. The mixing involved such a reckless exposure to mercury that organized dentistry officially renounced it in the 1990s, and several states banned its use in the 2000s.[31] In 2002 FDA conceded the system is defunct.

In the Food, Drug and Cosmetic Act, a "substantially equivalent" determination requires meeting two precise prongs. First, clinical or scientific data must demonstrate that the unclassified device is as safe and effective as the classified one.[32] FDA never produced such data; so it fails to meet this prong. Second, the two devices must not raise

---

[29] 21 U.S.C. §360c(i).

[30] 21 C.F.R. §872.3050.

[31] The occupational warnings from manufacturer to dentist remain vivid for capsulated amalgam as well. The Sixth Circuit threw out a claim by a dentist who suffered major health damage from workplace exposure to mercury from amalgam – on the grounds that the manufacturer had repeatedly warned the dentist, in writing, of the severe risks of amalgam. *Barnes* v. *Kerr Corp.*, 418 F.3d 583 (6th Cir. 2005).

[32] 21 U.S.C. §360c(i)(1)(A)(ii).

different questions of safety and effectiveness.  The agency *sub silentio* concedes that this prong is not met by convening a neurological panel to sit aside a dental panel to evaluate the health risks of mercury fillings.  By definition (the alloy has no mercury) the two products raise different questions of safety.   Both prongs must be met; neither is.[33]

When pressed, **FDA simply cannot consistently define by what authority they regulate amalgam**.  In an astonishing e-mail exchange in 2003-04 between Georgia consumer Pamela Floener and FDA officials, including defendant Runner, FDA gave three sequential, competing explanations of their classification system for capsulated amalgam.  First, they said, it is classified substantially equivalent as a single device (which is the official explanation, the one in the 2002 regulation).  When Floener challenged them, they said no, it is a dual device, the alloy and the mercury bottle.  When she again challenged them, they said no, it isn't classified at all, and that the decision to classify is on hold.  (Floener affidavit attached.)

The recent application of Silverfil to sell amalgam aptly illustrates that FDA uses substantial equivalence as a ruse to keep amalgam unregulated.  In its application, this British-based fillings manufacturer makes alarming concessions:

"In recent times, dental amalgam has had a bit of a rough ride.  The mercury content has been cited as a cause for many illnesses, and, although the jury is still out on many of these claims, there is no getting away from the fact that **mercury and its vapours are indeed very dangerous**, and direct contact with either is better avoided.
"This has led to very strict guidelines regarding placing and handling the material. … **In the UK** we have been advised to **avoid its use in children and expectant and nursing mothers**.  **Several European countries have banned its use entirely**."

_____

[33] Another route exists -- if the two have the same technological characteristics, 21 U.S.C. §360c(i)(1)(A)(i).  Plainly these disparate techniques do not meet that requirement: the powdered metal alloy is not capable of being used as a dental implant

With such extraordinary admissions, one might hope FDA would prick up its ears and demand proof of safety. But no, for amalgam, FDA's gold standard equates to golden acquiescence for manufacturers and golden silence to the American public.

See Professor Haley's affidavit, attached, regarding the enormous health risks of mercury amalgam.[34]

## IV. Plaintiffs Meet the Standard for Preliminary Injunction

Plaintiffs represent a wide variety of interests and a broad geographic reach adversely affected by FDA's failure to regulate dental mercury. Three Plaintiffs are nonprofit organizations which advocate for, respectively, mercury-damaged children in North Carolina, low-income and minority victims of environmental injustice in Connecticut, and unborn children in Oregon. Others are consumer victims, injured dental workers, dental workers, and public officials.

A four-part burden exists: (1) likelihood of success on the merits; (2) prospect of irreparable injury to moving party if relief withheld; (3) possibility of harm to other parties if relief granted; and (4) public interest.

## (A) Plaintiffs have a likelihood of success on the merits.

FDA's decision not to classify mercury amalgam is illegal. This two-decade set of stall tactics, neatly interrupted by three so-called "literature reviews" then renewed promises, equates to a decision not to classify. A decision not to classify a device –

---

[34] The suggestion that since every child and adult is not impacted by mercury amalgam exposure means none are harmed is as preposterous as to suggest that everyone who smokes gets lung cancer. Scientists are unanimous, and FDA concedes, that a certain percentage of the population is hypersensitive to mercury exposure, and could have a grievous reaction from the slightest exposure. The estimates of mercury hypersensitivity average 15%, varying from 25% to 1%. But even 1% equals three million Americans. To this hypersensitive population must be added those at substantial risk because their mercury burden is already overloaded from other exposures – e.g., residence near a power plant, eating large quantities of fish, or workplace exposure (such as a dental office) –so the amalgam may constitute their tipping point.

particularly an implant -- is per se illegal.  It is past time to "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. 706.  Since the non-action involves a neurotoxin, the evasion is hardly a technical matter.

FDA is required to classify all devices, 21 U.S.C. §360c(b).  FDA has never denied that it must classify capsulated amalgam, and, as briefed above, repeatedly promises to do so.  No agency has an infinite number of years do its duty – particularly FDA, who must classify "in a timely manner."  21 U.S.C. §393.  A judicial remedy is now necessary.

The inescapable conclusion:  **encapsulated amalgam is not regulated**.  It is neither classified nor substantially equivalent to what is classified.  **As an unregulated product, it must be removed from the marketplace, immediately**.

In addition, encapsulated mercury amalgam is a per se misbranded product   FDA is allowing the sale of a misbranded product.  21 U.S.C. §352.  FDA approves encapsulated mercury amalgam to be sold as a <u>non-mercury alloy device</u>.  21 C.F.R. §872.3050.  Since mercury is by far the largest component (43 to 54%) in a product FDA has approved as having no mercury, it is misbranded, and may not therefore be sold in commerce

A device is considered misbranded if its labeling does not provide adequate directions for use and fails to provide adequate warnings to people, including children, where using the device "may be dangerous to health."  21 U.S.C. §352(f).  For lactating and pregnant women, children, and people with impaired kidney function, the increased mercury body burden from amalgam may very well "be dangerous to health."  The language of the statute reflects a precautionary approach to particular devices – the

misbranded provisions of the Act do not require absolute proof of harm, but only some

indication that a device might be dangerous.  Because amalgam is not accompanied with

a set of special controls that includes warnings about mercury (nor do the controls

suggested then abandoned in 2002 do so) for special populations that are more

susceptible to mercury toxicity, encapsulated mercury and amalgam alloy is misbranded.

