IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MOMS AGAINST MERCURY, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No. 1:07-cv-02332 (ESH) |
| ) | |
| ANDREW VON ESCHENBACH, et al., ) | |
| ) | |
| Defendants. ) | |

**MOTION TO DISMISS**

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), the defendants move to dismiss the complaint in this action.  The grounds for this motion are explained further in the memorandum in support of this motion filed herewith.

Respectfully submitted,

Of Counsel:

JAMES C. STANSEL                          JEFFREY S. BUCHOLTZ
Acting General Counsel                    Acting Assistant Attorney General

GERALD F. MASOUDI                         C. FREDERICK BECKNER III
Chief Counsel, Food and Drug Division     Deputy Assistant Attorney General

ERIC M. BLUMBERG                          EUGENE M. THIROLF
Deputy Chief Counsel, Litigation          Director
                                          Office of Consumer Litigation
WENDY S. VICENTE
Associate Chief Counsel
                                          _____/s/_____
U.S. Dept. of Health & Human Services     DRAKE CUTINI
Office of the General Counsel             Attorney
5600 Fishers Lane                         Office of Consumer Litigation
Rockville, MD  20857                      U.S. Department of Justice
(301) 827-7138                            P.O. Box 386
                                          Washington, D.C.  20044
Dated: May 2, 2008                        202-307-0044
                                          drake.cutini@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MOMS AGAINST MERCURY, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| ANDREW VON ESCHENBACH, et al., | ) |
| | ) |
| Defendants. | ) |

No. 1:07-cv-02332 (ESH)

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Respectfully submitted,

Of Counsel:

JAMES C. STANSEL
Acting General Counsel

GERALD F. MASOUDI
Chief Counsel, Food and Drug Division

ERIC M. BLUMBERG
Deputy Chief Counsel, Litigation

WENDY S. VICENTE
Associate Chief Counsel

U.S. Dept. of Health & Human Services
Office of the General Counsel
5600 Fishers Lane
Rockville, MD 20857
(301) 827-7138

Dated: May 2, 2008

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

C. FREDERICK BECKNER III
Deputy Assistant Attorney General

EUGENE M. THIROLF
Director
Office of Consumer Litigation

DRAKE CUTINI
Attorney
Office of Consumer Litigation
U.S. Department of Justice
P.O. Box 386
Washington, D.C. 20044
202-307-0044
drake.cutini@usdoj.gov

**INTRODUCTION**

Plaintiffs allege that the federal defendants have failed to comply with various statutory provisions of the Federal Food, Drug, and Cosmetic Act ("FDCA" or the "Act") that govern the regulation of encapsulated amalgam alloy and dental mercury ("EAADM"). In their complaint, plaintiffs request that this Court take the unprecedented action of compelling the Food and Drug Administration ("FDA") to classify EAADM and completely ban these products until it does so. Although FDA has not formally classified EAADM, FDA has classified the individual components of that device, amalgam alloy and dental mercury, and regulates the combination product, EAADM, according to the more restricted classification of the higher-classified component, amalgam alloy. Thus, EAADM is not an "unregulated" device, as plaintiffs repeatedly allege.

In considering the appropriate classification for EAADM, FDA is evaluating emerging scientific evidence and thousands of comments that have been submitted regarding dental mercury products, including nearly 2,500 comments submitted to FDA in 2006. Recently, on April 22, 2008, FDA announced that it was reopening the comment period for a 2002 proposed rule. 73 Fed. Reg. 22,877 (Apr. 28, 2008). As set forth in that Federal Register notice, before FDA formally classifies EAADM, FDA seeks input on specific questions presented in that notice. FDA is taking care to complete the classification process in a thorough manner, particularly given the numerous concerns expressed by individuals and consumer groups about dental mercury, including plaintiffs in this suit. As explained further below, in a number of reviews of the scientific evidence, neither FDA nor expert panels have found valid scientific evidence that EAADM has caused adverse health effects such that FDA should regulate EAADM

1

differently, much less that this device should be banned.

Given the lack of practical consequences of classification, there is no basis for judicial intervention. The most basic reason is that plaintiffs lack standing. Although plaintiffs' complaint makes clear that they have an extreme dislike for mercury and for the manner in which FDA has regulated EAADM, their general assertions do not allege concrete, imminent injuries that are likely to be redressed upon FDA's classification of EAADM. Thus, this Court has no jurisdiction over their claims, and should dismiss for lack of standing. Moreover, most of plaintiffs' alleged violations of the FDCA fail to present any justiciable questions for this Court's review, and some of the claims fail to state a claim upon which relief can be granted. For these reasons, the complaint should be dismissed under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

On April 22, plaintiffs filed a motion for a preliminary injunction, which seeks the temporary removal of EAADM "from commerce" until EAADM is classified or this litigation is completed. There is no basis for this relief, however, even if plaintiffs have stated a cause of action for unreasonable delay under the Administrative Procedure Act ("APA"). If this Court were to conclude that plaintiffs have met their burden to establish standing, and to further conclude that FDA has unreasonably delayed in formally classifying EAADM, the appropriate remedy would be to order FDA to formally classify the device – *not* to ban the device. EAADM is currently regulated as a class II device and is legally on the market (these classifications are discussed further infra). When FDA classifies EAADM, whether under class I, II, or III, the device would not be removed from the market. Plaintiffs have asserted no provision of law that would require the removal of EAADM from commerce either now or when FDA classifies it.

For this reason alone, plaintiffs' motion for a preliminary injunction should be denied.

Even if "removal from commerce" were an appropriate remedy, however, the motion for preliminary injunction should be denied because plaintiffs have not satisfied the requirements to justify preliminary relief. Primarily for the same reasons that plaintiffs have not alleged a sufficient injury for standing purposes, plaintiffs will not suffer irreparable injury if the preliminary injunction is denied. In addition, in the context of all that has occurred with regard to EAADM, FDA's actions regarding EAADM have been reasonable, especially considering that the <u>scientific evidence</u> before FDA has not demonstrated that EAADM is regulated in an improper manner or should be removed from the market. More significantly, however, because EAADM is currently regulated as a class II device, any delay in classification has, in effect, no practical consequences. Given the current controls in place for regulating EAADM and the complex scientific and policy issues regarding classification, FDA's activities regarding classification of EAADM have not been unreasonable.

## BACKGROUND

### I.    Classification of Medical Devices Under the Federal Food, Drug, and Cosmetic Act

In 1976, Congress amended the FDCA, 21 U.S.C. §§ 301-399, extending the regulatory authority of the FDA to include premarket regulation of medical devices, thereby enabling the agency to "provide for the safety and effectiveness of medical device[s] intended for human use." <u>See</u> Medical Device Amendments of 1976, Pub. L. No. 94-295, 90 Stat. 539 (1976) (codified at 21 U.S.C. §§ 360c-360k); <u>see also</u> <u>Medtronic, Inc. v. Lohr</u>, 518 U.S. 470, 475-76 (1996); <u>Contact Lens Mfrs. Ass'n v. FDA</u>, 766 F.2d 592, 593 (D.C. Cir. 1985); 21 U.S.C. § 371(a) (granting FDA authority to issue regulations to implement the Act).

3

Under the FDCA, as amended, all medical devices are categorized in three classes, based upon the degree of regulation that the agency determines is necessary to reasonably assure their safety and effectiveness. See 21 U.S.C. § 360c(a). In making that determination, the agency, inter alia, must consider "the conditions of use prescribed, recommended, or suggested in the labeling of the device," and "weigh[] any probable benefit to health from the use of the device against any probable risk of injury or illness from such use." 21 U.S.C. § 360c(a)(2).

Class I devices are subject to the least amount of regulation and are defined as those devices for which the "general controls" provided by the FDCA are sufficient to provide a reasonable assurance of safety and effectiveness. 21 U.S.C. § 360c(a)(1)(A)(i). The "general controls" include, inter alia, prohibitions on adulteration (21 U.S.C. § 351) and misbranding (which include false or misleading labeling) (21 U.S.C. § 352), and requirements that manufacturers of devices register with the FDA (21 U.S.C. § 360) and maintain such records as the agency may require to assure a device's safety and effectiveness (21 U.S.C. § 360i). 21 U.S.C. § 360c(a)(1)(A).[1] Manufacturers of class I devices are also subject to FDA's Good Manufacturing Practice ("GMP") requirements, which are set forth in the Quality System Regulation, 21 C.F.R. part 820. This regulation requires manufacturers to, inter alia, establish management responsibility for quality (21 C.F.R. § 820.20); establish and maintain procedures

---

[1] The general controls of the FDCA apply to all devices, regardless of the class in which they are placed, except for class I devices for which the FDA has determined that certain requirements do not need to apply. See 21 U.S.C. § 360c(d)(2)(A). Moreover, the general controls apply to all devices whether or not they have already been classified. See H.R. Rep. No. 94-853, at 17 (1976) (noting that the "general controls" include the pre-existing adulteration and misbranding provisions of the FDCA and that "certain of the general controls," such as registration of device manufacturers, became applicable to all devices "immediately upon enactment of the . . . [Medical Device Amendments of 1976]").

for quality audits (21 C.F.R. § 820.22); have personnel with appropriate experience and training (21 C.F.R. § 820.25); establish document, purchasing, production, and process controls (21 C.F.R. §§ 820.40, 820.50, 820.70); establish and maintain procedures for corrective and preventative actions (21 C.F.R. § 820.100); and establish and maintain procedures to ensure that adverse events do not occur during product handling and storage (21 C.F.R. §§ 820.140, 820.150).[2] All device manufacturers are also required to report adverse events (21 C.F.R. part 803).

Class II covers those devices for which the general controls alone would be insufficient to reasonably assure the device's safety and effectiveness, but which may be marketed if "special controls," in addition to the general controls, would provide adequate assurance of the device's safety and effectiveness. See 21 U.S.C. § 360c(a)(1)(B). Special controls include performance standards, postmarket surveillance, patient registries, guidelines, or other actions the agency determines are necessary to reasonably assure a device's safety and effectiveness. Id. In addition, class II devices are subject to design controls in FDA's Quality System Regulation. 21 C.F.R. § 820.30.

Class III encompasses those devices that potentially pose the greatest risk. A device is placed in class III if the general controls alone, or general controls along with special controls, are insufficient to provide reasonable assurance of the device's safety and effectiveness. See 21 U.S.C. § 360c(a)(1)(C).

The FDCA instructed FDA to classify all medical devices that were already in interstate

---

[2] The only exception to the application of the Quality System Regulation to class I devices is specified in 21 C.F.R. § 820.30 (not all class I devices are subject to the "design controls" portion).