Additionally, 21 U.S.C. §321(m) and (n) point out that "labeling" includes all written,

printed, or graphic matter that accompanies amalgam, and that when determining whether

amalgam is misbranded because its labeling is misleading,

> "there shall be taken into account…representations made or suggested by
> statement, word…[and] also the extent to which the labeling or advertising
> fails to reveal facts material…"

FDA is now aware that (1) most consumers don't know that the fillings are mercury, and

(2) they are still being sold under the deceptive term "silver."  Thus, FDA has a duty to

take corrective action.

## (B) Irreparable injury exists if relief is withheld.

The equities for relief are powerful – continued mercury exposure and health

risks, especially to pregnant women and children; substantial environmental harm; and

sale of a misbranded product that fails to provide the most minimal warnings about

mercury exposure.

Plaintiffs' concern remains most acute for these two most vulnerable

subpopulations – children under six and unborn babies.  While other countries protect

their pregnant women and children, FDA maintains silence even on the <u>presence</u> of

mercury – even to the point of suggesting warnings on zinc to divert attention.  Since

FDA recognized on April 6 that amalgam raises questions of neurotoxicity, and since the

U.S. Public Health Service recognizes it is the developing brains of children and fetuses

that are most at risk for **severe and permanent neurological damage**, an order by this Honorable Court is necessary, particularly to protect children and fetuses.

The U.S. Environmental Protection Agency warns that one U.S. woman in seven is so mercury-damaged she is at risk of having a brain-damaged child.  For these tens of millions of women, any mercury exposure must be avoided.  Amalgam is either the major source of mercury exposure (World Health Organization, Health Canada), or a source of mercury exposure (U.S. Centers for Disease Control, U.S. Public Health Service).  Other modern health systems – e.g., Canada, United Kingdom, Germany, New Zealand, and Australia – prohibit the placing of mercury fillings in pregnant women and young children; Scandinavian countries ban them outright.  Major manufacturers issue contraindications, yet, incredibly, FDA's dentist-dominated regulators on this issue want to block such  warnings and leave pregnant women and parents unaware.

Among the winners from granting interim relief will be lower-income Americans and children.  Upper-middle-class adults do not generally receive mercury fillings any longer (they used to); they now get non-toxic materials.  Low-income families and children are more likely to go to factory-style dental offices whose economics are based on, in the words of a dental school joke, "drill, fill, and bill."

Another winner is America's environment – amalgam's environmental damage to the water supply, the ground, and the air is severe and ongoing.

## (C) Harm to other parties if relief is granted is *de minimis*.

No reduction in oral health care will occur, because dentists need never place mercury fillings in the days of modern alternatives.  Every cavity can be filled with alternatives like resin composite; see Gallagher and Margolis affidavits, attached.

No one will go without dental care.  A 2006 study of state Medicaid programs, in which over two-thirds of jurisdictions responded, show that all Medicaid programs  give patients the choice to get non-toxic alternatives to amalgam.  See Rayford affidavit, attached.  California and Georgia even have statutes with such a guarantee.  The only problem:  States don't tell patients they have a choice.

The equities against relief are *de minimis* – dental product makers, already prepared for this development, will sell other filling materials in greater quantities, while the dwindling pro-mercury dentists will have to switch to non-toxic materials like resin.

The dental product makers are prepared to exit amalgam.  Dentsply so implies in its 10Q statement to shareholders, indicating that an FDA classification decision could mean amalgam's demise.  The company did not warn of any concomitant diminution of stock; all the amalgam manufacturers also make the other filling materials, from which they will immediately fill in the gap.

Dentists have been converting to mercury-free practices, but not rapidly enough. The dwindling band of pro-mercury dentists – those who refuse to transition out of using this toxic product – will be momentarily inconvenienced by a requirement to implanting non-toxic fillings; possibly by implanting resin their profits per chair per day would somewhat recede, but that is a mere inconvenience, not a hardship.

## (D) The public interest overwhelmingly favors the injunction.

For FDA, the value of an injunction is to lift this albatross off its shoulders.  It is likely that many at FDA now recognize its amalgam policy is at loggerheads with its general policy on mercury – that one part of the agency is setting agency policy at odds

with the remainder – and that FDA is lagging behind rather than leading the world on amalgam policy.  At stake, then, is the very integrity of FDA's mission.

To deny relief and allow untrammeled sales of this mercury-based implant would reward an illegal two-decade pattern of false promises to classify, no environmental impact statement, a bogus substantial equivalence scheme, and a wall of silence about the mercury content.

*Respectfully submitted this 22nd day of April 2008.  Evidentiary hearing requested.*

_____

| | |
|---|---|
| Charles G. Brown, DC Bar #930-248 | Robert E. Reeves, KY Bar # 57,358 |
| 1725 K St., N.W., Suite 511 | REEVES LAW OFFICE |
| Washington, DC 20006 | 167 West Main St., Suite 1310 |
| Telephone 202.884-0315, fax 202.822-6309 | Lexington, KY 40507 |
| charlie@toxicteeth.org | Teleph 859-226-0700, fax 859-226-0711 |
| | Robertereeves@aol.com |

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

MOMS AGAINST MERCURY,  CONNECTICUT COALITION  )
for ENVIRONMENTAL JUSTICE,  OREGONIANS for LIFE,  )
CONSUMERS for DENTAL CHOICE,  Michael BENDER,  )
Karen JOHNSON,  Karen PALMER,  Corrie CROWE, Anita  )
Vazquez TIBAU,  R. Andrew LANDERMAN, Linda BROCATO, )
Plaintiffs,  )
        v.  )
Andrew von ESCHENBACH, Commissioner, Food and Drug  ) Case # 1:07-
Administration; Randall LUTTER, Deputy Commissioner;  )  cv002332-ESH
Norris ALDERSON, Associate Commissioner; Dan SCHULTZ,  )
Director, Center for Devices and Radiological Health ("The Center"))
Chiu LIN, Director, Anesthesiology, General Hospital, Infection  )
Control and Dental Devices, The Center; Mary Susan RUNNER,  )
Director, Devices Branch, The Center;  Mike LEAVITT, Secretary,)
Department of Health and Human Services;  )
                              Defendants.

NOTICE OF MOTION -- April 22, 2008

To: Drake Cutini, Trial Attorney, Civil Division, Department of Justice; and Wendy Vicente, Attorney, Office of the Chief Counsel, U.S. Food and Drug Administration – Counsel for Defendants.

      Please take notice that in 20 days from the above date, or as soon thereafter as counsel can be heard, in the United States District Court, Prettyman United States Courthouse, the undersigned will bring the above motion on for hearing.