5

commerce prior to the 1976 amendments (i.e., "pre-amendment devices").  See 21 U.S.C.

§ 360c(a), (b)(1).  However, unlike many other statutory requirements in the Act, Congress chose

to not impose any statutory deadline upon the FDA for classification of pre-amendment devices.

See FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 136 (2000) (noting that "the

FDCA prescribes no deadline for device classification").  Post-amendment devices (i.e., those

that entered commerce only after the 1976 amendments) are automatically classified by statute in

class III, without any rulemaking, unless and until the FDA issues an order finding that the device

is "substantially equivalent" to a device previously classified in class I or II, the agency

reclassifies the device into class I or II, or the agency classifies the device into class I or II under

the de novo classification provisions.  See 21 U.S.C. § 360c(f)(1)-(3); see also H.R. Conf. Rep.

No. 94-1090 at 56 (1976), as reprinted in 1976 U.S.C.C.A.N. 1103, 1108-09.

     Because of the degree of risk to safety, class III devices, unlike class I and II devices,

generally must be approved by the FDA before they are permitted to enter interstate commerce

(pursuant to premarket approval applications, or "PMAs").  See 21 U.S.C. §§ 360c(a)(1)(C),

360e; see also Dental Devices: Classification of Encapsulated Amalgam Alloy and Dental

Mercury and Reclassification of Dental Mercury; Issuance of Special Controls for Amalgam

Alloy, 67 Fed. Reg. 7,620, 7,621 (Feb. 20, 2002) (proposed rule).  An exception to this general

rule requiring premarket approval is for pre-amendment devices that have been classified as class

III devices.  Such devices can remain on the market and a PMA is not required until FDA issues

a final regulation requiring premarket approval.  See 21 U.S.C. §§ 351(f)(2)(B) & 360e(b)(1)(A);

see also Medtronic, Inc., 518 U.S. at 477-78; 67 Fed. Reg. at 7,621.  The FDCA provides a grace

period for marketing pre-amendment devices until the date that a premarket approval application

6

is required to be submitted, which is the later of 30 months after FDA classifies the device into class III or 90 days after the date of the regulation requiring submission of premarket approval applications. 21 U.S.C. § 351(f)(2)(B). If an applicant submits a premarket approval application by the date applications are due, its product may remain on the market during FDA's 180-day review of the application. The 180-day review period for pre-amendment devices may be extended if the agency finds that the continued availability of the device is necessary for the public health. See 21 U.S.C. § 360e(d)(1)(B)(i).

The FDA initiates the classification process for a pre-amendment device by referring the device to an expert panel, which evaluates the safety and effectiveness of the device and makes a recommendation to the FDA regarding the appropriate classification. See 21 U.S.C. § 360c(b), (c). The FDA then publishes in the Federal Register the panel's recommendation and a proposed classification regulation for the device, and provides opportunity for public comment. See 21 U.S.C. § 360c(d)(1). After reviewing any comments regarding the proposed classification, FDA issues a final regulation classifying the device. See id.

## II.    FDA's Regulation of Encapsulated Amalgam Alloy and Dental Mercury

EAADM is a device that is used to create a filling material for dental cavities. See generally 67 Fed. Reg. 7,620. The device is a "single-use capsule" that contains separately sealed portions of elemental mercury and amalgam alloy, which is composed of other metals such as silver, tin, copper, zinc, palladium, and/or indium. Id. at 7,621. The dental mercury and amalgam alloy in the capsule are mixed in a dentist's office to form "dental amalgam," which is used to fill cavities. Id. EAADM is a prescription device, and its sale and use are limited to licensed practitioners, i.e., dentists. See 21 C.F.R. § 801.109. Dental patients, rather than

7

reading the product labeling themselves, rely on their dentists to provide appropriate information about the potential risks of dental mercury amalgam products.

Pursuant to its statutory obligation to classify pre-amendment dental devices, FDA classified 110 dental devices in 1987, including the separate components of EAADM, dental mercury and amalgam alloy, as well as other devices intended for mixing those components.  See 52 Fed. Reg. at 30,084-85 (classifying amalgam alloy as class II (21 C.F.R. § 872.3050), dental mercury as class I (21 C.F.R. § 872.3700); mercury and alloy dispenser as class I (21 C.F.R. § 872.3080), and dental amalgam capsule as class I (21 C.F.R. § 872.3110)).  Those classifications remain in place today.  Through inadvertent error, FDA did not propose a classification for EAADM in 1980 (see 45 Fed. Reg. 85,962) and did not formally classify it in 1987.  67 Fed. Reg. at 7621.

Although FDA has not yet issued a regulation formally classifying pre-amendment EAADM pursuant to 21 U.S.C. § 360c, EAADM is regulated as a class II device because that is the classification of its more restrictively classified component, amalgam alloy (dental mercury is in class I).  See 67 Fed. Reg. at 7,621 ("Encapsulated amalgam alloy and dental mercury are now regulated as class II devices under the amalgam alloy classification (872.3050)"); Dental Devices; General Provisions and Classifications of 110 Devices, 52 Fed. Reg. 30,082, 30,099, 30,102 (Aug. 12, 1987); 21 C.F.R. § 872.3050 (amalgam alloy); 21 C.F.R. § 872.3700 (dental mercury).[3]  For this reason, EAADM devices are not "unregulated," as repeatedly alleged by

_____

[3] The expert panel had recommended, and FDA had proposed, to place dental mercury in class II.  But, in response to comments on the proposed rule, FDA placed dental mercury in class I because it concluded that there was "no valid scientific evidence of systemic poisoning to patients exposed to amalgam containing mercury."  52 Fed. Reg. at 30,089.  FDA agreed that there was a risk to the few patients who are allergic to mercury, but determined that the labeling

plaintiffs.  Compl. at 2, 4, 18.

In addition, even though EAADM has not been formally classified, it is nevertheless subject to the general controls of the FDCA.  See footnote 1, supra; 21 U.S.C. § 360c(a)(1)(A)(i) (discussing general controls).  Under these general controls, EAADM devices are subject to prohibitions on adulteration (21 U.S.C. § 351) and misbranding (which include false or misleading labeling) (21 U.S.C. § 352).  Manufacturers of EAADM must register with the FDA (21 U.S.C. § 360) and maintain such records as the agency may require to assure a device's safety and effectiveness (21 U.S.C. § 360i).  See 21 U.S.C. § 360c(a)(1)(A).  These devices are also subject to good manufacturing practice requirements.  Id.; § 360j(f).

Some manufacturers have introduced EAADM devices into the market since 1976, and these EAADM devices are regulated as class II devices because FDA has found them to be "substantially equivalent" to the combination of amalgam alloy (class II) and dental mercury (class I).  These substantial equivalence determinations were made pursuant to 21 U.S.C. § 360(k) (§ 510(k) of the FDCA), and are often referred to as "§ 510(k)" determinations.  When FDA formally classifies pre-amendment EAADM, all EAADM devices – those on the market before 1976, and those that came on the market after 1976 cleared by these substantial equivalence orders – will be subject to whatever requirements may be imposed by that classification.[4]

_____

requirements under the general controls (21 U.S.C. § 352) would adequately ensure the safety of those patients.  Id.

[4] Contrary to plaintiffs' suggestion (Compl. at 10), the D.C. Circuit did not "condemn" the agency's "substantial equivalence" test (as explained infra, some of the plaintiffs in the instant case previously attempted to assert the same claims they raise here in the D.C. Circuit, and that Court held that it had no jurisdiction over the claims).  See Moms Against Mercury v.

In 1993, several citizen petitions were filed by individuals requesting that the FDA take certain actions with respect to dental amalgam and dental mercury, including banning dental mercury, reclassifying dental mercury in class III, and conducting environmental assessments on the effects of dental mercury.  See 67 Fed. Reg. at 7,622.  In response, the FDA convened a panel of experts to consider the petitions and the scientific studies submitted by petitioners.  Id.  The panel concluded that none of the studies supported claims that dental amalgam containing mercury is harmful.  Id.  Accordingly, the FDA declined to ban the use of dental mercury or reclassify it.  Id. at 7,622-23.

At meetings in 1993 and 1994, the FDA asked the Dental Products Panel of the Medical Devices Advisory Committee to recommend a classification for EAADM.  See 67 Fed. Reg. at 7,624.  After considering expert testimony and reviewing published studies and a wide range of other literature, the panel concluded that there were "no major risks associated with encapsulated amalgam alloy/mercury [EAADM] when used as directed," and unanimously recommended a class II classification.  See id. at 7,624-25.  The panel stated, however, "that continued research in the area is prudent."  Id. at 7,624.

Agreeing with the panel's recommendation, in 2002 FDA published a proposed rule to formally classify EAADM in class II.  See 67 Fed. Reg. 7,620.  The rule also proposed to

---

FDA, 483 F.3d 824 (D.C. Cir. 2007).  The court stated that, as a pre-amendment device itself, EAADM was not the subject of an agency order deeming it substantially equivalent to a pre-amendment device, and thus there was no order that the court could review under 21 U.S.C. § 360g(a)(8).  Id. at 826-27.  As explained above, the FDA has determined that some EAADM devices first marketed after 1976 are substantially equivalent to the combination of amalgam alloy and dental mercury, but none of those specific orders was challenged by petitioners or were under review by the Court of Appeals in Moms Against Mercury; thus the Court did not "condemn" FDA's substantial equivalence orders.

reclassify dental mercury from class I to class II, and to amend the classification of amalgam

alloy to require certain special controls, such as labeling guidance.  Id.  The proposed rule

describes the information that FDA reviewed, including a comprehensive risk assessment of

dental amalgam issued in 1993 by the Public Health Service and reaffirmed in 1995; an updated

literature review; the recommendation of the Dental Products Panel of the Medical Devices

Advisory Committee; reports by foreign governments and international health organizations; and

numerous studies submitted to the FDA in citizen petitions.  Id. at 7,625-26.  FDA noted that it

"must make an assessment to weigh the probable benefits with the probable risks associated with

the use of the device."  Id. at 7,627.  The statute "states that FDA's classification decisions are to

be predicated on a 'reasonable assurance of safety and effectiveness,' not an absolute assurance

of safety and effectiveness."  Id.  In weighing the benefits versus the risks of dental amalgam

pursuant to 21 U.S.C. § 360c(a)(2)(C), the FDA concluded that:

> Given the known risks of untreated caries [cavities], the longstanding history of
> successful use of dental amalgam restorations, the benefits of products used in
> amalgam fillings over other alternative materials, and the overall lack of valid
> scientific evidence that persons whose carious teeth are treated with dental
> amalgam experience any adverse health effects, other than a very small number of
> people who are hypersensitive to mercury, FDA believes that the probable
> benefits of restorative dental products containing mercury outweigh the probable
> risks of using these products.