Charles G. Brown, Counsel for Plaintiffs
316 F St., N.E., Suite 210
Washington DC 20002
Phone 202.884-0315
Fax 202.544-6331
E  *charlie@toxicteeth.org*

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

MOMS AGAINST MERCURY,  CONNECTICUT COALITION  )
for ENVIRONMENTAL JUSTICE,  OREGONIANS for LIFE,  )
CONSUMERS for DENTAL CHOICE,  Michael BENDER,  )
Karen JOHNSON,  Karen PALMER,  Corrie CROWE, Anita  )
Vazquez TIBAU,  R. Andrew LANDERMAN, Linda BROCATO, )
Plaintiffs,                                                                            )
        v.                                                                  )
Andrew von ESCHENBACH, Commissioner, Food and Drug      ) Case # 1:07-
Administration; Randall LUTTER, Deputy Commissioner;          )   cv002332-ESH
Norris ALDERSON, Associate Commissioner; Dan SCHULTZ,      )
Director, Center for Devices and Radiological Health ("The Center"))
Chiu LIN, Director, Anesthesiology, General Hospital, Infection    )
Control and Dental Devices, The Center; Mary Susan RUNNER,    )
Director, Devices Branch, The Center;  Mike LEAVITT, Secretary,)
Department of Health and Human Services;                                     )
                                 Defendants.

# AFFIDAVITS

Following are affidavits from scientist Boyd Haley, consumer advocate Pamela Floener, consultant Paulette Rayford, dentist Timothy Gallagher, and dentist Michael Margolis.

They were submitted in the predecessor case, Moms Against Mercury v. FDA, in the United States Court of Appeals, where the Court ruled that the case needed to be filed in the District Court.  We have the notarized affidavits in our files.

Charles G. Brown

UNITED STATES COURT OF APPEALS, DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| MOMS AGAINST MERCURY,  CONNECTICUT COALITION for | ) |
| ENVIRONMENTAL JUSTICE,  OREGONIANS for LIFE, | ) |
| CALIFORNIA CITIZENS for HEALTH FREEDOM, | ) |
| Kevin J. BIGGERS (Member of the Dental Board of California), | ) |
| Karen JOHNSON (Arizona State Senator),  Linda BROCATO, | ) |
| R. Andrew LANDERMAN, D.D.S.,  Anita Vazquez TIBAU, | ) Docket |
| Petitioners, | ) #06-1147 |
| | ) |
| vs.    **AFFIDAVIT OF BOYD E. HALEY, Ph.D.** | ) |
| | ) |
| | ) |
| FOOD AND DRUG ADMINISTRATION ["FDA"], et al., | ) |
| Respondents. | |

## AN EVALUATION OF DENTAL AMALGAM
## AND ITS ABILITY TO INJURE HUMAN HEALTH

1)  I am Professor of Chemistry/Biochemistry in the Department of Chemistry at the University of Kentucky.  Throughout my career I have studied the effects of numerous compounds on the changes of the activity of enzymes, proteins and cellular function proteins and the relationship of these changes to disease states.  In the past 14 years I have concentrated my research on the effects of mercury toxicity on human health.  Specifically, I have researched and evaluated the contributions of dental amalgam, biologics and vaccines on the human body burden of mercury and organic-mercury compounds and the potential effects of these compounds on specific enzymes and cells.  Attached is a one page biography and an abbreviated copy of my Curriculum Vitae.  The full CV is approximately twenty five pages and to save space will be provided upon request.

2)  Mercury exposure to humans comes from various chemical forms such as elemental vapors, inorganic salts and organic-mercurials such as thimerosal and phenylmercury acetate (PMA). All chemical forms of mercury have been proven toxic at relatively low levels.  There is no doubt that mercury and mercury compounds represent the most dangerous form of metal toxicity since research on exposures show them to cause adverse effects in animals and humans at the very low levels. Mercury and mercury containing compounds are listed under the State of California's Proposition 65 as compounds that need to be evaluated for their level of toxicity to ensure the safety of the

citizens. Mercury vapor is one of the most toxic forms of mercury along with some of the organic mercury compounds. It is this vaporous form of mercury that is released from dental amalgams and is the major contributor to human mercury body burden.[22]

3) It is important to understand two concepts regarding mercury toxicity. The first is the level of exposure and the second is the contribution to human body burden. One can be exposed to mercury in the diet by eating fish, etc. This mercury is effectively excreted and does not appear to lead to a build up of mercury in the body but may cause subtle effects difficult to identify. The studies in the fish eating populations of the Faroe Islands and the Seychelles are examples of this.[36, 37] The citizens of these studies were exposed to high levels of mercury in their diets, but maintained a fairly low level of mercury body burden and urinary mercury levels not dramatically different from the USA population. In my opinion, the blood levels were higher due to excretion of the daily diet intake of bound mercury from sea food. This is most likely due to the fact that dietary mercury in fish has already reacted with protective compounds in the fish and are not as reactive or as capable of being retained on ingestion as would be other forms of mercury that have not been previously exposed to a biological system (e.g. mercury vapor).

4) In contrast to mercury from a fish diet, mercury vapor from amalgams has all of its chemical reactive potential and easily penetrates into the cells of the central nervous system where it is converted to the toxic form ($Hg^{2+}$), reacts with proteins in the brain, etc. and is retained for much longer periods of time and builds up in these tissues causing a significant toxic effect. Research has determined that about 80% of inhaled mercury vapor is retained by the human body and that the major contributor to human body burden is from dental amalgam. This is the position of the World Health Organization.

4) The exceptional toxicity of mercury vapor is probably due to the efficient partitioning of vaporous mercury into certain body organs (e.g CNS, kidney) and into specific cellular organelles (e.g. the mitochondria) based on mercury vapor's ability to easily penetrate membranes and the blood brain barrier. In this manner mercury vapor, $Hg^0$, is quite different from ionic $Hg^{2+}$ and $Hg^{1+}$. For example, air and oral ingestion of mercury vapor ($Hg^0$) primarily affects the central nervous system whereas the kidney is the major organ affected by the cationic forms of mercury (e.g. $Hg^{1+}$ and $Hg^{2+}$). Add to this problem is the fact that prolonged mercury vapor exposure can lead to inhibit the

excretion process itself.  Therefore, extended exposure to mercury vapor from amalgams will, by itself, decrease the body's ability to excrete mercury.  The recent data presented in the Children's Amalgam Trials, published in JAMA, shows that extended exposure to mercury from dental amalgams lead to a marked +40% decrease in the ability to excrete mercury in the urine.[27, figure 2, page 1788] from year two to year seven of the study.  Even though the children (orphans in a Lisbon, Portugal orphanage) were given additional amalgams from year two to year seven the rate of mercury excretion in their urine dropped dramatically.  Therefore, urine mercury levels do not represent in any way an accurate measure of the level of exposure of an individual.