Id. at 7,627.  Pursuant to 21 C.F.R. § 25.34(b) (exempting classification of devices from

environmental assessments or impact statements), the FDA did not conduct an environmental

assessment or issue an environmental impact statement in conjunction with its proposed rule.  Id.

at 7,628.  FDA received over 750 comments submitted to the docket following the 2002

proposed rule, and FDA reopened the comment period in response to the high level of interest.

67 Fed. Reg. 46,941 (July 17, 2002).[5]

Since the issuance of its proposed rule to classify EAADM, the FDA has continued to monitor emerging scientific studies on dental amalgam. <u>See</u> Dental Amalgam; Request for Information, 68 Fed. Reg. 25,048 (May 9, 2003) (sponsoring review of scientific literature about the health effects of dental amalgam and offering the public an opportunity to participate). The FDA has also received requests for further consideration of the potential risks of mercury in dental amalgam and for reconsideration of its 2002 proposed rule. For example, in November 2005, the FDA received citizen petitions from plaintiff Consumers for Dental Choice, requesting that the FDA set aside its proposed rule and "start over," and urging FDA to include an independent study and to consult with experts outside of the field of dentistry. <u>See</u> Citizen Petitions, Docket Nos. 2005P-0462, 2005P-0465, <u>available at</u> <u>http://www.fda.gov/ohrms/dockets/dockets/05p0465/05p-0465-cp00001-01-vol1.pdf</u>. FDA responded to some of the issues in the citizen petitions on October 26, 2006, stating that FDA had convened two advisory committees to discuss and review scientific literature on dental amalgam and its potential mercury toxicity. <u>See</u> Joint Meeting of the Dental Products Panel of

---

[5] Plaintiffs' argument that FDA advocates a warning that EAADM contain zinc in order to "cover up" that it contains mercury, Pl. Mem. at 4, 13 & n.27, Compl. at 2, 8, 9, 16-17, is misleading for several reasons. The guidance cited by plaintiffs (Pl. Mem. at 13 n.26, <u>available at</u>  <u>http://www.fda.gov/cdrh/ode/guidance/1192.pdf,</u> at 9) was a Draft Guidance issued in connection with the 2002 proposed rule for comment only. In addition to being just a proposal, this Draft Guidance also proposed ingredient labeling based upon the descending order of the weight percentage of the ingredient, which should be "conspicuously placed in the labeling so that it can be read and understood under customary conditions of use." <u>Id.</u> at 6. Thus, contrary to plaintiffs' claims, FDA proposed to make the presence of mercury in dental amalgam more apparent in the labeling, not less so. Moreover, the purpose of the proposed zinc warning was only to the effect that zinc may cause excessive expansion if moisture is introduced during use. <u>Id.</u> at 9.

the Medical Devices Advisory Committee of the Center for Devices and Radiological Health and

the Peripheral and Central Nervous System Drugs Advisory Committee of the Center for Drug

Evaluation and Research; Notice of Meeting, 71 Fed. Reg. 16,582 (Apr. 3, 2006).[6]

At that meeting, held on September 6 and 7, 2006, the panel generally agreed that there is

no scientific evidence from which to conclude that dental amalgams cause health problems.  See

Summary Minutes for Sept. 7 Meeting at 21, 25, available at

http://www.fda.gov/ohrms/dockets/ac/cdrh06.html#dental productspanel (plaintiff Bender

testified at this meeting, id. at 4).  The panel considered a draft White Paper developed by FDA

to determine whether the peer-reviewed literature published since 1997 (the date of a U.S. Public

Health Service update report) "substantially changes the comprehension of the health risk of

mercury in dental amalgam."  See Draft FDA Update/Review of Potential Adverse Health Risks

Associated with Exposure to Mercury in Dental Amalgam, National Center for Toxicological

Research, U.S. Food and Drug Administration (Aug. 2006), at 1, available at

http://www.fda.gov/ohrms/dockets/ac/06/briefing/2006-4218b1-01-white-paper-draft.pdf.  The

panel acknowledged concerns that mercury in dental amalgam may have adverse side effects on

certain subsets of individuals, such as pregnant women or those with hypersensitivity to mercury,

but concluded that, at that time, there was not sufficient scientific evidence to support a finding

that the potential risks of dental amalgam outweigh the potential benefits, even for those

--------

[6] FDA granted petitioner's request that FDA convene a panel with expertise in areas other than dentistry, but denied petitioner's request that FDA transfer regulatory responsibility and classification responsibility away from the Dental Devices Branch.  The FDA deferred its response to the request to withdraw the 2002 proposed rule, stating that such action would be premature before FDA had completed its review of the information and recommendations from the joint committee.

subgroups.  Id. at 21, 24; see also 21 U.S.C. § 360c(a)(2)(C).  The panel did, however, vote that

FDA's conclusions in the draft White Paper were not reasonable, explaining that FDA had

provided insufficient explanation about the following:  (1) how scientific references were chosen;

(2) failure to identify significant gaps in scientific knowledge, particular for exposure limits; and

(3) lack of attention to sensitive subpopulations.  The panel concluded that FDA should continue

to consider the safety of dental amalgam.   See Summary Minutes for Sept. 7 Meeting, at 26.[7]

        To that effect, the FDA opened a public docket (2006N-0352) to accept additional

comments about dental amalgam.  See FDA Dockets, available at

http://www.fda.gov/ohrms/dockets/dockets/dockets2006.htm.  That docket closed on November

9, 2006.  FDA is reviewing the nearly 2,500 comments submitted to the docket, as well as

studying peer-reviewed literature and the findings and recommendations from the panel meeting.

See CDRH Consumer Information, Questions and Answers on Dental Amalgam, available at

http://www.fda.gov/cdrh/consumer/amalgams.html (Oct. 31, 2006).  On April 22, 2008, FDA

announced that it was reopening the comment period on its 2002 proposed rule to give the public

an opportunity to further comment on the 2002 proposal.  73 Fed. Reg. 22,877 (Apr. 28, 2008).

This announcement noted that the 2004 review discussed above had found insufficient evidence

to support a relationship between exposure to dental amalgam and various diseases, and, while

---

        [7]  Plaintiffs argue that FDA has admitted in its brief to the Court of Appeals that it does
not know if amalgam is safe.  Pl. Mem. at 4.  Plaintiffs' claim relies on statements taken out of
context and mischaracterizes the agency's position, which was pointed out in the government's
reply brief submitted to the Court of Appeals.  As discussed above in the text, none of the
scientific evidence that FDA has reviewed has changed its view that the probable benefits of
EAADM outweighed any probable risks.  See, e.g., 67 Fed. Reg. at 7,627.  Similarly, the
affidavits submitted by plaintiffs with their motion for preliminary injunction contain
information similar to what has been submitted to FDA, and FDA's conclusions remain as
described above.

the majority of the panel that met in September of 2006 did not fully agree with an FDA draft

White Paper, the committee "generally agreed that there is no evidence that dental amalgams

cause health problems." Id. at 22,878.  Once the FDA completes this ongoing, extensive review,

the agency will take the appropriate next steps with respect to EAADM.

## III.    Previous Litigation

In 2006, four organizations and five individuals (including several of the plaintiffs in this

case) petitioned the United States Court of Appeals for the District of Columbia Circuit, seeking

direct review of the agency's actions regarding EAADM under 21 U.S.C. § 360g.  As mentioned

supra, that court dismissed their petition for lack of subject matter jurisdiction in April 2007.

The court held that none of the subsections in 21 U.S.C. § 360g, providing direct review in the

Court of Appeals, was applicable because FDA had not taken any of the regulatory actions

referred to in those provisions, such as (1) subjecting EAADM to premarket approval (21 U.S.C.

§ 360g(a)(4)); (2) making a reviewable substantial equivalence determination (21 U.S.C.

§ 360g(a)(8)); or (3) reclassifying EAADM (21 U.S.C. § 360g(a)(9)).  483 F.3d at 826-27.

Separately, the government challenged the petitioners' standing to seek review, but the D.C.

Circuit did not reach that issue.  Id. at 826.

## ARGUMENT

## I.    Plaintiffs Lack Standing to Challenge FDA's Actions Regarding EAADM

Federal judicial power is limited by Article III of the Constitution to the resolution of

"cases" and "controversies."  See, e.g., Valley Forge Christian College v. Americans United for

Separation of Church and State, Inc., 454 U.S. 464, 471 (1982).  To invoke federal court

jurisdiction, a party must establish the existence of a "justiciable controversy" with the adverse

party – one that is "definite and concrete, touching the legal relations of parties having adverse

legal interests." Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240-41 (1937). It is well

established that "federal courts are without power to decide questions that cannot affect the rights

of litigants in the case before them." DeFunis v. Odegaard, 416 U.S. 312, 316 (1974) (quotation

omitted). As summarized by the Supreme Court:

> Under Article III of the Constitution, federal courts may adjudicate only actual,
> ongoing cases or controversies. To invoke the jurisdiction of a federal court, a
> litigant must have suffered, or be threatened with, an actual injury traceable to the
> defendant and likely to be redressed by a favorable judicial decision.

Lewis v. Cont'l Bank Corp., 494 U.S. 472, 477 (1990) (citations omitted); see also

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992); Int'l Bhd. of Teamsters v. Transp.

Sec. Admin., 429 F.3d 1130, 1134 (D.C. Cir. 2005); Sierra Club v. EPA, 292 F.3d 895, 899

(D.C. Cir. 2002).

The "actual injury" must be "concrete in both a qualitative and temporal sense."

Whitmore. v. Arkansas, 495 U.S. 149, 155 (1990). The injury must be "distinct and palpable"

and "actual or imminent," not "conjectural" or "hypothetical." Id. (citations omitted); see also

Lujan, 504 U.S. at 560. To establish injury in fact, a "plaintiff must allege that he has been or

will in fact be perceptibly harmed by the challenged agency action, not that he can imagine

circumstances in which he could be affected by the agency's action." United States v. Students

Challenging Regulatory. Agency Procedures (SCRAP), 412 U.S. 669, 688-89 (1973); see also

Florida Audubon Soc'y v. Bentsen, 94 F.3d 658, 663 (D.C. Cir. 1996) (en banc) (plaintiff must

show that a particularized injury is at least imminent). The requirement of injury in fact will not

be satisfied "simply because a chain of events can be hypothesized in which the action

challenged eventually leads to actual injury."  Northwest Airlines, Inc. v. FAA, 795 F.2d 195,

201 (D.C. Cir. 1986).  As the Supreme Court has made clear, standing is not merely "an

ingenious academic exercise in the conceivable."  Lujan, 504 U.S. at 566 (quoting SCRAP, 412

U.S. at 688).