5)  The pro-amalgam group in the USA has "estimated" the amount of mercury excreted from amalgams by using urine mercury levels, which is obviously invalid, since over 90% of mercury is excreted via fecal routes, not through the urine.[34]  The British Dental Association also uses this same study to infer that amalgams do not contribute significantly to human mercury exposure.[35]  The pro-amalgam group are also aware of publications showing that over 90% of mercury excreted by the human body leaves through the bilary transport system of the liver and is excreted in the feces---yet they constantly refer to low urine mercury levels as their source of suggesting low exposures from dental amalgams.  They make the comment that "dose make the poison"[35] yet avoid determining the actual dose but instead depend on an "estimation" based on the urine excretion rate that represents at best 10% of the total mercury being excreted.

6)  It is now well known that the relative toxicity of mercury and organic mercury compounds fluctuate dramatically in humans depending on: (1) delivery route (2) the presence of other synergistic toxic metals such as lead, cadmium, aluminum, etc. (3) different diets (4) antibiotic exposure (5) genetic susceptibility[23,24] and allergic reactions (estimated as at least 1% of the human population[7] with 8.7 to 13.4% showing sensitivity to a diagnostic patch test [5 & references therein]) (6) gender (7) state of health and (8) age of exposure[19].  Therefore, attempting to determine a generalized, lowest observable affect level (LOAEL) or no observable effect level (NOAEL) regarding mercury vapor exposure is a complicated, if not impossible, procedure as explained by the analysis of published refereed research articles (these are presented below).

7)  The end point for measuring toxicity is also critical.  That is, if lethality versus loss of neurological function are the end points then different values for a minimum daily acceptable limits of exposure will be arrived at.  Also, when lethality is compared to loss of neurological function, or suppression of the immune system, as the end points a different minimum acceptable daily exposure would be expected.  In today's medicine the health of the individuals metabolism and neurological is of prime concern and this has lowered the level of mercury exposure that is considered a NOEL.

8)  It is obvious that lethality requires a higher level of exposure to mercury vapor than does neurological, immunological or developmental damage. For example, adverse immunological effects and autoimmunity induced by dental amalgam and alloy in mice has been demonstrated.[25]  This has been further supported by observations that the phagocytosis by macrophages, the first step in the innate and acquired immune systems, is inhibited by low nanomolar levels of mercury.[30]  Neurotoxicity combined with a suppressed immune system in an aged patient would be considered a danger for an amalgam exposed person with a neurological disease, such as a motor neuron diseased. Low nanomolar levels of mercury are reached in the blood and urine of individuals with amalgam fillings.  For example, in a urine or blood with a low 3 micrograms/liter of mercury the concentration would be about 15 nanomolar or $15 \times 10^{-9}$ molar ($3 \times 10^{-6}$ grams divided by 201 grams/mole for Hg).  One to five nanomolar levels of mercury can have dramatic effects on certain enzymes or neurons or immune system cells in culture. Porphyrin profiles (see below), leading to the synthesis of heme, in dentists show mercury induced aberrancies at urine levels in the 3 microgram/liter range[23,24]

9)  Many individuals may appear normal and have apparently non-toxic levels of blood and urine mercury and still suffer from extreme mercury toxicity.  For example, young athletes and others who died from Idiopathic Dilated Cardiomyopathy (IDCM) have been found to have 22,000 times the mercury in their heart tissue when compared to their muscular levels or the mercury in the hearts of individuals who died of other forms of heart disease[18].  This level, 178,400ng/g, would have definitely have been lethal to the kidney and CNS cells and this level has never, to my knowledge, been observed in a blood, urine or hair sample of a human.  In my opinion, the unexplained, abnormal partitioning of huge levels of mercury into specific organs in certain individuals

essentially renders it impossible to identify a hair, blood or urine level of mercury that is safe for all, a NOEL.  It certainly indicates that a person with an existing motor neuron disease would be at elevated risk if constantly exposed to low level mercury vapors.  It is important to note that mercury toxicity is a retention toxicity, where mercury is extracted from the blood and retained in certain tissues, leading to elevated levels that can cause illnesses.

10)  For an accurate determination of a LOEL or NOEL for injury causing mercury exposure it is clear that using data from one strain of a genetically inbred rat or mouse strain could result in a very inaccurate answer, going either way.[4]  However, this has been done.  Humans are not genetically inbred and their diets differ dramatically. Some are on antibiotic medications that would enhance the toxicity of all mercury compounds.  Further more, it has been established in the literature that different strains of mice and rats give different sensitivities to mercury and that there can be dramatic differences in sensitivity to specific toxicants between species such as rats and humans. Therefore, basing safety on animal data is often very misleading.

11)  Recent studies on dentists and dental technicians (selected as they are exposed to mercury vapor) has shown that a specific polymorphism in the CPOX gene leads to enhanced disruption of the porphyrin pathway which leads to the synthesis of heme.  About 85% of all dentists had abnormal porphyrin profiles that indicated their ability to make heme was being impeded, and 15% of this 85% displayed a marked inhibition that correlated with their mercury exposure. [23,24]  Similar data has been reported for autistic children, where 53% have shown abnormal porphyrin profiles indicative of mercury toxicity.[26]  Treating a subset of these autistic children with a mercury chelator effected a porphyrin profile change back towards the normal range indicating that the cause of the abnormality was toxicity, not genetics.[26]  This implies that very low levels of mercury exposure as determined by urinary mercury levels can have an effect on 85% of the population and a dramatic affect on certain susceptible individuals who represent 15% of the population.

12)  It is very important to note the negative contributions secondary to the mercury inhibition of heme synthesis.  Heme is required for oxygen carrying capacity of blood, it is also necessary for a critical step in the electron transport system of the

mitochondria. Both of these steps, if impeded, will decrease the ability of the body to make energy for physiological functions that are necessary for good health. Also, heme is a needed cofactor for the P450 enzymes that have a primary role in detoxing the body of many organic toxins such as pesticides, PCBs, herbicides, etc. Without adequate heme a human will have an impeded ability to detox many different toxins that they may be exposed to.[(ref. Any good biochemistry textbook)]