        Nor will an abstract or generalized grievance constitute "injury."  The Supreme Court has

held that "an injury amounting only to the alleged violation of a right to have the Government act

in accordance with law [is] not judicially cognizable because 'assertion of a right to a particular

kind of Government conduct, which the Government has violated by acting differently, cannot

alone satisfy the requirements of Art. III without draining those requirements of meaning.'"

Lujan, 504 U.S. at 575-76 (quoting Allen v. Wright, 468 U.S. 737, 754 (1984), and Valley Forge

Christian College, 454 U.S. at 483); see also Schlesinger v. Reservists Comm. to Stop the War,

418 U.S. 208, 220 (1974) ("[S]tanding to sue may not be predicated upon an interest of the kind

alleged here which is held in common by all members of the public . . . ."); United States v.

Richardson, 418 U.S. 166, 175 (1974) (rejecting plaintiff's attempt to "employ a federal court as

a forum in which to air his generalized grievances about the conduct of government. . . ."); La.

Envtl. Action Network v. Browner, 87 F.3d 1379, 1382 (D.C. Cir. 1996) ("Fundamental standing

doctrine instructs that, 'when the asserted harm is a "generalized grievance" shared in

substantially equal measure by all or a large class of citizens, that harm alone normally does not

warrant exercise of jurisdiction.'") (quoting Warth v. Seldin , 422 U.S. 490, 499 (1975)); Evans

v. Lynn, 537 F.2d 571, 598 (2d Cir. 1975) ("Disagreement with government action or policy,

however strongly felt, does not, standing alone, constitute an 'injury' in the Constitutional sense

which is cognizable in the federal courts and susceptible of remedy by the judicial branch; it is a

17

matter properly addressed to the Congress or the Executive.").

In addition, in a case seeking injunctive relief (as here), allegations of past injury alone are insufficient. City of Los Angeles v. Lyons, 461 U.S. 95, 103 (1983) (". . . past wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy."). This is so "even if the complaint present[s] an existing case or controversy." Id. See also Cruz v. Am. Airlines, Inc., 356 F.3d 320, 328-29 (D.C. Cir. 2004) (past injury will not support standing when requested remedy is prospective and past injury is unlikely to recur).

Finally, "[t]he party invoking federal jurisdiction bears the burden of establishing these elements." Lujan, 504 U.S. at 561. None of the plaintiffs has met this burden by alleging a sufficiently concrete, imminent injury. Nor have the plaintiffs demonstrated that any injury they do allege was caused by the lack of classification of EAADM or that the failure to classify that device would cause injury in the future. In addition, plaintiffs have not shown how any injury they allege would be redressed by an order directing FDA to classify EAADM.

## A.    None of the Individual Plaintiffs Alleges a Sufficiently Concrete, Personal Injury for Article III Standing

None of the individual plaintiffs alleges a sufficiently concrete, personal injury sufficient to invoke the Article III jurisdiction of this Court. The injury alleged by four of the seven plaintiffs (Palmer, Crowe, Brocato, and Tibau), is past injury. Compl. at 4-5. These allegations, if accepted as true, are not cognizable for standing purposes because they would not be remedied by the prospective relief that plaintiffs seek in this Court. See City of Los Angeles. v. Lyons, 461 U.S. at 103; Cruz v. Am. Airlines, Inc., 356 F.3d at 328-29; Worth v. Jackson, 451 F.3d 854, 858 (D.C. Cir. 2006).

The other individual plaintiffs (Bender, Johnson, and Landerman) fail to allege any personal, cognizable injury that would support standing.  Plaintiff Bender alleges that he serves on the state of Vermont's Advisory Committee of Mercury Pollution, and his duties include "'advis[ing] the general assembly, the executive branch, and the general public on matters relating to the prevention and cleanup of mercury pollution, and the latest science on remediation of mercury pollution.'"  Compl. at 4.  Mr. Bender alleges that his duties "cannot be done effectively or efficiently with FDA's policy of covering up the impact of mercury amalgam and disseminating incorrect information about it."  Id.  Such governmental duties, however, do not confer standing to challenge the FDA's regulation of EAADM.  See Alaska Legislative Council v. Babbitt, 181 F.3d 1333, 1337-38 (D.C. Cir. 1999) (rejecting state legislators' standing to challenge a federal statute based on claim that statute generally interfered with their legislative duties to regulate the same subject matter).  Mr. Bender has failed to demonstrate any injury to himself; he has also failed to explain how his alleged injuries were caused by FDA's regulation of EAADM, or how a court's order in this case would afford him relief.

Moreover, Mr. Bender has not established that his activities (fulfilling his state advisory duties) put him within the zone of interest meant to be protected by classification of a device. Therefore, he lacks prudential standing to bring this case.  See Role Models Am., Inc. v. Geren, 514 F.3d 1308, 1311-12 (D.C. Cir. 2008); Nat'l Ass'n of Home Builders v. United States Army Corps of Eng'rs, 417 F.3d 1272, 1287-88 (D.C. Cir. 2005).

Similarly, plaintiff Johnson's allegations fail to establish standing.  She states that she is a state senator from Arizona and chair of the state senate's Children and Families Committee.  She alleges that she has a "constitutional and statutory duty to regulate the dental profession, and a

19

delegated role to lead efforts to protect children and families from dangers such as neurotoxins." Compl. at 4. These allegations fail for the same reasons that Mr. Bender's allegations fail. Ms. Johnson fails to allege any injury to herself, let alone any injury caused by FDA's regulation of EAADM, or one that would be redressed by a court order.[8]

Petitioner Landerman, a dentist, states that he "does not implant mercury fillings, but he and his staff are constantly exposed to such mercury in the workplace because of its continued use." Compl. at 5. Dr. Landerman has not alleged any actual injury relating to EAADM, nor has he explained how his exposure to mercury in the workplace has been caused by FDA not classifying EAADM, nor how such a classification would redress his alleged injury, i.e., how "he personally would benefit in a tangible way from the court's intervention" compelling the FDA to classify EAADM. Warth, 422 U.S. at 508.

### B.    The Organizational Plaintiffs Lack Standing

Plaintiffs also include four organizations. An organization may seek review either on its own behalf or on behalf of its members. See Nat'l Taxpayers Union, Inc. V. United States, 68 F.3d 1428, 1432-33 (D.C. Cir. 1995). Organizational standing requires an injury to the organization itself, as well as causation and redressability. To demonstrate a cognizable injury to the organization, it is not sufficient to allege that the organization's objectives have been frustrated or impaired. Id. at 1433. Rather, the organization must demonstrate a "'concrete and

---

[8] For these same reasons, plaintiffs Brocato and Tibau's allegations that they are advocates for abolishing mercury amalgam fillings, Compl. at 5, do not establish a concrete, redressable injury. See, e.g., Lujan, 504 U.S. at 560; see also Ctr. for Law and Educ. v. Dep't of Educ., 396 F.3d 1152, 1162 n.4 (D.C. Cir. 2005) (". . . to hold that a lobbyist/advocacy group had standing to challenge government policy with no injury other than injury to its advocacy would eviscerate standing doctrine's actual injury requirement.").

demonstrable injury to the organization's activities – with [a] consequent drain on the

organization's resources – constitut[ing] . . . more than simply a setback to the organization's

abstract social interests.'"  Id. (quoting Havens Realty Corp. v. Coleman, 455 U.S. 363, 379

(1982)).  "Such a showing requires 'more than allegations of damage to an interest in "seeing"

the law obeyed or a social goal furthered.'"  Id., quoting in part Am. Legal Found. v. FCC, 808

F.2d 84, 92 (D.C. Cir. 1987).  "The organization must allege that discrete programmatic concerns

are being directly and adversely affected by the defendant's action."  Am. Legal Found. v. FCC,

808 F.2d at 92.

Plaintiffs fail to allege that any of their activities have been impaired by a lack of a formal

classification for EAADM.  Plaintiff Moms Against Mercury, a North Carolina nonprofit

corporation, states that it "represents children suffering substantial neurological harm from

mercury exposure and their families, and works to end those risks in the future, with amalgam

being one such major exposure of mercury."  Compl. at 3.  Similarly, petitioner Connecticut

Coalition for Environmental Justice, a "state-based group representing the needs of lower-income

and minority citizens," merely alleges that "[i]ts central mission is to address the disproportionate

impact of toxins on the poor, the urban, and minorities, and it has been active in trying to end the

use of mercury amalgam."  Id.  Plaintiff Oregonians for Life states that it "has a mission to

protect the unborn from harm, whether via abortion or toxin."  It states that its mission "includes

a major focus on toxins that harm unborn babies, and its work has included a focus on mercury

from dental fillings as a risk to such babies."  Id.  Finally, plaintiff Consumers for Dental Choice,

a Delaware nonprofit corporation, states that it "has as its sole mission to end the use of mercury

in dentistry," and notes that it has "petitioned FDA several times, held meetings with FDA

officials, written letters to officials at all levels of leadership, . . . organized submissions by

injured consumers and mercury-free dentists, and otherwise taken steps to invite FDA to comply

with the Food Drug and Cosmetic Act." Id. at 3-4.

These plaintiffs have failed to allege that any discrete activities or programs "are being

directly and adversely affected" by FDA's conduct regarding EAADM. Nat'l Taxpayers, 68 F.3d

at 1433; see also Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 39-40 (1976) (". . . the

five respondent organizations, which described themselves as dedicated to promoting access of

the poor to health services, could not establish their standing simply on the basis of that goal.

Our decisions make clear that an organization's abstract concern with a subject that could be

affected by an adjudication does not substitute for the concrete injury required . . .  Insofar as

these organizations seek standing based on their special interest in the health problems of the

poor their complaint must fail."); Sierra Club v. Morton, 405 U.S. 727, 739-40 (1972) ("[A] mere

'interest in a problem,' no matter how longstanding the interest and no matter how qualified the

organization is in evaluating the problem, is not sufficient by itself to render the organization

'adversely affected' or 'aggrieved' within the meaning of the APA.").  "Frustration of an

organization's objectives is the type of abstract concern that does not impart standing."  Ctr. for

Law and Educ. v. Dep't of Educ., 396 F.3d at 1161-62, quoting Nat'l Treasury Employees Union

v. United States, 101 F.3d 1423, 1429 (D.C. Cir. 1996).  Further, a "conflict between a

defendant's conduct and an organization's mission is alone insufficient to establish Article III

standing."  Id.; see also Nat'l Taxpayers, 68 F.3d at 1433-34.  Otherwise, every advocacy group

would be able to claim standing to challenge any policy or regulation it opposed.  See id. at 1434.