12) Additionally, recent research has shown that the removal of beta-amyloid protein from the brain in a normal fashion requires a specific heme, and that a lack of this heme prevents beta-amyloid excretion and leads to the formation of amyloid plaques (senile plaques) in the brain.[32] The amyloid plaque build up is a major pathological, diagnostic hallmark of Alzheimer's disease.[27] Therefore, the mercury inhibition of heme synthesis could lead to a secondary systemic abnormality that contributes to severe neurological illnesses, including the neuronal disease classified as Alzheimer's disease. The observation of increased amyloid build up due to inadequate forms of the proper heme molecule is also supported by the observed formation of neurofibillary tangles (NFTs) from neurons in culture by the exposure to sub-nanomolare levels of mercury, much lower (by about 1,000 fold) than is found in many human brains.[31] NFTs are also a major pathological, diagnostic hallmark of Alzheimer's disease. This data is consistent with the observations published earlier where mercury, and again, only mercury could cause a major biological abnormality in a major brain protein when added to normal human brain tissues or in rat brain on exposure to mercury vapor.[12, 13] Therefore, mercury, and only mercury at very low levels, can generate the two major pathological hallmarks of a major neurological disease as well as mimic the protein level aberrancies. The exposure to mercury and its known effects on neurons may explain the uptake of inorganic mercury by olfactory patways and the entry of low doses of mercury vapor into the nervous system.[6, 14]

13) Synergistic toxicity of two or more toxic metals has been known for some time. It has been shown that the relative toxicity of mercury containing compounds appears to be dramatically affected by the presence of other compounds and heavy metals that synergistically enhance the toxicity of mercury. For example, mixing of an LD1 dose of mercury with a 1/20 dilution of an LD1 of lead produces a mixture with an

LD100, not an LD2 or less that would be expected with additive toxicities[1].  Since there is considerable concern about the lead levels in the drinking water in our nation's capital and other major cities it seems the citizens there would be under more toxic stress from dental amalgams than those in locations with little or no lead exposure.

14)  Consider also that mercury from different exposures are at the least additive in their toxicity effects and they may come from different types of iatrogenic exposures.[15, 16, 17]  A report from the National Center for Health Statistics, Center for Disease Control and Health in 2003 stated that approximately 8% to 10% of women of child-bearing age had concentrations of mercury higher than the US EPA's recommended reference dose, below which exposures are considered to be without adverse effects[3]. One would expect similar mercury levels, or higher, in the male population and in the population of individuals with motor neuron disease or other neurological illnesses.. This blood level in women caused more recent concern with data showing that cord blood was 1.7 times the level of maternal blood indicating that more than 8% of children being born are being exposed to toxic levels of mercury from their mother's blood.  All of these individuals would definitely be more at risk during transient mercury exposures than would the general population and are certainly not comparable to animals in a pristine environment being exposed to only one mercury toxicant and fed a chow that is designed to be free of other toxic metals.  Therefore, a 10-fold reduction for urinary mercury levels, as is common in converting a LOEL into a NOEL, most likely does not provide the protection factor predicted as it would not account for exposures to materials that synergistically enhance mercury toxicity nor does it account for the reduction of urinary mercury excretion caused by prolonged mercury vapor exposures.

15)  It is well known that diet plays a major role in the ability of mammals to excrete mercury[2].  Studies have shown that three different diets fed to adult female mice (high protein synthetic diet; standard rat chow diet; milk diet) dramatically changed the rate of fecal excretion of mercury.  Mercury was introduced orally as methyl-mercury (MeHg) and diet caused differential rates of whole body mercury elimination.  The results showed that mice fed a synthetic, high protein diet had the lowest tissues levels of mercury whereas those fed the milk diet retained the highest mercury levels.  This was confirmed by the total percentage of mercury excreted in the feces after 6 days of 43%,

29% and 11% in the high protein, rat chow and milk diets, respectively. Therefore, diet plays a major role in the fecal excretion rates of mercury from an organic mercury compound. As expected, diet also affected the excretion rate of mercury from body tissues. The obvious importance of this data is that the retention of mercury in the body of someone on a milk diet would be much higher. Twenty year old studies report that suckling animals absorb about 50% of $Hg^{2+}$ versus 5% in non-suckling animals[11]. Since the level of toxicity would likely increase with retention time, especially if the exposure rate to mercury were consistent over any significant period of time, then the diet can have a major affect on a calculated NOELs and minimum acceptable daily levels.

16)  Gender effects of mercury toxicity appear to be based on both the protective effects of the female hormone[28] and the enhancement of mercury and ethylmercury toxicity by testosterone, the male hormone[29]. Research in our laboratory showed that testosterone dramatically enhanced the toxicity of mercury and ethylmercury whereas estrodiol showed a potent protective effect. A significant quote from another lab states "The estrogenic effects were associated with a reduction of mercury content of the anterior pituitary gland and medial hypothalmus, suggesting a protective estrogenic effect."[28] Further, a study has found that amniotic fluid testosterone levels appear higher in mother who give birth to children with autism spectrum disorders. The conclusions of one paper stated "These finding implicate foetal testosterone in both social development and attentional focus. They may also have implications for understanding the sex ratio in autism."[33] What is of importance here is the fact that gender plays a major role in susceptibility to mercury toxicity with the male gender appearing to be more susceptible.

17)  Toxicity is also known to vary with the chemical species of mercury that exists in the body's tissues. Diets can change this as it was observed that foods ingested played a major role in the mercury chemical species that existed in the mice given oral doses of MeHg. $Hg^{2+}$ was the species found at the highest level in test animals on a synthetic protein diet (35.3%) and was the lowest in test animals on a milk diet (6.6%). It is reasonable to predict that diet changes the conversion of MeHg to $Hg^{2+}$ and would likely do so for other organic mercury compounds, such as ethyl-mercury (Et-Hg), which is released from thimerosal. The toxicity of organic mercury compounds (e.g. MeHg versus EtHg), which partition into the body organs similar to mercury vapor, has been

suggested to be greater than $Hg^{2+}$ (inorganic mercury). It is also reasonable to expect the toxicity to be partially determined by the rate that the organic mercury compounds are converted to $Hg^{2+}$ after the chemical nature of the mercury source has allowed effective partitioning across the blood brain barrier.

18) Other studies confirm that the renal uptake and toxicity of circulating mercury is significantly enhanced in rats by the co-ingestion of the essential amino acid L-cysteine[8] and disease marker homocysteine[9]. Elevated blood homocysteine level is also a major risk factor for cardiovascular disease. Therefore, humans with risk for cardiovascular disease would be more at risk by low level mercury exposure than others due to the more effective mercury uptake stimulated by elevated homocycteine levels.