In addition, none of the organizations is in the zone of interest meant to be protected by

classification of the device.  See <u>Role Models Am., Inc. v. Geren</u>, 514 F.3d at 1311-12.

Plaintiffs also assert that they have suffered "legal wrong" under 21 C.F.R. § 10.45.

Compl. at 5.  That regulation sets forth the agency's requirement that interested persons must

exhaust their administrative remedies before seeking judicial review of final agency action.  21

C.F.R. § 10.45(b).  Once the agency takes final action, 21 C.F.R. § 10.45(d)(1)(ii) provides that

interested persons have standing to obtain review of final agency action.  That regulation does

not confer Article III standing upon any of the plaintiffs in this case.  The only plaintiff that has

submitted a citizen petition relating to the classification of dental amalgam is Consumers for

Dental Choice.  That petition sought, <u>inter</u> <u>alia</u>, FDA withdrawal of the 2002 proposed rule.  In

its 2006 response, FDA deferred its response to petitioner's request to withdraw the 2002

proposed rule because it was still reviewing information from the docket of a joint committee

meeting.  See FDA Response, Citizen Petition Docket Nos. 2005P-0462, 2005P-0465, <u>available</u>

<u>at</u> http://www.fda.gov/ohrms/dockets/dockets/dockets2005.htm (Oct. 26, 2006).  Even when

FDA takes final action, a regulation cannot by itself provide Article III jurisdiction to this Court;

the Court must independently assess whether it has jurisdiction.  See, e.g., <u>Pfizer Inc. v. Shalala</u>,

182 F.3d 975, 980 (D.C. Cir. 1999) (determining case was unripe despite FDA's final decision

denying Pfizer's citizen petition); <u>see also</u> <u>Schering Corp. v. FDA</u>, 866 F. Supp. 821, 824 (D.N.J.

1994) ("FDA cannot infringe upon congressional authority by removing prudential standing

barriers through its regulations."), <u>aff'd</u> 51 F.3d 390, 394 n.6 (3d Cir. 1995); <u>cf.</u> <u>Am. Legal</u>

<u>Found. v. FCC.</u>, 808 F.2d at 89 ("Congress cannot statutorily remove or diminish the

constitutional limits on which standing is based.").

If an organization cannot demonstrate any injury to itself, it may nevertheless be able to

23

establish associational standing by showing that the organization's members would have standing to sue, that the interests it seeks to protect are germane to the organization's purpose, and that participation of individual members in the lawsuit is not necessary.  See Hunt v. Wash. Apple Adver. Comm'n, 432 U.S. 333, 343 (1977); Nat'l Taxpayers, 68 F.3d at 1435; Wash. Legal Found. v. Leavitt, 477 F. Supp. 2d 202, 207-08 (D.D.C. 2007).  The allegations of the organizational plaintiffs here, however, do not even indicate who their members are, much less provide any facts supporting a conclusion that those members have suffered cognizable injuries, or any other requisite elements of associational standing.  Thus, these allegations are insufficient to establish associational standing.[9]

### C.    Plaintiffs Have Failed to Establish That Their Alleged Injuries Were Caused by FDA's Conduct Regarding EAADM or That FDA Would Cause Plaintiffs to be Injured if Such Devices are Not Classified in the Future

Even if plaintiffs had alleged some type of imminent injury related to mercury, none of them demonstrates the necessary causal link between an alleged injury and FDA's activities regarding EAADM.  That is, plaintiffs have not demonstrated that FDA not formally classifying EAADM has caused them any injury.  Because FDA earlier classified the individual components of EAADM, dental mercury and amalgam alloy, into class I and II, respectively (see 52 Fed. Reg. 30,082 (Aug. 12, 1987)), and FDA regulates EAADM as class II devices, see 67 Fed. Reg. at 7,621, plaintiffs' claims rest on the sheer speculation that, if FDA had earlier classified EAADM,

---

[9] In the Moms Against Mercury Court of Appeals case discussed above, petitioners submitted statements from some individuals associated with some of the organizations that are plaintiffs in this case.  Here, however, they have not alleged the necessary requirements for associational standing, discussed above, nor have they demonstrated that they are "traditional membership organizations" or "functionally equivalent" to such organizations.  See Wash. Legal Found., 477 F. Supp. 2d at 208.

FDA would have classified it differently than its individual components and would have regulated it differently. None of plaintiffs' allegations supports such speculation, and FDA's actions certainly suggest otherwise. <u>See</u> 67 Fed. Reg. 7670 (proposing classification into class II for EAADM). For this reason, plaintiffs do not allege an actual injury "traceable to the defendant." <u>Lewis v. Cont'l Bank Corp.</u>, 494 U.S. at 477.

More importantly, plaintiffs have not alleged that, even if FDA failed to classify EAADM, they would be likely to suffer an injury in the future. Such a likelihood of future injury – caused by FDA – is a necessary prerequisite to injunctive relief, which is the relief they seek here. <u>See</u> <u>City of Los Angeles v. Lyons</u>, 461 U.S. at 103; <u>see also</u> <u>Whitmore</u>, 495 U.S. at 155 (injury must be "distinct and palpable" and "actual or imminent," not "conjectural" or "hypothetical"). Further, plaintiffs allege that they believe that there are health risks from EAADM; thus, it is not likely that they would consent to receive EAADM in the future. For this reason, there is no likelihood that plaintiffs will suffer any future injury caused by FDA even if FDA does not classify EAADM.

### D.    Plaintiffs Have Not Established that Their Alleged Injuries Would be Redressed by Classification of EAADM Devices

Nor have the plaintiffs made any demonstration whatsoever that classification of EAADM would redress any of their alleged injuries. It must be more than merely "possible" that an alleged injury would be redressed by the requested relief; the alleged injury must be "<u>likely</u> to be redressed by a favorable judicial decision." <u>Lewis v. Cont'l Bank Corp.</u>, 494 U.S. at 477 (emphasis added); <u>see also</u> <u>Lujan</u>, 504 U.S. at 561; <u>Valley Forge</u>, 454 U.S. at 472; <u>Allen</u>, 468 U.S. at 751.

In this case, plaintiffs seek an order requiring FDA to classify EAADM. See Compl. at 21. Plaintiffs have not identified any injury that would be redressed by their requested relief. Indeed, because petitioners are now aware of the mercury content of EAADM and the potential health risks of mercury, they would be unlikely to consent to receive mercury fillings in the future. Thus, petitioners cannot identify any prospective injury that their requested relief would redress. As noted, EAADM devices are regulated as class II devices. In 1994, the Dental Products Panel of the Medical Devices Advisory Committee recommended that EAADM be regulated as Class II devices. FDA made the same proposal in 2002, 67 Fed. Reg. 7,620, and has since reopened the comment period, 73 Fed. Reg 22,877 (Apr. 28, 2008). Given this history, it is highly speculative that FDA would classify EAADM into class III.

Even if FDA were to classify EAADM as a class III device, however, such action would not require removal of EAADM from the market. Rather, EAADM would legally remain on the market pending FDA's promulgation of a final regulation requiring premarket approval, and for a certain period of time following that event. See 21 U.S.C. § 351(f)(2)(B) (setting as a grace period the later of 30 months after FDA classifies the device into class III or 90 days after the date of the regulation requiring submission of premarket approval applications). If an applicant submits a premarket approval application by the date applications are due, its product may remain on the market during FDA's 180-day review of the application. The 180-day review period for pre-amendment devices may be extended if the agency finds that the continued availability of the device is necessary for the public health. See 21 U.S.C. § 360e(d)(1)(B)(i). Accordingly, individual EAADM products would be removed from the market only if FDA denied a particular manufacturer's PMA for EAADM after that regulatory process. Thus,

although plaintiffs assert that EAADM should be removed from the market while FDA

completes the classification process, see Compl. at 21, plaintiffs cite no authority that would

require doing so.  For these reasons, it is highly speculative whether classification of EAADM

would redress any alleged injury.

## II.    THIS COURT LACKS SUBJECT MATTER JURISDICTION OVER MOST OF PLAINTIFFS' CLAIMS, AND SOME OF PLAINTIFFS' ALLEGATIONS FAIL TO STATE CLAIMS UPON WHICH RELIEF CAN BE GRANTED

While plaintiffs discuss many activities of FDA in connection with the regulation of

dental mercury, in the "Statement of Allegations" section of their complaint, they allege six

specific violations of the FDCA.  Compl. at 19-20.  As described below, each of those claims

should be dismissed under Fed. R. Civ. P. 12(b)(1).  Pursuant to Rule 12(b)(1), the plaintiff bears

the burden of establishing that the Court has jurisdiction.  See McNutt v. General Motors

Acceptance Corp. of Indiana, 298 U.S. 178, 182 (1936); Hilska v. Jones, 297 F. Supp. 2d 82, 86

(D.D.C. 2003).  Dismissal for lack of subject-matter jurisdiction is proper when the federal claim

is "insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise

completely devoid of merit as not to involve a federal controversy."  Steel Co. v. Citizens for a

Better Env't, 523 U.S. 83, 89 (1998) (quoting Oneida Indian Nation of N. Y. v. County of

Oneida, 414 U.S. 661, 666 (1974)).  Each of plaintiffs' specific allegations fails to present a

federal claim subject to review by this Court.

Some of plaintiffs' claims should also be dismissed under Fed. R. of Civ. P. 12(b)(6)

because plaintiffs have failed to set forth any basis upon which relief can be granted.  To prevent

dismissal under Federal Rule of Civil Procedure 12(b)(6), "allegations must be enough to raise a

right to relief above the speculative level."  Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955,

1965 (2007).  Plaintiffs must present a "claim to relief that is plausible on its face."  Id. at 1974.

In reviewing a complaint under this standard, a court may review not only the complaint and

documents referenced in the complaint, but matters of judicial notice and matters of public

record.  EEOC v. St. Francis Xavier Parochial School, 117 F.3d 621, 624 (D.C. Cir. 1997);

Marshall County Health Care Auth. v. Shalala, 988 F.2d 1221, 1226 n.6 (D.C. Cir. 1993).  The

court must accept as true all of plaintiff's well-pled factual allegations; however, courts "accept

neither 'inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in

the complaint,' nor 'legal conclusions cast in the form of factual allegations.'"  Browning v.

Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002); Luck's Music Library, Inc. v. Ashcroft, 321

F.Supp.2d 107, 112 (D.D.C. 2004).  Here, even assuming the truth of plaintiffs' factual

allegations, it is plain that plaintiffs do not state any claim that "is plausible on its face."

Twombly, 127 S.Ct. at 1974.

A.    21 U.S.C. § 360g(a)(8)

Plaintiffs allege that defendants have violated the FDCA by allowing EAADM to be

marketed via a deceptive, unlawful, and sham classification, citing 21 U.S.C. § 360g(a)(8).

Compl. at 19.  That provision confers jurisdiction on a Court of Appeals to review (within 30

days) orders under 21 U.S.C. § 360c(i), determining that a post-amendment device is

"substantially equivalent," for purposes of safety and effectiveness, to a predicate device that has

already been classified.  See 21 U.S.C. § 360g(a)(8).  When, as here, Congress has vested

jurisdiction of a particular matter in the Court of Appeals, jurisdiction is cut off in the district

court.  See Telecommunications Research and Action Center v. FCC, 750 F.2d 70, 77 (D.C. Cir.

1984) ("TRAC") ("Because the District Court has no present or future jurisdiction over agency

28

actions assigned by statute to appellate court review, it can contemplate no exercise of jurisdiction that mandamus might aid.").  The Courts of this Circuit have on numerous occasions held that, when exclusive jurisdiction over a claim lies in the Court of Appeals, issues relevant to that claim must be brought in the Court of Appeals.  See, e.g., Int'l Union, UMW v. Dep't of Labor, 358 F.3d 40, 43 (D.C. Cir. 2004) (withdrawal of rule); Ukiah Adventist Hospital v. FTC, 981 F.2d 543, 549-51 (D.C. Cir. 1992) (rejecting argument that "purely legal" questions of jurisdiction can be brought in District Court); Community Nutrition Inst. v. Young, 773 F.2d 1356, 1360-61 (D.C. Cir. 1985) (allegation of agency delay to be brought in Court of Appeals); Marchiano v. Nat'l Ass'n of Securities Dealers, Inc., 134 F. Supp. 2d 90, 94 (D.D.C. 2001) (constitutional claim).

Thus, plaintiffs' claim alleging a violation of 21 U.S.C. § 360g(a)(8) should be dismissed for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) because any claims brought under § 360g(a)(8) must be brought in the Court of Appeals.  In addition, as the Court of Appeals held in Moms Against Mercury, FDA has not made any substantial equivalence determinations that are now subject to review under § 360g(a)(8).  483 F.3d at 826-27.

**B.    21 U.S.C. § 360g(a)(4)**

Plaintiffs also allege that FDA has violated 21 U.S.C. § 360g(a)(4) because "[e]ncapsulated amalgam is being marketed despite never having been classified, and this failure to classify, far from being inadvertent, represents a calculated FDA decision to keep selling amalgam with no safety review."  Compl. 19.  That provision, like subsection (a)(8), provides direct review in a Court of Appeals of a particular type of FDA action, and thus cuts off review in this Court for the same reasons stated above.  See TRAC, 750 F.2d at 77.  Thus, plaintiffs' claim

29

must be dismissed for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1).

Also, as with § 360g(a)(8), FDA has not taken any of the substantive actions that are the subject of § 360g(a)(4), as the D.C. Circuit found. 483 F.3d at 826. That subsection provides review only over (1) final regulations that require premarket approval for a device, and (2) orders granting or denying premarket approval, and FDA has issued no such regulation or order for EAADM.

### C.    21 U.S.C. § 351

Plaintiffs allege a violation of 21 U.S.C. § 351, stating that encapsulated amalgam is "adulterated" because it contains mercury. Compl. 20. Even if EAADM were adulterated – which it is not – the United States has exclusive authority to enforce FDCA provisions, not private parties. See 21 U.S.C. § 337(a); Buckman Co. v. Plaintiffs' Legal Comm., 531 U.S. 341, 349 n.4, 352 (2001); Medtronic, Inc. v. Lohr, 518 U.S. 470, 487 (1996); Merrell Dow Pharms., Inc. v. Thompson, 478 U.S. 804, 810-12 (1986); Heckler v. Chaney, 470 U.S. 821 (1985). Plaintiffs' claim appears to be an impermissible attempt to bring a private right of action to enforce the FDCA against the FDA. There is no basis for such a private right of action, as the cases cited above hold. In addition, this nonsensical claim is unreviewable inasmuch as it is a challenge to FDA's enforcement discretion, and should be dismissed under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction. Chaney, 470 U.S. at 837; Jerome Stevens Pharms. v. FDA, 402 F.3d 1249, 1257-58 (D.C. Cir. 2005).

Alternatively, plaintiffs' claim that EAADM is adulterated can also be dismissed under F. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. Plaintiffs have not made allegations sufficient to support a claim that the product is adulterated under the FDCA.

As discussed above, EAADM devices are legally marketed and are regulated as class II devices.

### D.    21 U.S.C. § 352

Similarly, plaintiffs allege a violation of 21 U.S.C. § 352, stating that encapsulated amalgam is misbranded because it contains mercury.  For the same reasons stated above with respect to plaintiffs' adulteration claim, however, plaintiffs' misbranding claim should be dismissed for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) and for failure to state a claim under Fed. R. Civ. P. 12(b)(6).

### E.    21 U.S.C. § 379o

Plaintiffs also claim that defendants have violated the FDCA provision implementing the National Environmental Policy Act ("NEPA"), 21 U.S.C. § 379o, by failing to prepare an environmental assessment ("EA") and environmental impact statement ("EIS").  Compl. at 20. That statute provides that an EIS prepared in accordance with 21 C.F.R. part 25 shall be considered to meet the requirements for a detailed statement as required by NEPA.  FDA's regulations provide that FDA actions pertaining to the "classification or reclassification of a device" are categorically exempt from the requirement for an EA or EIS "if the action will not result in increases in the existing levels of use of the device or changes in the intended use of the device or its substitutes."  21 C.F.R. § 25.34(b).

In this case, FDA's compliance with NEPA obligations is not ripe for review because the FDA has not yet completed the classification process culminating in a final regulation.  See, e.g., Pub. Citizen v. United States Trade Representative, 5 F.3d 549, 551-52 (D.C. Cir. 1993) (requiring final agency action under the APA as a predicate for challenging NEPA compliance). Thus, plaintiffs' claim should be dismissed for lack of subject matter jurisdiction under Fed. R.

Civ. P. 12(b)(1).

Moreover, the cited statute, 21 U.S.C. § 397o, is intended to clarify that FDA's compliance with its regulations will constitute compliance with NEPA.  It is not, as plaintiffs assert, a mechanism to challenge FDA's compliance with NEPA.  For this alternative reason, plaintiffs have failed to state a claim for relief that can be granted under Fed. R. Civ. P. 12(b)(6).

### F.    21 U.S.C. § 393

Plaintiffs contend that defendants' actions regarding EAADM violate 21 U.S.C. § 393, which states that FDA's mission is to "promote the public health."  21 U.S.C. § 393(b)(1); Compl. 20.  That general mission statement "underscores FDA's authority to determine how best to ensure the safety and effectiveness of [products regulated by FDA]."  See Jerome Stevens Pharms. v. FDA, 319 F. Supp. 2d 45, 56-57 (D.D.C. 2004), rev'd on other grounds by Jerome Stevens Pharms. v. FDA, 402 F.3d 1249 (D.C. Cir. 2005) (citing Safe Energy Coalition v. U.S. Nuclear Regulatory Comm'n., 866 F.2d 1473, 1478 (D.C. Cir. 1989)).  That statute does not confer any substantive right upon plaintiffs to challenge an agency action apart from the APA, nor does it provide any guidance sufficient to overcome a presumption that FDA's enforcement decisions are not reviewable.  See Buckman Co., 531 U.S. at 349 n.4; Medtronic, 518 U.S. at 487; Merrell Dow Pharms., 478 U.S. at 810-12; Heckler v. Chaney, 470 U.S. at 837; Jerome Stevens, 402 F.3d at 1257.  Thus, plaintiffs' claims that defendants have violated 21 U.S.C. § 393 are not reviewable, and should be dismissed under Fed. R. Civ. P. 12(b)(1).

### G.    Allegation of Unreasonable Delay

Plaintiffs' complaint does not allege a violation of 21 U.S.C. § 360c(b)(1), which is the statutory section that directs FDA to classify devices.  Nor do plaintiffs assert a specific violation

under 5 U.S.C. § 706(1), which gives a reviewing court authority to "compel agency action unlawfully withheld or unreasonably delayed." In the "Remedy" section of the complaint, however, plaintiffs discuss the language of § 706(1). Compl. at 20. Plaintiffs also cite the language of § 706(b)(1) in their memorandum in support of their motion for a preliminary injunction. Pl. Mem. at 18. Although an "unreasonable delay" allegation is far from clear, for purposes of this motion, defendants do not contest that plaintiffs have alleged a claim of unreasonable delay. If this Court finds it has jurisdiction to proceed despite plaintiffs' apparent lack of standing, this is likely to be the sole cause of action remaining. As explained in the next section of this memorandum, however, even if plaintiffs could establish a likelihood of success on this issue and the other standards for preliminary relief were met, there are no grounds to provide the preliminary injunction plaintiffs seek, i.e., the removal of EAADM from the marketplace. If FDA has unreasonably delayed, the remedy is to enjoin the delay; plaintiffs cite no basis for the removal of EAADM from commerce.

III.    **PLAINTIFFS HAVE FAILED TO ESTABLISH THE REQUIREMENTS NECESSARY TO OBTAIN PRELIMINARY INJUNCTIVE RELIEF**

A.    **The Relief Plaintiffs Seek in Their Preliminary Injunction is Not Available to Them Even if They Met the Standards for a Preliminary Injunction**

When a plaintiff alleges that an agency has unlawfully withheld or unreasonably delayed agency action under the APA, the remedy is for the court to "compel agency action," by issuing an order requiring the agency to act, without directing the substantive content of the decision. See, e.g., 5 U.S.C § 706(1); In re Barr Labs, Inc., 930 F.2d 72, 74 (D.C. Cir. 1991); Pub. Citizen Health Research Group v. FDA, 740 F.2d 21, 32 (D.C. Cir. 1984). Such an order by this Court would not result in removal of EAADM from the marketplace. EAADM has been legally on the

33

market since before 1976, and has been regulated as a class II device. If EAADM were formally placed into class II, it would obviously remain on the market. Also, as explained above, even if FDA were to classify EAADM into class III – the most restrictive classification – it would also remain on the market while PMAs were submitted; at most, an individual manufacturer's product would be removed if that manufacturer's PMA were ultimately denied.