19) Medical status is of concern when considering mercury compound toxicity, especially when bacterial infections are being treated. Treatment of adult female mice with widely used antibiotics 7 days prior to MeHg exposure dramatically influenced mercury retention of tissues from mice receiving similar organic mercury exposures[2]. The calculated whole body mercury elimination half-times from day 1 to day 6 varied from 34, 10 and 5 days for mice fed a milk diet, mice chow or high protein diet. A remarkable 6.8 fold increase in retention half-life existed between a milk diet and high protein diet that was caused by antibiotic treatment that also changed the gut microflora. Antibiotic treatment dropped the fecal mercury excretion to near zero in the high protein and milk diets and to less than 8% with the mouse chow diet.[2] Therefore, it can be concluded that the relative toxicity of mercury and organic-mercury compounds would be dramatically increased if the test subjects were on certain antibiotics.

20) The toxicity of mercury vapor is dependent on retention and excretion and these vectors are dramatically affected by diet and antibiotic treatment as well as other factors. This makes it nearly impossible to define a safe level of exposure for any individual, but especially individuals with other types of neurological illnesses like motor neuron diseases or impending dementias. Being exposed minute by minute to mercury vapor for years has never been established as safe, but it has been effectively avoided by the dental organizations with the exception of giving their opinions regarding perceived safety. It is incredible that the responsible US government agencies and the organizations and companies using dental amalgam have not felt the need to produce such research.

10

Especially with the obvious severe toxic nature mercury vapor and the ease at which the level of mercury vapor that would escape from a dental amalgam could be measured. The quality data is just not available in the literature to evaluate and determine the level at which mercury vapor is emitted from the various types of dental amalgam. However, it is my opinion that the reason is not because it would be difficult to do, but to do so would place the manufacturers and users of dental amalgam at risk for major lawsuits and they would lose their businesses.

21)  One has to ask the simple question "Why are producers of amalgam products not required to produce data in the packages that describe the amount of mercury vapor that escapes daily from their amalgam of known weight and surface area under conditions that mimic the mouth with regards to temperature, pH and brushing?"  In my opinion, the reason they don't is well known since to do so would quickly establish their amalgam products as dangerous to human health.

22)  The process of placing or removing dental amalgam's in a pregnant mother has to increase the exposure of the *in utero* infant to elevated mercury vapors as it would dramatically increase the mother's blood mercury levels.  It is well known that mercury vapor can cross the placenta, and is even concentrated in the cord blood versus the mother's blood.  Other studies have shown that mercury increases in the birth hair of normal children in response to increasing dental amalgams in the birth mother[20].  Other similar studies point to aberrant mercury hair levels in children with neurological problems[20,21]. There can be little doubt that the exposure of a pregnant mother to mercury vapor by aggressive dental amalgam treatment could cause harm to her infant *in utero*.  It also points out that the most effective protection of the body cannot keep mercury from spreading throughout the most susceptible of our population, the very young, the very old and the very ill.

Boyd E. Haley, Ph.D.,
Professor, Department of Chemistry,
University of Kentucky,
Lexington, KY

Subscribed and sworn to by Boyd E. Haley, Ph.D. this May 30, 2006.

_____
Robert E. Reeves, Notary Public
State At Large
Commonwealth of Kentucky
My commission expires Oct 6,2006

## References:

1.  Schubert, J., Riley, E.J. and Tyler, S.A., Combined Effects in Toxicology—A Rapid Systemic Testing Procedure: Cadmium, Mercury and Lead. J. of Toxicology and Environmental Health v4;763-776, 1978.
2.  Rowland, I.R., Robinson, R.D. and Doherty, R.A. Effects of Diet on Mercury Metabolism and Excretion in Mice Given Methylmercury: Role of Gut Flora Archives of Environmental Health V39, 401-408, 1984.
3.  Schober, S.E., Sinks, T.H., Jones, R.L., Bolger, P.M., McDowell, M., Osterland, Garrett, E.S. Canady, R.A., Dillon, C.F., Sun, Y., Joseph, C.B. and Mahaffey, K. Blood Mercury Levels in US Children and Women of Childbearing Age, 1999-2000. JAMA April2;289(13) 1667-74, 2003.
4.  Hornig, M., Chian, D. and Lipkin, W.I. Neurotoxic Effects of Postnatal Thimerosal are Mouse Strain Dependent. Molecular Psychiatry p1-13, 2004.
5.  Havarinasab, S., Lambertsson, L., Qvarnstrom, J., and Hultman, P. Dose-response Study of Thimerosal-induced Murine Systemic Autoimmunity. Toxicology and Applied Pharmacology V194, 169-179, 2004.
6.  Henriksson, J. and Tjalve, H. Uptake of Inorganic Mercury in the Olfactory Bulbs via Olfactory Pathways in Rats. Environmental Research 77, 130-140, 1998.
7.  Berlin, M. Mercury in Dental Filling Materials-An Updated Risk Analysis in Environmental Medical Terms. The Dental Material Commission Care and Consideration, September 2003, Sweden URL: http://www.dental material.gov.se/mercury.pdf.
8.  Zalups, R.K., Barfuss, D.W. Nephrotoxicity of Inorganic Mercury Co-administered with L-cysteine. Toxicology 109, 15-29, 1996.
9.  Zalups, R.K., Barfuss, D.W. Participation of Mercuric Conjugates of Cysteine, Homocysteine, and N-acetylcysteine in Mechanisms Involved in the Renal Tubular Uptake of Inorganic Mercury. J. American Society of Nephrology V9 (4) 551-561, 1998.
10. Schardein, J.L. Chemically Induced Birth Defects, 2nd Edition, Chapter 8, Psychotropic Drugs. Marcel Dekker, Inc. NY, NY
11. Clarkson, T.W., Nordberg, G.F., and Sager, P. Reproductive and Developmental Toxicity of Metals. Scand. J. Work Environ. Health 11, 145-154, 1985.
12. Pendergrass, J.C. and Haley, B.E. Inhibition of Brain Tubulin-Guanosine 5'-Triphosphate Interactions by Mercury: Similarity to Observations in Alzheimer's Diseased Brain. In Metal Ions in Biological Systems V34, pp 461-478. Mercury and Its Effects on Environment and Biology, Chapter 16. Edited by H. Sigel and A. Sigel. Marcel Dekker, Inc. 270 Madison Ave., N.Y., N.Y. 10016 (1996).
13. Pendergrass, J. C., Haley, B.E., Vimy, M. J., Winfield, S.A. and Lorscheider, F.L. Mercury Vapor Inhalation Inhibits Binding of GTP to Tubulin in Rat Brain: Similarity to a Molecular Lesion in Alzheimer's Disease Brain. Neurotoxicology 18(2), 315-324 (1997).
14. Pamphlett, R. and Coote, P. Entry of Low Doses of Mercury Vapor into the Nervous System. NeuroToxicology 19(1), 39-48, 1998.
15. Gasset, A.R. Motokazu, I. Ishij, Y and Ramer, R.M. Teratogenicities of Opthalmic Drugs. Arch. Ophthalomol. V93, 52-55, 1975.
16. Lowell, J.A., Burgess, S., Shenoy, S., Curci, J.A., Peters, M., and Howard, T.K. Mercury Poisoning Associated with High-Dose Hepatitis-B Immune Globulin Administration after Liver Transplantation for Chronic Hepatitis-B. Liver Transplantation and Surgery V2(6) 475-478, November 1996.