Plaintiffs cite no authority that would require removal of EAADM from the market, either now or when it is classified. On this basis alone, plaintiffs' motion for a preliminary injunction should be denied.[10]

**B.      Legal Standard for a Preliminary Injunction**

Even if this Court were to determine that plaintiffs have standing and that the relief they seek is available to them, their motion for a preliminary injunction should be denied. To obtain a preliminary injunction, parties must demonstrate that: (1) they have a substantial likelihood of success on the merits; (2) they will suffer irreparable injury in the absence of preliminary relief; (3) other interested parties will not be substantially injured if the requested relief is granted; and (4) granting such relief would serve the public interest. See Katz v. Georgetown Univ., 246 F.3d 685, 687-88 (D.C. Cir. 2001). The injunctive relief plaintiffs seek – the removal of EAADM

---

[10] Although plaintiffs argue that dental fillings are "implants" and thus "presumptively Class III," Pl. Mem. at 11, that is not the case. Implants are presumed to be class III devices unless the classification panel determines that such classification is not necessary. 21 U.S.C. § 360c(c)(2)(C). The classification panel that originally considered dental restorative materials excluded them from the definition of "implants." See 45 Fed. Reg. 85,964 (Dec. 30, 1980) (noting that dental implants are devices that are surgically placed into the maxilla or mandible, excluding restorative materials such as amalgams, gold alloys, silicates, and cements). FDA agreed with this definition. 52 Fed. Reg. At 30,084-85 (classifying amalgam alloy as class II and dental mercury as class I). Thus, contrary to plaintiffs' claim (Compl. at 15), FDA has not determined that dental fillings are implants, and such materials are not presumptively placed into class III.

34

from the market – is demonstrably not to preserve the status quo, but to obtain far-reaching and unprecedented mandatory relief. This peculiar request for relief presents an additional and very high hurdle. A court's power to issue such a mandatory injunction "should be sparingly exercised." Mylan Pharms., Inc. v. Shalala, 81 F. Supp.2d 30, 36 (D.D.C. 2000), quoting Dorfmann v. Boozer, 414 F.2d 1168, 1173 (D.C. Cir. 1969); see generally Mazurek v. Armstrong, 520 U.S. 968, 972 (1997); Bristol-Myers Squibb Co. v. Shalala, 923 F. Supp. 212, 215 (D.D.C. 1996). As shown below, plaintiffs have failed to satisfy the elements needed to obtain a preliminary injunction, much less a mandatory injunction.

C.    **Plaintiffs Will Not Suffer Irreparable Injury in the Absence of Preliminary Relief**

Perhaps the most important reason the preliminary injunction should be denied is that plaintiffs will not suffer irreparable injury if their request for a temporary ban on EAADM is denied. Courts insist that only irreparable harm justifies the issuance of a preliminary injunction. "The *sine qua non* of granting any preliminary injunctive relief is a clear and convincing showing of irreparable injury to the plaintiff." Experience Works, Inc. v. Chao, 267 F. Supp. 2d 93, 96 (D.D.C. 2003). "Irreparabilty of injury is a very high standard." Bristol-Myers, 923 F. Supp at 220, quoting Am. Coastal Line Joint Venture, Inc. v. United States Lines, Inc., 580 F. Supp. 932, 936 (D.D.C. 1983); see also Varicon Int'l v. OPM, 934 F. Supp. 440, 447 (D.D.C. 1996). "Moreover, demanding scrutiny must be applied to claims of irreparable injury." Bristol-Myers, 923 F. Supp at 220. The Court of Appeals has stated that "the injury must be both certain and great; it must be actual and not theoretical. Injunctive relief will not be granted against something merely feared as liable to occur at some indefinite time, . . . the party seeking

35

injunctive relief must show that [t]he injury complained of [is] of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." <u>Wisconsin Gas Co. v. FERC</u>, 758 F.2d 669, 674 (D.C. Cir. 1985) (citations and internal quotation marks omitted).

The primary reason there is no irreparable injury is the same that underlies the reasons – stated above – that plaintiffs do not have standing. That is, if EAADM were to remain on the market pending classification, it would not result in any injuries to plaintiffs. Existing EAADM fillings would not be affected, nor would any past injury be remedied. As plaintiffs recognize, fillings other than EAADM are available now (and could be readily requested by plaintiffs if they needed a filling). For these reasons, if this Court were to deny plaintiffs' request to temporarily ban EAADM pending classification, plaintiffs would suffer no irreparable harm.

**D.    Plaintiffs Are Not Likely to Succeed On The Merits**

**1.    The Standard of Review under the APA**

The case of <u>Cutler v. Hayes</u>, 818 F.2d 879 (D.C. Cir. 1987), is instructive on the issue of agency delay. The facts in that case are similar to the instant case. There, FDA had been directed by statute in 1962 to review all then-marketed drugs for effectiveness (instead of just safety). This required FDA to categorize the products into three groups. <u>Id.</u> at 883-84. Over 20 years later, plaintiffs alleged, among other things, that FDA's actions with respect to over-the-counter drugs had been unreasonably delayed. <u>Id.</u> at 894. The district court ruled that FDA's actions did not amount to unreasonable delay. Although the Court of Appeals reversed on this issue, it did not hold that a delay of over 20 years was <u>per se</u> unreasonable; rather, it remanded to the district court. The Court noted that "an administrative agency is entitled to considerable deference in establishing a timetable for completing its proceedings." <u>Id.</u> at 896. The Court also

36

stated: "An agency has broad discretion to set its agenda and to first apply its limited resources to the regulatory tasks it deems most pressing." <u>Id.</u> The Court identified three factors to guide the district court: "First, the court should ascertain the length of time that has elapsed since the agency came under a duty to act. . . ." <u>Id.</u> at 897. "Next, '[t]he reasonableness of the delay must be judged 'in the context of the statute' which authorizes the agency's action.'" <u>Id.</u> quoting <u>Pub. Citizen Health Research Group v. Auchter</u>, 702 F.2d 1150, 1158 n.30 (D.C. Cir. 1983). "Third, and perhaps most critically, the court must examine the consequences of the agency's delay. The deference traditionally accorded an agency to develop its own schedule is sharply reduced when injury likely will result from avoidable delay." <u>Id.</u> at 898.

The Court directed the district court to consider these factors in light of the monumental task Congress had given to FDA in 1962 with respect to drugs – which is much like the task Congress gave to FDA in 1976 regarding devices. In addition, another factor the Court should consider is "the effect of expediting delayed action on agency activities of a higher or competing priority." <u>TRAC</u>, 750 F.2d at 80. In <u>Barr Laboratories</u>, the Court concluded: "In short, we have no basis for reordering agency priorities. The agency is in a unique – and authoritative – position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way." 930 F.2d at 76. <u>See also</u> <u>Liberty Fund, Inc. v. Chao</u>, 394 F. Supp. 2d 105, 117 (D.D.C. 2005) ("The Department's decision on how to handle competing applications is deserving of deference. In analogous cases, where resource allocation is the source of the delay, courts have declined to expedite action because of the impact on competing priorities."). The reordering of agency priorities has an impact on other activities and requires extraordinary circumstances to justify judicial intervention. <u>See</u> <u>In re Barr Labs</u>, 930 F.2d at 74 ("The issue . . .

37

is . . . whether we should exercise our equitable powers to enforce the deadline.  Equitable relief .

. . does not necessarily follow a finding of a violation:  respect for the autonomy and comparative

institutional advantage of the executive branch has traditionally made courts slow to assume

command over an agency's choice of priorities.").  Finally, "a presumption of regularity attaches

to the actions of Government agencies."  United States Postal Serv. v. Gregory, 534 U.S. 1, 10

(2001).

### 2.    The Pace of FDA's Classification Activities Regarding EAADM Has Not Been Unreasonable

The second factor discussed in Cutler v. Hayes is the context of the statute under which

the agency is acting, such as the extent to which Congress has provided a timetable or other

indication of the speed with which it expects the agency to proceed, and the extent to which the

statutory scheme may supply a rule of reason for the time taken for agency action.  As noted,

Congress did not impose any deadline for classification of pre-amendment devices.  FDA v.

Brown & Williamson Tobacco Corp., 529 U.S. at 136.  By contrast, in Cutler v. Hayes, the

FDCA imposed immediate efficacy requirements for the over-the-counter drugs at issue.  818

F.2d at 883.  In evaluating whether the length of time expended in conducting an administrative

proceeding constitutes unreasonable delay, courts typically apply the "rule of reason."  TRAC,

750 F.2d at 80.  "Resolution of a claim of unreasonable delay is ordinarily a complicated and

nuanced task requiring consideration of the particular facts and circumstances before the court."

Mashpee Wampanoag Tribal Council, Inc. v. Norton, 336 F.3d 1094, 1100 (D.C. Cir. 2003).

"The 'rule of reason' requires the courts to evaluate alleged agency delay in light of the particular

facts of a given case; accordingly, there is no hard-and-fast rule as to what amount of time

constitutes an unreasonable delay." Natural Res. Def. Council, Inc. v. Fox, 93 F. Supp. 2d 531,

544 n.8 (S.D.N.Y. 2000), vacated in part on other grounds sub nom. Natural Res. Def. Council,

Inc. v. Muszynski, 268 F.3d 91 (2d Cir. 2001).

 Given the volume of materials FDA is reviewing in connection with the classification of

EAADM, the complexity of the scientific and policy issues involved in this case, the challenges

to its classification activities at nearly every step of the process, and the many other duties to

which FDA must also allocate resources, FDA's activities regarding EAADM have been

reasonable.

 Significantly, courts have been particularly deferential to FDA with respect to issues

pertaining to the classification of devices.  In Contact Lens Mfrs., this Circuit upheld FDA's

decision to withdraw its proposal to reclassify plaintiff's device to a less restrictive classification.

The court recognized that the FDCA conferred "broad administrative discretion . . . upon the

FDA" with respect to device classification.  766 F.2d at 594.  Also, "in such matters generalist

courts see through a glass darkly and should be especially reluctant to upset an expert agency's

judgment. . . ."  Id. at 600.  In Gen. Med. Co. v. FDA, 770 F.2d 218 (D.C. Cir. 1985), this Circuit

affirmed FDA's denial of plaintiff's request that its device be reclassified from class III to class I.