17. Quadir, M., Zia, H., and Needham, T.E.  Toxicological Implications of Nasal Formulations.  Drug Delivery V6, 227-242, 1999.

18. Frustaci, A., Magnavita, N., Chimenti, C., Cladarulo, M., Sabbioni, E., Pietra, R., Cellini, C., Possati, G.F. and Maseri, A.  J. American College of Cardiology V33(6), 1578-1583, 1999.

19. Kostial, K., Kello, D., Jugo, S., Rabar, I. and Maljkovic, T.  Influence of Age on Metal Metabolism and Toxicity.  Environmental Health Perspectives V25, 81-86, 1978.

20. Holmes, A.S., Blaxill, M.F. and Haley, B.  Reduced Levels of Mercury in First Baby Haircuts of Autistic Children.  International J. of Toxicology, 22:1-9, 2003

21. L-W. Hu, J. A. Bernard and J. Che, "Neutron Activation Analysis of Hair Samples for the Identification of Autism", *Transactions of the American Nuclear Society*; 2003;89:681-2.

22. Kingman et al. J. Dental Research 77(3) 461, 1998.  In a study of 1,127 military personnel by NIH the level of mercury in the urine of amalgam bearers was 4.5 times that of amalgam free controls.  Some with extensive amalgams had levels 8 times or high than the amalgam free controls.

23. Echeverria, D., Woods, JS et al.  Chronic low-level mercury exposure, BDNF (brain derived neurotrophic factor) polymorphism, and associations with cognitive and motor function.  Neurotoxicol. Teratol, 2005 Nov-Dec; 27(6) 781-96.

24. Echeverria, D. Woods, JS, et al.  The association between a genetic polymorphism of coproporphyrinogen oxidase, dental mercury exposure and neurobehavioral response in humans.  Neurotoxicol. Teratol. 2005 Dec 8.

25. Hultman, P. et al.  Adverse immunological effects and autoimmunity induced by dental amalgam and alloy in mice.  The FASEB Journal 8 Nov 1183-1190, 1994.

26. Nataf, Robert.  Porphyrinuria in Childhood Autistic Disorder.  Conference on Autism in Edinburgh, Scotland December 2005. Also, Nataf et al. J. Toxicology and Applied Pharmacology 2006 (in press).

27. DeRouen et al. JAMA 295, 1784-92, 2006

28. Oliveria et al. Estradiol Reduces Cumulative Mercury and Associated Disturbances in the ypothalamus-Pituitary Axis of Ovariectomized Rats. Ecotoxicol. Environ. Safety Jan.10, 2006.Haley, B.  Medical Veritas

30. Rampersad et al., Transfusion 45(3):384-93,2005).

31. Leong, CCW, Syed, N.I., and Lorscheider, F.L.  Retrograde Degeneration of Neurite Membrane Structural Integrity and Formation of Neruofibillary Tangles at Nerve Growth Cones Following In Vitro Exposure to Mercury.  NeuroReports 12 (4):733-737, 2001

32. Atamna, H. and Frey, W.H.  A Role for Heme in Alzheimer's Disease:  Heme Binds Amyloid-ß and has Altered Metabolism.  Proc. Natl. Acad. Sci. 101(30) 11153-11158, 2004.

33. Knickmeyer, R., Baron-Cohen, S. Raggatt, P. and Taylor, K.  Foetal Testosterone, Social Relationships, and Restricted Interests in Children.  J. Child Psychology and Psychiatry 46:2 198-210, 2005.

34. Mackert, J.R. and Berglund, A.  Mercyr Expposures from Dental Amalgam Fillings: Absorbed Dose and the Potential for Adverse Effects.  Crit. Rev. Oral Biol. 8: 410-436, 1997.

35. British Dental Association website http://www.bda-dentistry.org.uk/advice/factfile.cfm 2006

36. Murata, K., Weihe, P., Budtz-Jorgensen, E., Granjean, P. and Grandjean, P.  Delayed Brainsteam Auditory Evoked Potential Latencies in 14 year old Children Exposed to Methylmercury.  J. Pediatrics 44:177-183, 2004.

37. Huang, L.S., Cox, C Wilding, G.E., Meyers, G.J. Davidson, P.W. et al. Using measurement Error Models to Assess Effects of Prenatal and Postnatal Methylmercury Exposure in the Seychelles Child Development Study.  Environ. Res. 93:115-122, 2003

UNITED STATES COURT OF APPEALS, DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| MOMS AGAINST MERCURY, et al. | ) |
|     Petitioners, | ) Docket |
| v. | ) #06-1147 |
| FOOD AND DRUG ADMINISTRATION ["FDA"], *et al*., | ) |
|     Respondents. | ) |

**Sworn statement of Pamela Floener**

I am a resident of Sugar Hill, Georgia.  I am an author about, advocate for, and practitioner of health-conscious choices.  For many years, I have been active in the movement to abolish mercury dental fillings.

Since I have long been baffled on why FDA won't face up to its duty to regulate mercury amalgam, I decided to make my own inquiry.

The attached materials represent an e-mail exchange I had with various FDA staff between December 2003 and January 2004.  I affirm that I am the "Pam" in that exchange, with an e-mail address of Rmacnc@aol.com.

What I found out is quite alarming.  Twice, FDA personnel said encapsulated dental amalgam is regulated as a single device, under the section reserved for the non-mercury alloy.  When I press them on why this was so, **FDA changed its story**, saying capsulated amalgam is regulated as a dual device, non-mercury alloy and the bottled mercury.  When I again challenged such a system, **FDA changed its story again**, saying the device is not yet classified at all.  When I said why, FDA staff said it was doing a "literature review," and until then the decision on whether and how to classify is "on hold."

The emboldening of certain statements was added by counsel, Charles G. Brown, to emphasize the points in the above paragraph.

I swear or affirm under the penalties of perjury that the above statements are true and correct, and that the e-mails attached represent the full and exact sequence of exchanges between me and various FDA staff.