The court noted "broad discretion" given to FDA "in implementing the definition of 'substantial

equivalence,'" and that "the FDA was within its broad discretion in weighing unproven benefits

against small but proven harms and finding the balance tilted towards a finding of a 'potential

unreasonable risk of illness of injury.'"  Id. at 221.  In Ethicon, Inc. v. FDA., 762 F. Supp. 382

(D.D.C. 1991), plaintiff challenged FDA's decision to reclassify another manufacturer's device

from a Class III to a Class II.  The court stated:  "Congress gave FDA sweeping discretion in

determining the classification of devices and therefore in judging the safety and effectiveness of medical devices." Id. at 386. Also, "the Court does not weigh the evidence; it merely examines 'the record to see if there is evidence, which if accepted by the Secretary, supports the determination of the agency.'" Id. at 389 (quoting in part Nat'l Soft Drink Ass'n v. Block, 721 F.2d 1348, 1354 (D.C. Cir. 1983)).

In this case, because of the lack of consequences attributable to FDA's regulatory pace – the "most critical" factor discussed in Cutler v. Hayes – FDA's actions have not been unreasonable. See 818 F.2d at 898. In view of FDA's ongoing efforts to classify EAADM in light of current scientific developments, any delay in classification has not been unreasonable, and does not warrant judicial intervention. As explained above, although the FDA has not formally classified EAADM, FDA separately classified its component parts: amalgam alloy (class II) and dental mercury (class I) in 1987. See 52 Fed. Reg. at 30,084-85. Accordingly, EAADM is effectively classified in class II and regulated as a class II device, pursuant to the highest classification of its components. Therefore, this product is by no means unregulated, and plaintiffs' assertion that FDA allows "untrammeled sales" of a device in which it has no confidence are simply wrong. Compl. at 2. Rather, when FDA determined that it had a reasonable assurance of safety and effectiveness for the individual components, it reasonably had similar confidence for the combination of the components, and has regulated the combination product accordingly. See 67 Fed. Reg. at 7621. Had FDA previously believed that a more restrictive classification was urgently necessary to protect the public health, it would have acted.

The scientific information before FDA underscores the lack of harm caused by any agency delay. Dental amalgams containing mercury have been used for decades, yet there is no

clear scientific evidence that they are so harmful as to prompt immediate agency action, much less to warrant judicial intervention.  Moreover, as plaintiffs note, there are alternatives to EAADM and other mercury-containing amalgams, and patients may choose mercury-free fillings.  Pl. Mem. at 21.

As described at length in the background section of this memorandum, FDA has taken a significant number of actions relating to classification of EAADM, including convening the Dental Products Panel of the Medical Devices Advisory Committee to recommend a classification for EAADM in 1993-94, and publishing a proposed rule to classify EAADM in class II in 2002.  See 67 Fed. Reg. at 7,624.  The 2002 proposed rule describes the information that FDA reviewed, including information that became available only after the panel's 1993-94 proposal:  a comprehensive risk assessment of dental amalgam issued in 1993 by the Public Health Service and reaffirmed in 1995; an updated literature review; the recommendation of the Dental Products Panel of the Medical Devices Advisory Committee; reports by foreign governments and international health organizations; and numerous studies submitted to the FDA in citizen petitions.  Id. at 7,625-26.  After receiving over 750 comments submitted to the docket following the 2002 proposed rule, FDA reopened the comment period again in 2002 in response to the high level of interest.  67 Fed. Reg. 46,941 (July 17, 2002).

There are a number of reasons why FDA has not yet finalized the 2002 proposed rule. Since the proposed rule published, new reviews have been conducted that required additional consideration.  See Dental Amalgam; Request for Information, 68 Fed. Reg. 25,048 (May 9, 2003) (sponsoring review of scientific literature about the health effects of dental amalgam and offering the public an opportunity to participate).  In addition, a plaintiff in this suit (Consumers

41

for Dental Choice) specifically challenged the 2002 rule in a citizen petition filed in 2005.  See

Citizen Petitions, Docket Nos. 2005P-0462, 2005P-0465, available at

http://www.fda.gov/ohrms/dockets/dockets/05p0465/05p-0465-cp00001-01-vol1.pdf (requesting

that FDA "start over" for the 2002 proposed rule and convene a joint panel).  In its partial

response to that petition on October 26, 2006, FDA agreed to convene two advisory committees

to discuss and review scientific literature on dental amalgam and its potential mercury toxicity.

See 71 Fed. Reg. 16,582 (Apr. 3, 2006).

　　　FDA convened the joint meeting on September 6 and 7, 2006.  Significantly, the panel

generally agreed that there is no scientific evidence upon which to conclude that dental amalgam

creates a probable health risk to the general population.  See Summary Minutes for Sept. 7

Meeting at 21, 25, available at http://www.fda.gov/ohrms/dockets/ac/cdrh06.html#dental

productspanel.  The panel acknowledged concerns that mercury in dental amalgam may have

adverse side effects on certain subsets of individuals, such as pregnant women or those with

hypersensitivity to mercury, but concluded that, at that time, there was not sufficient scientific

evidence to support a finding that the potential risks of dental amalgam outweigh the potential

benefits, even for those subgroups.  Id. at 21, 24.

　　　To give effect to the panel's recommendations, FDA opened a public docket (2006N-

0352) to accept additional comments about dental amalgam.  See FDA Dockets, available at

http://www.fda.gov/ohrms/dockets/dockets/dockets2006.htm.  That docket closed on November

9, 2006.  FDA is reviewing the nearly 2,500 comments submitted to the docket and studying

peer-reviewed literature and the findings and recommendations from the panel meeting.  See

CDRH Consumer Information, Questions and Answers on Dental Amalgam, available at

http://www.fda.gov/cdrh/consumer/amalgams.html (Oct. 31, 2006).

Most recently, on April 22, 2008, FDA reopened the notice and comment period to the 2002 proposed rule.  See Dental Devices: Classification of Encapsulated Amalgam Alloy and Dental Mercury and Reclassification of Dental Mercury; Issuance of Special Controls for Amalgam Alloy; Reopening of Comment Period, Docket No. 2008-N-0163, 73 Fed. Reg 22,877, available at http://www.fda.gov/OHRMS/DOCKETS/98fr/08-1187.pdf.  In that document, FDA noted the significant events that have occurred since the 2002 proposal, including the 2004 report by the Life Sciences Research Office, Inc., the recommendations of the joint panel meeting in 2006, and more recent scientific articles.  73 Fed. Reg. at 22878.  FDA stated that it was "taking this action to provide the public with an additional opportunity to comment and to request data and information that may have become available since publication of the proposed rule."  Id. at 22,877.  FDA has specifically asked for comments on how labeling controls should disclose the composition of dental amalgam, including its mercury content, and on how labeling controls should address precautions for use of the device in sensitive subpopulations such as children under age 6, pregnant and lactating women, and hypersensitive or immunocompromised individuals.  Id. at 22,878.  FDA also asked for comments on whether the labeling controls should require more specific patient labeling, such as for patients of identified subpopulations, regarding the mercury content, alternatives to the device, and the health risks associated with the failure to obtain dental care.  Id.  In addition, FDA has asked for comments and data on the number of procedures using mercury amalgams; the differences in costs between amalgams and alternative materials; reimbursement rates for amalgams and alternative materials; how labeling for certain subpopulations would be communicated, and how would it affect the demand for

43

mercury amalgam products; and what the current exposure is to mercury for patients and professionals, and what reduction in exposure would result from alternative devices. Id. Thus, as can be seen from that Federal Register notice, FDA has identified a number of issues that merit further input before finalizing the 2002 proposed rule.

This history of FDA's classification activities for EAADM reflects FDA's active – and time-and-resource-consuming – consideration of the appropriate classification for EAADM, as well as FDA's responsiveness to the comments and the resistance that has been shown along the way by concerned individuals and consumer groups. This is not a case in which the agency has been neglecting its duty to classify; rather, the agency has been steadily working towards classification. Given the current controls in place for regulating EAADM and the complex issues regarding classification, FDA's activities regarding classification of EAADM have not been unreasonable.

## C. Granting the Requested Injunction Would Not Serve the Public Interest and Could Injure Other Parties

Temporarily removing EAADM from the market would not serve the public interest and could harm other parties. As noted, based on the scientific evidence before it, FDA has not found significant health risks from EAADM. Although other materials are available for dental fillings, they are more expensive than EAADM and generally do not last as long. See http://www.fda.gov/cdrh/consumer/amalgams.html. As also discussed above, when FDA weighed the risks of untreated cavities, the longstanding and successful use EAADM, the benefits of EAADM over other materials used in fillings, and "the overall lack of valid scientific evidence that persons whose carious teeth are treated with dental amalgam experience any

44

adverse health effects," it concluded that the probable benefits of EAADM outweighed the

probable risks.  67 Fed. Reg. At 7,627.  Given the current controls in place for regulating

EAADM, a court order temporarily banning EAADM would not be in the public interest.

## CONCLUSION

For the foregoing reasons, plaintiffs' complaint should be dismissed, and their motion for

a preliminary injunction denied.

Respectfully submitted,

Of Counsel:

JAMES C. STANSEL                    JEFFREY S. BUCHOLTZ
Acting General Counsel              Acting Assistant Attorney General

GERALD F. MASOUDI                   C. FREDERICK BECKNER III
Chief Counsel, Food and Drug Division   Deputy Assistant Attorney General

ERIC M. BLUMBERG                    EUGENE M. THIROLF
Deputy Chief Counsel, Litigation    Director
                                    Office of Consumer Litigation
WENDY S. VICENTE
Associate Chief Counsel

                                    _____/s/_____
U.S. Dept. of Health & Human Services   DRAKE CUTINI
Office of the General Counsel        Attorney
5600 Fishers Lane                    Office of Consumer Litigation
Rockville, MD  20857                 U.S. Department of Justice
(301) 827-7138                       P.O. Box 386
                                     Washington, D.C.  20044
Dated: May 2, 2008                   202-307-0044
                                     drake.cutini@usdoj.gov

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                              )
MOMS AGAINST MERCURY, et al.,                 )
                                              )
                    Plaintiffs,               )
                                              )
        v.                                    )     Civil Action No. 07-2332 (ESH)
                                              )
ANDREW VON ESCHENBACH, et al.,                )
                                              )
                    Defendants.               )
_____)

**ORDER**

Upon consideration of defendants' motion to dismiss and the opposition thereto, it is

hereby

ORDERED that the motion is granted, and this case is dismissed with prejudice.

Date: _____

                                        _____
                                        UNITED STATES DISTRICT JUDGE