_____    _____

Pamela Floener                  Date

Sugar Hill, Georgia

UNITED STATES COURT OF APPEALS, DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| MOMS AGAINST MERCURY, et al. | ) |
|   Petitioners, | ) Docket |
| v. | )  #06-1147 |
| FOOD AND DRUG ADMINISTRATION ["FDA"], *et al*., | ) |
|   Respondents. | ) |

**Sworn statement of Paulette Rayford**

I am a consultant for Consumers for Dental Choice, 1725 K St., N.W., Washington, DC 20006, web site www.toxicteeth.org. The organization's chief mission is to ban mercury fillings.

We did a survey of the state Medicaid program, inquiring whether they cover dental care and if for what populations; whether they cover alternatives to mercury amalgam; if so, why they cover alternatives; and also if so, whether they had outreach program to inform patients they had choices of alternatives to mercury amalgam.

Of the 50+ jurisdictions surveyed, we have information from 35, including 33 states, the District of Columbia, and Guam.

We found, universally, that every jurisdiction covers alternatives to mercury amalgam, which to this organization is quite good news. For many states, this policy of consumer choice represented a recent change in policy, implemented for reasons such as a statute, dentist requests, or the public interest.

But we also found that among the 35 jurisdictions, none – save Guam alone – have any programs to inform Medicaid patients of their choices. We are going to begin educational programs among advocacy groups to make these choices known, and are going to ask the Medicaid programs themselves to begin publicizing to patients that they have choices.

I swear or affirm under the penalties of perjury that the above statements are true and correct, and that the e-mails attached represent the full and exact sequence of exchanges between me and various FDA staff.

_____    _____
Paulette Rayford         Date
Washington, D.C.

15

UNITED STATES COURT OF APPEALS, DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| MOMS AGAINST MERCURY, et al. | ) |
|      Petitioners, | ) Docket |
| v. | )  #06-1147 |
| FOOD AND DRUG ADMINISTRATION ["FDA"], *et al.*, | ) |
|      Respondents. | ) |

**Sworn statement of Timothy Gallagher, DDS**

I practice general dentistry in Sunnyvale, California.  I am president of the Holistic Dental Association, a national dental society founded in 1978 that focuses on science as the guide to healthy dentistry, and on dentistry that will not adversely affect other parts fo the body.  The Holistic Dental Association's address is P.O. Box 151444, San Diego, CA 92175, and our web site is www.holisticdental.org.

Neither I nor any of our members, to my knowledge, ever implant dental fillings containing mercury.  To do so would violate the rule of precaution, a standard prevalent through professional health care that emphasizes, among other things, to keep toxins out of a patient's body.

Today, mercury amalgam fillings are no longer necessary for any cavity.  I fill cavities of all types from patients of all ages, including those with disabilities, and I am certain that any cavity may be addressed without resort to the mercury amalgam.  To my knowledge, every one of our members who are general dentists agree with me.

I swear or affirm under the penalties of perjury that the above statements are true and correct.


_____     _____
Timothy Gallagher, D.D.S.                    Date
Sunnyvale, California

UNITED STATES COURT OF APPEALS, DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| MOMS AGAINST MERCURY, et al. | ) |
|      Petitioners, | ) Docket |
| v. | )  #06-1147 |
| FOOD AND DRUG ADMINISTRATION ["FDA"], *et al.*, | ) |
|      Respondents. | ) |

**Sworn statement of Michael Margolis, DDS**


I practice general dentistry in Mesa, Arizona, and am president of the International Academy of Biological Dentistry and Medicine.  Founded in 1985 as a dental society, the American Academy of Biological Dentistry, we recently changed our name and reached out to include other health care professionals as well.   Our address is 17222 Red Oak Dr., Ste. 101, Houston, TX 77090, and our web site is www.iabdm.org.

The first two principles of our mission statement are

1) Mercury-free dentistry and the safe removal of mercury amalgam, with effective detoxification, and

2) The biocompatibility of dental materials.

Our members believe in mercury-free dentistry, because mercury is a virulently toxic material.  Consistent with the principal, we endorse only biocompatible dental materials.  Some materials may be biocompatible for one patient and not for another – but mercury amalgam is not biocompatible for anyone.  As the World Health Organization has noted, there is no safe level of mercury for a human being.

As a general dentist, I have learned that any cavity can be filled without resorting to mercury amalgam.  Our members who practice general dentistry have found out the same.  It is correct to say that today, modern dentists no longer need to place mercury amalgam.

I swear or affirm under the penalties of perjury that the above statements are true and correct.


_____      _____
Michael Margolis, D.D.S.            Date
1303 South Longmore, Suite 1
Mesa, Arizona 85202


17

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

MOMS AGAINST MERCURY,  CONNECTICUT COALITION  )
for ENVIRONMENTAL JUSTICE,  OREGONIANS for LIFE,   )
CONSUMERS for DENTAL CHOICE,  Michael BENDER,      )
Karen JOHNSON,  Karen PALMER,  Corrie CROWE, Anita   )
Vazquez TIBAU,  R. Andrew LANDERMAN, Linda BROCATO, )
Plaintiffs,                                       )
                        v.                        )
Andrew von ESCHENBACH, Commissioner, Food and Drug    ) Case # 1:07-
Administration; Randall LUTTER, Deputy Commissioner;    )   cv002332-ESH
Norris ALDERSON, Associate Commissioner; Dan SCHULTZ,   )
Director, Center for Devices and Radiological Health ("The Center"))
Chiu LIN, Director, Anesthesiology, General Hospital, Infection    )
Control and Dental Devices, The Center; Mary Susan RUNNER,   )
Director, Devices Branch, The Center;  Mike LEAVITT, Secretary,)
Department of Health and Human Services;             )
                        Defendants.

# Affidavit by Counsel

I, Charles G. Brown, do affirm:

(1)  I am counsel for plaintiffs, and also am National Counsel for Consumers for Dental Choice, a private non-profit with headquarters in Washington D.C., a plaintiff in this action, and the lead consumer group challenging FDA's decades of inaction on mercury-based dental fillings.

(2) For the past ten years, I have observed, met with, challenged, petitioned, and sued the U.S. Food and Drug Administration seeking compliance with the legal requirement to classify encapsulated mercury amalgam.  I have participated in hearings before the agency and before Congress, have appeared before the United States Court of Appeals, attended a major FDA hearing 2006, and had summit meetings with FDA officials in 2005 and 2007.  I have the experience to know that the facts alleged to be true, or to believe the facts alleged to be true:

(3)  I have prepared the Motion for Preliminary Injunction and supporting documents.

(4)  The facts alleged in these documents are facts personally known to me or obtained by me in my position as National Counsel for Consumers for Dental Choice; and for which I can provide evidence at a hearing on the matter.

April 22. 2007
Charles G. Brown