UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MOMS AGAINST MERCURY, *et al*., | ) |
| Plaintiffs, | ) Case # 1:07- |
| v. | )   cv002332-ESH |
| Andrew von ESCHENBACH, Commissioner, Food and Drug | ) |
| Administration; *et al.*, | ) |
| Defendants. | ) |

## *Plaintiffs' Opposition to Motion to Dismiss:*
## One or More Plaintiffs Have Standing, and
## Plaintiffs Have Stated a Cause of Action

Devoid of any defense on the merits – the law requires FDA to classify every

device, and FDA defiantly refuses to classify encapsulated mercury amalgam – FDA

banks its only hope on winning on a threshold question.  On standing, however, FDA

raises the bar beyond the Constitutional minimum, and ignores the nexus of several

plaintiffs to the required criteria of injury, causation, and redressability.  Seeking a

motion to dismiss, FDA bypasses the rather obvious point that major factual questions

exist; to prevail, the government would need this Court to decide factual issues in a light

most favorable to FDA, while of course the law requires the opposite.

## I. One or More Plaintiffs Have Standing

The attached sworn statements from several plaintiffs, along with the complaint,

show that one or more plaintiffs easily meet their burden of injury, causation, and

redressability.  Should the government move that plaintiffs need to amend the complaint

to elaborate in the way such sworn statements have done, plaintiffs will have no

objection.

Before proceeding plaintiff by plaintiff, it is important to point out that the

government is trying to move back the goalposts on what constitutes standing.

Particularly troubling is the government's theory on injury:  in effect, says FDA, <u>injured persons have roughly a nanosecond between "too soon" and "too late" to file suit</u>. Dentist Corrie Crowe has lost two babies to miscarriages, and the subsequent diagnosis is that mercury exposure in the public health clinic where she works is the cause.  "Too late," says FDA; she already miscarried.  She is still married and of childbearing age, but not pregnant at this time (so far as counsel know) and therefore – Catch 22 – it's also "too soon" for Crowe to be in Court.  Linda Brocato also flunks the nanosecond government theory;  she returned from round-the-clock nursing care to independent living by removing her fillings ("too late"), but her hope to walk again rests on medicine mainstreaming mercury toxicity as a cause of continued neurological impairment and hence engaging in an aggressive detoxification strategy ("too soon").

The government's theory of causation would have the Court ignore FDA's own policy about mercury and its virulent toxicity that is in effect at the Center for Veterinary Medicine, the Center for Drug Evaluation and Research, and the Center for Food Safety and Applied Nutrition – everywhere, really, but with the dentists and their allies at the Center for Devices.  FDA banned Mercurochrome.  FDA bans any mercury product for horses and dogs.  When mercury is in dental fillings, however, the Center for Devices – basing its theory of safety on longevity of use, not science[1] – says it's different when a dentist is the one putting mercury in a child's or a pregnant woman's mouth.[2]  Hence FDA asks this Court to rule that its policy to hide the mercury from unsuspecting Americans still believing the fillings are "silver" – a violation of its duty to classify and

---

[1] 67 Fed. Reg. 7626-27 (2002)

[2] FDA's unwillingness to protect unborn children from mercury exposure is particularly surprising in light of defendant Leavitt's professed commitment, both as Secretary and earlier as Governor of Utah, to protect unborn children.

to ban adulterated products -- somehow has no causal connection to the mercury causing severe harm to plaintiffs' health, economic status, and the unborn children they have been prevented from carrying to term, even though the entire remainder of FDA is advising consumers to the contrary. At the barest minimum, causation has major factual questions.

The government's theory of redressability is that FDA owes no duty to anyone to do its duty. FDA may ignore its legal duty to classify, says the government, because omniscient FDA officials, supreme over the law itself, determine FDA's "priorities." If "priorities" established by these philosopher-kings in Rockville mean defying the Food Drug and Cosmetic Act, so be it – no remedy exists for injured persons. Faced with choosing between adopting a rule whose special controls (disclosing zinc, hiding the mercury) cannot possibly survive a court test, and admitting it has been wrong, FDA is a non-chooser. The agency puts classifying mercury fillings into indefinite regulatory equipoise.

It is a well settled issue that the existence of a statute itself may create a legal right, the invasion of which causes injury sufficient to create standing. See *Warth v. Seldin*, 422 U.S. 490 (1975); *Linda R.S. v. Richard D*., 410 U.S. 614 (1973). By FDA's twenty-one year old failure to act in accordance with 21 U.S.C. §360(c), by FDA's subterfuge in classifying "component parts" but not the mercury amalgam device itself, Defendants FDA deprived each and every plaintiff herein of necessary notification about the actual device itself, in fact illegally on the market because EEADM is not individual components, *but a separate and distinct medical device* with specific directions for combining components in usage. Without such notification of the *device's* hazards, *each*

plaintiff, either by having had the device placed, or having handled the device, or having had a duty to create statutorily-mandated public warnings about the device, suffered injury by being unable to avail themselves of their right to informed consent – the right to be properly protected, through scientific classification, from a hazardous medical device (21 US 360(c)), a device so hazardous, in fact, that Scandinavian nations have outright banned its use.

If, *arguendo*, certain of plaintiffs' injuries were more heavily inflicted in the past than present, the fact is that every plaintiff herein has ongoing, current injury. Furthermore, the U.S. Supreme Court has held that "past wrongs...are evidence bearing on whether there is a real and immediate threat of repeated injury." *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) at 102.

A.    Michael Bender Has Standing

Mr. Bender is a Member, and former Chair, of the Vermont Advisory Committee of Mercury Pollution (*www.mercvt.org/acmp/index.htm*), based on appointment of the state's Governor.

The one case cited by the Government against Mr. Bender – *Alaska Legislative Council* v. *Babbitt*, 181F.2d 1333 (D.C. Cir. 1999) – applies to state legislators, and is plainly limited to that function. While the case probably means plaintiff Arizona State Senator Johnson does not get standing, it has no bearing on Bender.

The apt legal precedents are the cases challenging the Brady gun law, where Sheriffs from Vermont and Montana were granted standing because federal standards affected them in their duties. Standing was granted by two Circuits despite the impact

being a mere "thin reed."[3]   On appeal the Supreme Court accepted standing as it addressed the merits.[4]

As Bender details in his affidavit, FDA's failure to do its legal duty has impacted directly on his work.  He must make recommendations about the major sources of mercury, dental amalgam being one[5] -- but a federal regulator of this device, FDA, refuses to do its job.

The fact that FDA is AWOL on complying with its duty to classify amalgam has created an "unduly burdensome" impact on plaintiff Bender

In sum: (1) plaintiff Bender has direct injury because he, like the Sheriffs, falls short of fulfilling his duty as a state officials as a result of FDA's failure to fulfill its mandated duties; (2) the injury to Bender is caused directly by FDA's failure to do an

---

[3] After the Brady Act went into effect, Sheriffs in Vermont, Montana, and Arizona challenged the law's impact on their responsibilities.  The Vermont case twice reached the Second Circuit, in between being vacated by the Supreme Court in light of the parallel case: *Frank v. U.S.*, 78 F.3d 815 (2d Cir. 1996), *cert granted, then judgment vacated in light of Printz*, __ U.S. ___ (1997); *on remand*, 129 F.3d 273 (2d Cir. 1997).  In *Frank*, the issue of standing for the Sheriffs was squarely addressed – and standing was granted.  The Vermont county Sheriff could offer but "a thin reed" of a burden (the Second Circuit's term):  he argued that he was unable to enforce the law and that he was presented with had an administrative burden.  The dissent felt the burden too light to get standing, but the majority said the burden was sufficient to show injury, the first prerequisite.  Causation was obvious: a federally mandated policy that called for state participation.  Likewise, redressability would come if the Court struck down the federal provision.

[4] The Montana and Arizona cases were ruled on together by the Supreme Court, *Printz* v. *United States*, 521 U.S. 898 (1997).  Justice Scalia, for the majority, historically the most precise in ensuring parties have standing, did not even see the need to address standing for sheriffs.  Nor did the Court see fit to instruct the Second Circuit to address standing when it remanded *Printz*.

[5] Mercury Policy Project, Health Care Without Harm, Sierra Club, and Toxics Action Center, *Dentist The Menace? The Uncontrolled Release of Mercury*, by the (2002), *www.mercurypolicy.org/new/documents/DentistTheMenace.pdf* ; and Clean Water Action New England, Health Care Without Harm, Mercury Policy Project, Natural Resources Council of Maine, and National Wildlife Federation, *Taking a Bite Out of Dental Mercury Pollution / The 2005 Report Card on Dental Mercury Use and Release Reduction* (2005) *www.mercurypolicy.org/new/documents/NEZMC_Report_Card_on_Dental_MercuryFINAL.pdf*

environmental impact statement and by failing to classify, creating a vacuum of information; and by FDA's failure to issue proper Special Controls, stopping consumers in his state from learning information about mercury ; (3) redress comes when FDA classifies, permitting Bender to have before him, or deduce from the decision, information about mercury from the nation's leading health regulator that he can, with confidence, properly advise the Governor, the Legislature, and the people.

    B.    <u>Dentists Crowe and Landerman Have Standing</u>

    Analogous to Marie Curie's handling of, and perishing from, radium and plutonium before the risk of such toxins were fully understood, dentists Landerman and Crowe (as well as dental assistants Palmer, *infra*,) have all suffered, and continue to suffer from, chronic grave physical injury from having handled mercury in mercury amalgam devices.  Although both Crowe and Landerman no longer use this material, both have suffered injury so grievous its health effects cannot but persist: osteonecrosis resulting in loss of jawbone, teeth, and other hard tissue; demyelination from destruction of the myelin sheath encasing neurons resulting in, *inter alia,* nerves misfiring, inoperative tendons; heavy mercury toxicity resulting in autoimmune diseases which have been proven to range from grotesque foetal reproductive harms to parathesias, palsies, carcinogenic mutations and Alzheimer's.  Both Crowe and Landerman continue to require extensive medical attention for this occupational exposure, which is difficult to obtain from mainstream providers as the science on this issue is purposely obfuscated by Defendant FDA.  Neither can currently pursue their profession in traditional occupational workplaces not properly regulated for toxic mercury vapor release by OSHA due to FDA's inaction, because their injury has sensitized them to mercury poisoning, and both

have suffered and will continue to suffer economic and physical harms therefrom.

Additionally, dentists have a fiduciary duty to care for their patients, who rely on the doctor to give them proper information regarding their health and safety. Both Crowe and Landerman in turn rely on Defendant FDA to keep them apprised of the safety and science of medical devices released onto the market. FDA has failed in its statutory duty to do so, thus causing Crowe and Landerman to suffer harms. Such harms have long been accepted by the Court as creating third-party standing, particularly when there is no other venue to bring a grievance. See *Doe v. Bolton* 410 U.S. 179 (1973); *Griswold v. Connecticut*, 381 U.S. 479 (1965), *Barrows v. Jackson*, 346 U.S. 249 (1953).

C.  Corrie Crowe Has Standing

Corrie Crowe has standing not only as a dentist impaired by handling toxic mercury in the workplace, Corrie Crowe has standing *in propria persona* from ingesting toxic mercury vapors, whose methylated byproducts (as in the most toxic form of mercury, methylmercury) continue to live on in half-lives in her brain tissue, well after they ate through her foetus' brain, perhaps the most vivid example of mercury's virulent neurotoxicity herein.

Corrie Crowe spends half her monthly income just trying to get the mercury out of hers and her one living child's system so that they can survive. Her injury is not a past injury, or a generalized grievance, or lacking in concrete reality. It continues to plague her today, as it will tomorrow, as it has for almost two decades - the same two decades of defendant FDA's inaction.

Plaintiff Crowe will obtain immediate relief from imminent harms inflicted not only in her professional workplace, or her ability to carry out her fiduciary duties, *supra,*

but to her personal health and welfare were FDA to recognize and acknowledge that EAADM is illegally on the market, misbranded, lacking proper warnings, and making Dr. Crowe, as well as millions of children to retirees, sick every day, indeed every hour, this product is foisted upon the environment for public consumption without proper regulation.

       D.  <u>Linda Brocato Has Standing</u>

Linda Brocato was made paraplegic, essentially, because her right to informed consent was violated by dentists and doctors - whose right to informed consent was in turn violated, by FDA. Like Crowe's injury, like every plaintiff's injury herein, Brocato's injury did not stop when mercury amalgam was removed; this is not the mechanistic nature of this neurotoxin, whose half-life in brain tissue, unlike in blood tissue quantitatively measurable as lasting for months, cannot even be known for a fact (but is believed to be of at least 20 years duration). Ms. Brocato's devastating neurological impairments were *directly caused* by mercury toxicity, *which source* was mercury amalgams, the unregulated existence of which is *directly caused* by FDA. Ms. Brocato must continue to get medical help to survive on a daily basis.

While it is a fact that no one could compensate Plaintiff Brocato for the past injury she has so grievously suffered, Ms. Brocato's suffering is present and future injury as well. This Court could immediately remediate some of the harms perpetrated on Brocato by enjoining Defendant FDA to obey the law: properly assess environmental harms from mercury, properly assess the science behind mercury vapor exposure, and regulate accordingly. Were this Court to grant such relief, Brocato's efforts to find informed professionals from whom to receive medical care sufficient to perhaps even get

her up out of her wheelchair to walk again would be profoundly aided. Conspiring to keep a wrapper over the truth of this toxic substance has caused, causes, and will continue to cause irreparable harm to Brocato, who like other plaintiffs, relies on this Court for relief in the absence of any other forum in which to address FDA malfeasance.

E. Karen Palmer Has Standing

Dental Assistant Karen Palmer has standing, for occupational injury so severe she won a difficult workman's compensation case on grounds of mercury poisoning causing parathesias, chronic fatigue and peripheral neuropathy so severe she could no longer work.

Once again, Plaintiff Palmer was never told of what Palmer's boss apparently never knew, nor could Palmer have any access to such knowledge, as FDA stood silent while a quarter of a century elapsed. Palmer still cannot work, and still does not receive the medical care she may benefit from for diseases that supposedly marginally exist from a product whose dangers supposedly marginally exist.

Again, as with plaintiffs above, Palmer's injuries are not generalized, nor abstract, nor past, nor, although they may be to a certain extent – myelin sheaths surrounding neurons are not currently known to be rebuildable – irremediable. To the significant extent that they are remediable – promulgating accurate information about a medical device to the medical-device consuming public – this Court has the power to do so, preventing further irreparable harm to Karen Palmer as she continues to seek medical assistance for a disease whose symptoms continue to plague her, from a device marketed without requisite legal controls.

F. R. Andrew Landerman, D.D.S., has standing

Landerman is required to handle hundreds of grams of mercury every year, with no discernable end in sight, with two consequences to him: (1) a greater, non-trivial risk of being mercury toxic, *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1235 (D.C. Cir. 1996) (increased risk of forest fire sufficient for standing); and (2) the necessity (to minimize his risk of mercury toxicity) to spend up to thousands of dollars a year on equipment designed to safely remove mercury particulate and vapors in his clinic. Yet FDA will not "promote the public health by…taking appropriate action on the marketing of [amalgam] in a timely manner," nor "protect the public health [via] a reasonable assurance of the safety … of devices intended for human use."  21 U.S.C. § 393.  No doubt, FDA has been a causative factor in Dr. Landerman's injuries.  Had FDA not ducked classifying, decade after decade, either amalgam would be gone by not having been proved safe, or its use would be off-limits for children then turning into adults, or informed consumer choice would have sidelined the product's frequency.  Moving to the present, if FDA adopts the 2006 Panel recommendations, Dr. Landerman gets redress: more restrictions, fewer amalgams; fewer amalgams, less investment obligations and less risk.

G. Plaintiff Moms Against Mercury ("Moms") has standing.

For standing in its own right, the question is "concrete and demonstrable injury to the organization's activities – with the consequent drain on the organization's resources." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).  Injuries need not be economic. *Id.* ("that the alleged injury results from the organization's noneconomic interest in encouraging open housing does not effect the nature of the injury suffered.");

*Spann v. Gerstein*, 899 F.2d 24, 28 (D.C. Cir. 1990) ("increased education and counseling" is sufficient for organizational injury); *Abigail Alliance v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006) (actively engaging in an increase in "counseling, referral, advocacy, and educational services" is enough for standing). While Moms was initially formed to educate people about the dangers of mercury in thimerosol, it had to divert resources to informing its membership of another source of mercury: vapor from mothers' fillings going to the womb. Due to FDA's refusal to take meaningful action on amalgam, Moms has spent more time telling its membership what FDA will not: that amalgam contains mercury and is a huge risk for fetal health. Moms keeps the membership up to date on current developments in dental mercury regulation, largely through email. It even created a public service announcement that addresses the dental mercury issue, something it would not have had to do had FDA realized that mercury in "silver" fillings is something patients ought to know about. Because FDA has received an advisory panel recommendation that proposes that amalgam use be restricted in pregnant women and children, and in the event that this Court compels FDA to regulate amalgam, Moms will no longer have to inform women about the presence of mercury in amalgam.

Even if Moms does not have organizational standing, it has representational standing on its members' behalf.[6] Moms member Karey Williams, from Illinois, would never have had her ten amalgams placed if she was aware that they contained mercury. *Nat'l Taxpayers Union v. United States,* 68 F.3d 1428, 1435 ("at least one member" must

---

[6] Moms has representational standing if "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Humane Soc. of the United States v. Hodel*, 840 F.2d 45, 53 (D.C. Cir. 1988).

demonstrate injury). Because of her many fillings, she suffers "acute gastrointestinal, thyroid, and neurological problems." App. 298. While FDA action mandating contraindications and warnings would prevent a new generation of women like her from choosing amalgam as a filling option, it would not remove her ten fillings, fillings she says she cannot get removed "because her dentist refuses to remove them, and her insurance company will not pay for the removal of intact" mercury amalgam. *Id.* Redressability exists, however, because <u>FDA action calling for additional controls, per the panel's recommendation, would ease the reluctance of dentists and insurance companies like hers to remove fillings where there is concern that the continued presence of mercury fillings may harm her or her child</u>.

That the interests protected for Ms. Williams are germane to Moms' mission is clear: Moms seeks to remove all mercury from medicine, especially when it can risk fetal harm. Manifestly, the claim can be asserted, and relief granted, with Moms rather than Ms. Williams as a party.

H. <u>Connecticut Coalition for Environmental Justice (CCEJ) likewise has organizational as well as representational standing.</u>

Because FDA will not classify, mercury amalgam sales remain high – dentists are the third largest purchaser of mercury. Much of this mercury goes into the environment; <u>dental offices are the largest source of mercury in wastewater</u>.[7][8] CCEJ had to divert its energies from addressing other forms of pollution to fighting the release of dental

---

[7] Mercury Policy Project, Health Care Without Harm, Sierra Club, and Toxics Action Center, Dentist The Menace? The Uncontrolled Release of Mercury, (2002), *www.mercurypolicy.org/new/documents/DentistTheMenace.pdf*
[8] Clean Water Action New England, Health Care Without Harm, Mercury Policy Project, Natural Resources Council of Maine, and National Wildlife Federation, *Taking a Bite Out of Dental Mercury Pollution / The 2005 Report Card on Dental Mercury Use and Release Reduction*, *www.mercurypolicy.org/new/documents/NEZMC_Report_Card_on_Dental_MercuryFINAL.pdf*

mercury into "local urban environments" – sadly, the areas hardest hit by industrial toxins like amalgam.  To that end, it has had to spend money surveying local dentists about their use of mercury amalgam, and whether they have separators installed.  It has advocated for public hearings on the issue.  It has conducted a number of outreach efforts aimed at educating local residents about the existence of dental mercury in the environment.  It has petitioned the state government.  If FDA would only follow the FDA Panels' recommendation, or do an Environmental Assessment, public knowledge would grow and use would decline dramatically.  Soon, substantially less mercury would be in Connecticut wastewater.

CCEJ also has representational standing.  Four of its members would have chosen alternatives to amalgam had they been informed that their "silver fillings" are in fact composed of mercury.  Each member would benefit from (1) having FDA comply with its mission of protecting the public health by regulating devices in a timely manner; (2) seeing to it that less mercury is introduced into the local environment; and (3) enjoying a more precautionary, and proactive regulatory stance by FDA—one that makes getting treatment for mercury fillings easier.

I. Consumers for Dental Choice has standing.

Defendants would have this Court believe that the time, energy, and money spent by Consumers for Dental Choice, on the issue of having FDA comply with its statutory mandate to classify mercury amalgam, was for some set of "abstract social interests." However, defendant's failure to classify amalgam has impeded Consumers' mission to ensure that there is more effective governmental oversight of amalgam.  By never classifying amalgam, FDA has preempted Consumers from ever challenging any final

regulation on the grounds that it is arbitrary and must be set aside. So long as the device remains unclassified, the only remedy an aggrieved party can hope for is a court order. Also, while the device remains unclassified, special controls sufficient to protect sensitive subpopulations stay on the sideline. Effective governmental oversight of amalgam requires new special controls, warnings, contraindications—all of which would come to bear if defendants would just classify mercury amalgam. Defendants maintain that mercury amalgam is "effectively regulated" as a class II device, amalgam alloy. But amalgam alloy doesn't contain mercury. And mercury requires special controls that can be found in final regulations. Indeed, "effectively regulated" does not mean "regulate effectively," which Consumers has asked FDA to do repeatedly, for years.

Moreover, plaintiffs have spent a great deal of time and money doing what FDA will not: conducting surveys of dentists regarding the use of dental mercury, polling the public, raising awareness of the risks of using dental mercury in sensitive subpopulations, determining dental coverage across different state Medicare programs, and identifying trends and exposure levels. These are issues that FDA should have addressed years ago, when it could have classified mercury amalgam along with the other filling materials, but did not because of "inadvertent error." Now, defendants appear to ask the very questions that Consumers for Dental Choice, with very little resources, has attempted to answer for over ten years. *See* 73 Fed. Reg. 22, 877 (Apr. 28, 2008). Had defendants laid the proper foundation for the classification of amalgam, i.e., a comprehensive, impartial risk analysis, the identification of sensitive subpopulations, an inquiry into the availability of alternative treatment options, its current usage trends, and a review of its treatment by comparable regulatory agencies in different countries, plaintiff Consumers for Dental

14

Choice  would not have had to divert significant attention from its efforts to ensure that different states comply with their laws and regulations respecting mercury generally, or specifically in regard to precautions in dental offices, the treatment of mercury in wastewater, etc.  *See, generally, Havens Realty Corp. v. Coleman*  455 U.S. 363 (1982). This is not a case where Consumers for Dental Choice has expended money and energy challenging a regulation.  *See Fair Employment Council of Greater Wash., Inc. v. BMC Mktg. Corp.,* 28 F.3d 1268, 1276 (D.C.Cir.1994).  It is instead a case where plaintiffs have expended a considerable amount of resources acting where there has been no regulation.  *See, generally, Nat'l Treasury Employees Union v. United States,* 101 F.3d 1423, 1430 (D.C.Cir.1996); *see also, Alliance v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006).

## II.  The Court Has Subject Matter Jurisdiction

<u>21 U.S.C. §§360g(a)(4) and (8)</u>

The Government is correct that no subject matter exists under these two subsections; that cause of action goes to the Court of Appeals.


<u>21 U.S.C. §§351 and 352</u>

The causes of action alleging adulterated and mislabeled devices are fact questions.  The Center for Veterinary Medicine, for example, would consider a horse medicine containing mercury to be adulterated; indeed, it recalled Miracle Leg Paint II. The constant marketing of amalgam as "silver fillings," a fact well known to FDA, is an example of the mislabeling of the device.  That FDA chooses to allow dental organizations to promote the fillings as "silver" does not prevent a cause of action.  When

plaintiffs offer proof in the specifics, perhaps FDA will choose to, or be compelled to, change its famous "priorities" and decide to enforce the law against mislabeled and adulterated mercury amalgam.

21 U.S.C. §379o (incorporating NEPA into FDCA)

*Foundation on Economic Trends v. Lyng*, 943 F.2d 75, 89 (D.C. Cir.1991), makes clear that in this Circuit, "Withholding judicial review until there is final agency approval of the proposed action would effectively eliminate judicial oversight of NEPA's procedural requirements."   NEPA was designed to ensure that "important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." The need to fully assess potential harm *before* a project is undertaken is a major justification for the broad test courts have laid down for NEPA standing.  See *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349, (1989).  It is absurd to suggest that the National Environmental Policy Act allegation is a purely legal issue devoid of factual differences, or to suggest that the United States District Court lacks subject matter jurisdiction over NEPA cases.  The fact questions here must be developed; the Courts plainly have the authority to entertain such suits.  The two parties have intensely different versions of the facts.

FDA has repeatedly denied requests to do an Environmental Assessment, most recently in November 2007 before Congress.  In 2002, FDA falsely claimed in its proposed rule that it had considered environmental factors, so Congressional investigators asked for documentation.  It turns out that FDA had not one single document it had written; not one.  It gave the House a petition from Attorney Reeves,

submitted in 1997, asking FDA to do such an Environmental Assessment, a petition FDA has to this day never answered.

Therefore:

1) FDA has turned NEPA on its head:  FDA wants to consider all its options first; FDA wants to consider all public input first; FDA wants to move to the threshold of decision-making first.  NEPA requires the study first, so environmental factors may be inputted.

2) FDA made a false claim in 2002 that it had reviewed the environmental issues and found no reason to do a study.  With FDA admitting to Congress it has no documents whatsoever, major factual issues exist on the issue.  FDA may not ask the Court to dismiss the case based on <u>its</u> version of the facts.


<u>21 U.S.C. §393</u>

Here is the catch-all, FDA's duty to promote the public health.  It encompasses the specific duties, such as the duty to classify, 21 U.S.C. §360c(b)(1).

<u>Alternative statutory causes of action – leave to amend</u>

As stated above, plainly FDA has the duty to classify.  21 U.S.C. §360c(b)(1). Plaintiffs argue that such statute is subsumed in the catch-all or otherwise, as it is repeatedly cited herein.  Alternatively, plaintiffs ask the Court permission to amend the complaint to include this section as a cause of action.  Defendants are not aggrieved nor should not be surprised; it has been the gravamen of the back-and-forths in the past two years of litigation.

Unreasonable delay

Plaintiffs have pled unreasonable delay,[9] which defendants do not contest. *Motn.
at 35*. Plaintiffs also assert subject matter jurisdiction under 21 U.S.C. §1331. While
FDA is given real discretion to act, especially where a statute is silent on an end date, its
discretion is not limitless. To support FDA's refusal to classify, Defendants cite case law
that is not particularly helpful. Although both cases stand for the proposition that FDA
should be given great leeway when "implementing the definition of substantial
equivalence," or "weighing unproven benefits against small but unproven harms," or in
"judging the safety and effectiveness of medical devices," they are limited to those
situations where FDA is exercising its scientific judgment for devices already classified.
*Motn. at 4*1. Plaintiffs do not ask this Court to require FDA to reclassify dental mercury,
or perform a harm/benefit analysis, or implement the substantial equivalency mandates of
the FDCA.

Plaintiffs do not want this Court attempting to substitute its scientific judgment
for FDA's. Plaintiffs ask only that this Court require FDA to stop the unreasonable,
three-decade delay of its statutory responsibility to classify mercury amalgam.

To that effect, this Court is required to consider how much time has elapsed
since defendants came under a duty to act, the reasonableness of the delay in the context
of what Congress wanted, and the consequences of the agency's delay. *See, generally,
Cutler v. Hayes,* 818 F.2d 879 (D.C. Cir. 1987). Now, it has been <u>32  years since</u>
Congress ordered all pre-amendment devices to be classified, <u>21 years since</u> FDA
classified all other dental fillings except this controversial one because of an "inadvertent

---

[9] Quoting from page 20 of the complaint: "Defendants have unlawfully withheld and
unreasonably delayed the classification of encapsulated mercury and amalgam alloy."

error," 16 years since winning a mandamus based on exhaustion of remedies, 14 years since a classification panel recommended that mercury amalgam be classified, 11 years since promising in writing to classify mercury amalgam, 6 years since a sequence of meetings began between plaintiffs and FDA officials that have continued year after year, 6 years since promising a House committee it will classify, 3 years since promising a Senate confirmations committee it will classify, 3 years since plaintiff Consumers for Dental Choice filed a sequence of petitions for FDA to act, 2 years since two Scientific Advisory Committees voted decisively that FDA's claim of mercury amalgam's safety is mistaken. All the while, mercury amalgam has been "effectively regulated" as a non-mercury containing alloy, without precautions, contraindications, or warnings for pregnant women, children, people with impaired kidney functions, and other sensitive subpopulations.

Next, this Court must consider how reasonable 32 years is. When Congress passed the Medical Devices Amendments Act of 1976 (MDAA), it was concerned with FDA's inability to regulate effectively the vast numbers of medical devices on the market. At the time, FDA had no real way of ensuring the safety and effectiveness of devices on the market, and those that were soon to enter. Many devices already on the market, if they did not kill anyone, were given no further attention. They were neither safe nor unsafe. Other devices were on the market, were immediately unsafe, but FDA had little enforcement mechanisms to deal with them. *See* SENATE REPORT NO. 94-33. S. REP. 94-33, 11, 1976 U.S.C.C.A.N. 1070, 1080) (1975) Other devices were shams, quack devices meant to fool the public into believing they offered a clinically

significant benefit.[10]  In light of this, Congress passed the MDAA, noting the urgency of the situation.

It is no surprise that the American Dental Association, along with the American Dental Trade Association, had real reservations about the bill.  They argued that dental devices should be exempted from classification, are not harmful or life-threatening, and most interestingly: that the market for dental products was very small. *Id*.  They lost.

Defendants would have this Court believe that FDA is "steadily working" towards regulating amalgam, and that considering "the current controls in place for regulating EAADM and the complex issues regarding classification, FDA's activities regarding classification of EAADM have not been unreasonable." Motn. at 46.  However, there aren't any responsive special controls in place.  For a device containing mercury, consumers should expect some contraindications, perhaps some informed consent, maybe a brochure; dentists should expect some controls on the handling and safe disposal of mercury.  If there are any issues that are complex, they would by and large be addressed in response to the questions in FDA's new comment period, which closes this summer. FDA could act by this fall.  That FDA could have asked these same questions, and proposed an end date for classifying 20 or 30 years ago in the face of then-existing consumer pressure makes its delay patently unreasonable.

Finally, this Court must examine the consequences of the agency's delay in classifying mercury amalgam.  As FDA says, the consequences attributable to its snail's pace of regulating amalgam is indeed a most critical factor. *Motn. at 42*.  FDA's argument goes like this: Mercury amalgam has been used for decades.  Although it was

---

[10] As an aside, the term "quack" is derived from a name given to early dentists who placed "quacksilber," or quicksilver/mercury fillings in the mouths of their patients.

"inadvertently" not classified, it's effectively classified (without special controls that address mercury) as a non-mercury containing alloy. Because FDA "determined that it had a reasonable assurance of safety for" non-mercury containing amalgam alloy, "it reasonably had similar confidence for" mercury-containing amalgam. *Id*. No one is hurt, defendant says, because mercury amalgam is regulated!

The consequences of FDA's unreasonable delay in *regulating* mercury amalgam are clear. Amalgam alloy was never prescribed special controls. It is a class II device without special controls. *See* http://www.fda.gov/cdrh/ode/guidance/1192.pdf (at p. 3); *see also* 21 C.F.R. §872.3050. Mercury-containing silver fillings are "effectively classified" as amalgam alloy. Motn. at 42; *please see also* http://www.fda.gov/cdrh/pdf5/K053114.pdf (an example of mercury-containing EAADM being deemed substantially equivalent to amalgam alloy, a device with no mercury, and no special controls). Because mercury amalgam is "regulated" as class II amalgam alloy, it has no special controls. What this means is that for 32 years, there has not been a warning, a labeling revision, a precaution, or a contraindication issued to *one* consumer to reflect the fact that mercury amalgam contains mercury.

Mercury is swallowed when placed or removed. It is swallowed when chewing, or drinking hot beverages. It is inhaled as vapor when drilling an old filling. It is inhaled by patients, dentists, and assistants. It gets stuck in the carpet. It crosses the placental barrier. And yet not ONE special control, all by virtue of it being "effectively classified" as amalgam alloy. [11]

"Effective classification" means regulation for defendants, and regulation, for plaintiffs and other American consumers, has meant literal tons of dental mercury, with

---

[11] As another aside, Band-Aids likewise have no special controls.

accumulative and disastrous consequences, for both the human and animal environment alike.

In addition to the practical consequences of regulating a mercury-containing device as one without mercury and accompanying special controls, an additional consequence attributable to FDA's regulatory pace has been the preemption of effective judicial review.  Until FDA classifies mercury amalgam, the only remedy a plaintiff can hope for is classification.  After classification, the remedy changes, *i.e.*, a court then has the power to set aside an FDA rule that is arbitrary, capricious, or otherwise not in accordance with the law.  That case has been under wraps for a long time. And it will stay as such, so long as FDA continues to avoid classifying amalgam.  Until then, mercury amalgam continues to be sold as a device with safety controls akin to bandages.

Respectfully submitted this 8th day of May 2008

_____/ s /_____
Charles G. Brown, DC Bar #930-248      Robert E. Reeves, KY Bar # 57,358
316 F St., N.E., Suite 210             REEVES LAW OFFICE
Washington, DC 20002                   167 West Main St., Suite 1310
Telephone 202.544-6333, fax 202.544-6331 Lexington, KY 40507
charlie@toxicteeth.org                 Teleph 859-226-0700, fax 859-226-0711
                                       robertereeves@aol.com

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MOMS AGAINST MERCURY, CONNECTICUT COALITION | ) |
| for ENVIRONMENTAL JUSTICE, OREGONIANS for LIFE, | ) |
| CONSUMERS for DENTAL CHOICE, Michael BENDER, | ) |
| Karen JOHNSON, Karen PALMER, Corrie CROWE, Anita | ) |
| Vazquez TIBAU, R. Andrew LANDERMAN, Linda BROCATO, | ) |
| Plaintiffs, | ) |
| v. | ) |
| Andrew von ESCHENBACH, Commissioner, Food and Drug | ) Case # 1:07- |
| Administration; Randall LUTTER, Deputy Commissioner; | ) cv002332-ESH |
| Norris ALDERSON, Associate Commissioner; Dan SCHULTZ, | ) |
| Director, Center for Devices and Radiological Health ("The Center") | ) |
| Chiu LIN, Director, Anesthesiology, General Hospital, Infection | ) |
| Control and Dental Devices, The Center; Mary Susan RUNNER, | ) |
| Director, Devices Branch, The Center; Mike LEAVITT, Secretary, | ) |
| Department of Health and Human Services; | ) |
| Defendants. | |

### AFFIDAVIT OF SANDRA N. DUFFY, J.D.

I, Sandra N. Duffy, of Lake Oswego, Oregon, swear that the following is true and based upon my personal knowledge:

1. I am President of the Board of Consumers for Dental Choice ("Consumers"), a Delaware private non-profit corporation (at www.toxicteeth.org), with headquarters in Washington, D.C., and a plaintiff in the above-captioned action, and the lead consumer group challenging FDA's decades of regulatory inaction on mercury amalgam dental fillings.

2. I am a lawyer licensed to practice law in the State of Oregon since 1982. I have been employed by Multnomah County, the most populous county in the state, for more than twenty years, and specialize in municipal administrative law.

3. It is the sole mission of Consumers to abolish the use of mercury amalgam dental fillings, which contain 50% elemental mercury (1/2 to 1 gram per filling). When the use of mercury amalgam is abolished, Consumers will have fulfilled its mission and will cease to exist.

3. Consumers is the only organization in the United States representing the interests of American dental consumers relating to the safety of mercury amalgam dental fillings.

4. Consumers has filed formal petitions with the FDA requesting compliance with federal law and federal regulations that mandate classification of dental devices. Consumers has filed mandamus actions in federal courts seeking a court order to mandate

that FDA fulfill its statutory and regulatory mandates to classify the dental device known as encapsulated amalgam fillings.

5. Additionally, Consumers have held meetings with FDA officials, written letters to officials at all levels of the U.S. Senate and the U.S. House leadership, assisted with Congressional oversight hearings, organized submissions to the FDA and congressional hearings by injured consumers and mercury-free dentists, monitored literature reviews conducted by or on behalf of the FDA, conducted surveys related to the use by dentists of amalgam and the public's awareness of the issues related to amalgam, critiqued scientific experiments or published scientific articles related to mercury amalgam, and otherwise taken steps to require FDA to comply with the Food Drug and Cosmetic Act.

6. Consumers' budget revenues come from grants (25%) and monthly donations by mercury-free dentists (75%). The budget revenues are used to pay for office rent, utilities, services, equipment, personnel, education, public relations, litigation and other expenses related to our mission.

7. FDA's failure to classify encapsulated mercury amalgam has impeded Consumers' mission. By never classifying amalgam, FDA has preempted Consumers from being able to legally challenge any final regulation that falls short of an adequate warning of toxicity or a ban of the product. So long as encapsulated mercury amalgam remains an unclassified dental device, the only remedy an aggrieved party can hope for is a court order to classify. Also, while the dental device remains unclassified, special controls (warnings) sufficient to protect sensitive subpopulations are non-existent. American dental consumers are the class intended to be protected by the federal statutes and federal regulations directed at dental devices. No other organization, other than Consumers, exists solely to protect the American dental consumer from harm presented by mercury amalgam dental fillings.

8. At a minimum, 25% of paid personnel time has been spent on FDA and its failure to meet its statutory and regulatory obligations. Consumers has spent a great deal of its resources doing what FDA will not do: conducting surveys of dentists regarding the use of mercury amalgam dental fillings, polling the public, raising awareness of the risks of using dental mercury in sensitive subpopulations, determining dental care coverage across different state Medicare programs, identifying mercury exposure levels and following trends related to the usage of mercury amalgam. These are issues that FDA could and should have addressed decades ago if it had classified mercury amalgam along with other filling materials it actually did classify in compliance with the law.

9. In fact, just recently, the FDA published a Federal Register notice an April 28, 2008, (73 Fed. Reg. 22, 877) seeking responses to questions that lay a foundation for classification of encapsulated mercury amalgam: the existence of a comprehensive, impartial risk analysis; identification of sensitive subpopulations who might be more easily harmed by mercury exposure from amalgams; an inquiry into the availability of alternative treatment options; the current usage trends of mercury amalgam; and a review of mercury amalgam treatment by comparable regulatory agencies in other countries.

Many of these matters are the same questions that Consumers, with very limited resources, has attempted to answer over the past decade.

10.  Because of the FDA's recalcitrance in fulfilling its legal duties, Consumers spent much time, as well as its limited resources, to work with states to ensure that they were complying with their laws and regulations respecting mercury generally, or specifically with regard to protections for dental personnel (state OSHA and dental board actions), environmental contamination caused by mercury amalgam releases from dental offices, mercury solid waste contamination originating from dental offices, as well as mercury air pollution from crematoria caused by amalgam in the deceased.  These state efforts were made by Consumers, at considerable expense in time and with a drain on Consumers resources, because of the lack of FDA compliance with federal law and federal regulations.

11.  Consumers also has a non-economic interest in American dental consumers, dentists and dental personnel not being exposed to mercury from amalgam fillings sooner than later.  As a consumer protection organization, founded for the purpose of protecting American consumers from toxic exposures from mercury amalgam dental fillings, the continuation of such exposures is harmful to dental consumers and to Consumers on an ongoing basis.

12.  On a regular basis I receive phone calls from people around the country who have been mercury poisoned by amalgam fillings seeking help.  Consumers receives and responds to many emails from such people.  There is an increasing number of inquiries seeking referrals to mercury-free dentists, health care professionals who treat mercury poisoning and educational materials to learn more about the amalgam issue.  We spend more time telling dental consumers what the FDA will not – that amalgam contains mercury, is a risk to themselves, their children and their unborn children

13.  I make this Affidavit in support of Plaintiffs' Motion for a Preliminary Injunction in the above-captioned case.

Affiant saith no more.

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct pursuant to 28 U.S.C. Section 1746.  Executed on this_May 8, 2008
/S/_____    (Signature)

Sandra N. Duffy, J.D.

*Charles G. Brown, Counsel for Plaintiffs*
*316 F St., N.E., Suite 210*
*Washington DC 20002*
*Phone 202.884-0315*
*Fax 202.544-6331*
*E* [charlie@toxicteeth.org](mailto:charlie@toxicteeth.org)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MOMS AGAINST MERCURY,  et al., | ) |
|     Plaintiffs, | ) Case # 1:07- |
|     v. | )   cv002332-ESH |
| Andrew von ESCHENBACH, Commissioner, Food and Drug | ) |
| Administration; et al., | ) |
|     Defendants. | ) |

AFFIDAVIT OF MICHAEL BENDER

I, Michael Bender of Montpelier, Vermont, a plaintiff in *Moms Against Mercury v. Von Eschenbach*, swear that the following is true and based upon my personal knowledge:

1. Via appointment of my Governor, I am a member of the Vermont Advisory Committee of Mercury Pollution ( *www.mercvt.org/acmp/index.htm*).  I have served as the Co-Chairman of that body.  (I am not representing or speaking for the Committee or any other Member.)

2. My statutory duties include "advising the general assembly, the executive branch, and the general public on matters relating to the prevention and cleanup of mercury pollution, and the latest science on remediation of mercury pollution."

3. By creating an Advisory Committee focused exclusively on mercury, our state legislature demonstrates a state policy of serious concern about the enormously harmful impact this element, coming from several sources to people, the environment, and the overall interests of the state.

4. A major source of mercury in Vermont is from amalgam, manifesting itself in several ways.  In addition to spillage, air and water releases from dental offices, it comes from the human beings who receive the fillings AS FOLLOWS:  the largest source of mercury from homes is via human feces emanating from the mercury in amalgam; the largest source of air pollution in communities with no power plants is from amalgam when the dead are cremated; and a major source of mercury in the ground is from BURIED AMALGAM in human burial.

5. Simple knowledge that "silver fillings" are really "mercury fillings" would dramatically reduce the use of mercury amalgam, but the Food and Drug Administration refuses to issue such warnings.  States have begun to do so because FDA will not; three New England states – Maine, New Hampshire, and Connecticut – now mandate that dentists hand fact sheets, prepared by the state, to patients about the mercury.  See, e.g., *HYPERLINK "http://www.state.me.us/dhs/boh/files/odh/AmalBrochFinal2.doc"*
*www.state.me.us/dhs/boh/files/odh/AmalBrochFinal2.doc*

6. I am directly and adversely affected in my duties by FDA's failure to classify and failure to warn.  Advocates of mercury amalgam, including dentists still placing amalgam and the association that represents them, repeatedly cite FDA as supporting its use, relying on FDA's 2002 draft regulation, never adopted, and on FDA old news releases, which contain inaccurate information but which have never been corrected. FDA's refusal to do an Environmental Assessment on amalgam, the third largest use of mercury in the United States today, means information about the contribution of amalgam to the mercury problem is missing.  FDA inaction and FDA silence means I am unable to report accurately, or advise wisely, the Governor, the Vermont Legislature, and the citizens of my state on the impact of dental amalgam to the mercury problem.

7. FDA repeatedly has refused to an Environmental Impact Statement, or even an Environmental Assessment, on mercury amalgam regulatory decision, despite assertions from a committee of the House of Representatives and from petitioners that the step is legally required before classifying.  Such a study would be enormously beneficial to me in my work, and FDA's failure to do the EIS, a precondition to classifying, harms me in my Advisory work.

8. The adverse impact on my duties caused by FDA silence and FDA inaction can start to be cured by the Court removing mercury amalgam from the market, or by FDA classifying amalgam, with appropriate Special Controls, and providing warnings or educational materials to consumers about the impact of mercury exposure from amalgam.

I declare under penalty of perjury that the foregoing is true and correct pursuant to 28 U.S.C. Section 1746.  Executed on this 8th of May 2008.


_____/s/_____
Michael Bender

AFFIDAVIT OF DR. CORRIE CROWE

I, Corrie Crowe, D.D.S, of Cherry Hill, New Jersey, swear that the following is true and based upon my personal knowledge:

1.      I have been a dentist for fourteen years now, licensed by and working primarily in the state of Florida since 1994, with intervening periods of Air Force service, until last January, when I moved to New Jersey to join a metal-free dentistry practice.

2.      From  July 2003 to January 2007 I was dental director of the Inverness Dental Center in Citrus County, Florida, where I treated a large proportion of Medicaid patients.

3.       I treated these patients initially with mercury amalgam, as I was taught to do in school, for several years until I stopped using mercury fillings, but other dentists in the practice continued to do so, exposing all of us to mercury vapors.

4.      Because of occupational exposure to mercury in mercury fillings, I have suffered serious illness, great loss, and continue to suffer from and require medical treatment for  immunosuppressant mercury poisoning.

5.      In October of 2004 I lost my first child, who was terminated at four and a half months, due to a cleft lip and a skull with no brain lobes formed within it;  the worst case of holoprosencephaly  (incomplete cleavage of the embryonic forebrain) the hospital said it had ever seen.  We had already named this little girl.

6.      My husband and I were tested for genetic disease suspected of causing this deformity occurred and found to normal.

7.      In the spring of 2006, I developed a nasty rash on my leg, for which I saw approximately five doctors over the course of the next year, yet not one doctor could figure out what it was until an occupational dermatologist/toxicologist identified it as a mercury burn.

8.      In September 2006, doctors advised me to terminate my second child, who had no heartbeat and for whom the doctors had evidence would again be malformed.

9.       In December of 2006, after I found out that a dental assistant I had hired was keeping scrap mercury amalgam in a cup next to other cups where she collected metals from dental restorations in hope of reselling the used metal for money, I called up the Health Department to investigate mercury toxicity in my workplace.

10.      Several days later, the Health Department tested mercury levels with a Lumex detector (mercury sniffer), and found them to be off the charts.

11.       In April of 2007, I received autopsy results back from Dr. Nylander of Sweden on both foetuses, which definitively showed foetal mercury poisoning.

3

12.    In May of 2007, I was tested for mercury toxicity and found to have a body burden of mercury four times higher than normal.

13.    In September of 2007, my sixteen-month old son, my one live birth of three conceptions, was also found to mercury poisoned, with levels almost five times higher than normal.

14.    The main reason I moved to New Jersey was to be closer to medical treatments - intraveneous therapies - for myself and my son. These treatments are not covered by insurance, and cost me half my monthly income, leaving us struggling economically with barely enough for rent and food.

15.    I attended the top-ranked dental school in the nation at the time, the University of Texas Health and Science Center at San Antonio [UT]. No one there taught, or appeared to know, about mercury toxicity (although if a thermometer containing mercury was dropped, the room was evacuated.)

16.    In 1990, the Monday after a Sunday night CBS "60 Minutes" expose on the mercury in mercury fillings, UT hastily convened a panel meeting at which dental student attendance was mandatory, to convince students that no hazard from mercury fillings existed.

17.    I found out last year that UT accepts significant funding from the pro-mercury amalgam ADA, more than most dental schools.

18.    I have never been compensated at all for any of my pain and suffering through using this mercury-filled medical device, which did not come with the sort of warnings it so clearly merits. I have been marginalized in my academic and medical community for speaking up about what other countries have already accepted as mainstream knowledge. I have lost income, children, my health and my children's health. We continue to suffer from mercury poisoning.

19.    However, if other dentists, as well as their patients, were to be warned through proper FDA classification about this virulent neurotoxin, mainstream doctors would be educated, I would more easily and affordably being able to obtain my own and my son's extensive medical treatment (eg., through insurance reimbursement), I would cease to be stigmatized for my accurate medical knowledge, and I would be able to provide safer care to my patients, as would all dentists.

I declare under penalty of perjury that the foregoing is true and correct pursuant to 28 U.S.C. Section 1746. Executed on this 8th of May 2008.

_____/ s /_____
Corrie Crowe, D.D.S

AFFIDAVIT OF LINDA BROCATO

I, Linda Brocato, of Prospect Heights, Illinois, swear that the following is true and based upon my personal knowledge:

1.      I am currently a victim of mercury poisoning, and have been for the last thirty-one years, ever since I had the mercury dental amalgams continually placed in my mouth starting at 7 or 8 years of age.

2.      In 1976, when I was 27 years old, I began suffering from migraine headaches, light sensitivity, severe nausea and temporary loss of my center vision.

3.      I was diagnosed by a neurologist as suffering from a demyelinating disease and optic neuritis and placed on the steroid, prednisone.

4.      By 1981, suffering with great difficulty in walking, I was diagnosed with Multiple Sclerosis (MS) an incurable autoimmune disease by another neurologist.  I felt hopeless when I heard this diagnosis.

5.      By 1987, I underwent the first of many treatments of chemotherapy and experimental plasmaphoresis for MS along with the other medications.

6.      By 1988, I could no longer work, I was so ill, and had to go on disability.

7.      In 1990, I became paraplegic, was confined to a wheelchair, and required 24-hour care.

8.      In 1990, I found out from the founder of DAMS (Dental Amalgam Mercury Syndrome) about Multiple Sclerosis and its connection to mercury poisoning from the "silver" in the mercury dental amalgam fillings.

9.      By September 1990, I had all 16 fillings removed, and immediately experienced noticeable neurological improvement, such as a lessening of slurred speech.

10.      In 1994, results of a Neurometric Brain mapping EEG & EP Report concluded- "As a result, there is evidence which supports both a degenerative disease and toxicity."

11.      I believe that had the mercury amalgam filling been properly labeled with sufficient warnings and the health risks involved, my dentist would have known enough never to have placed this dangerous product in my mouth, inches from my brain.

12.      Now I know that there is a large amount of data on the connection between mercury fillings and diseases like the one that has taken most of my life away. Norway and Sweden have banned amalgams as of January 1, 2008, and Denmark has announced that it is phasing out amalgams later this year.

13.     I know that if the federal agency charged with protecting me from dangerous medical devices were to properly classify and regulate this toxic material, mainstream doctors would be aware that mercury could precipitate this disease and mainstream insurance would cover treatments, and I would have a much better chance of achieving recovery.

14.     I also know that the longer FDA pretends, by not restricting this biohazard, that there is no connection between MS and mercury amalgam, the more delayed the treatment will become that I require, causing me to suffer continued damage for which I can never truly be compensated.
.
        I declare under penalty of perjury that the foregoing is true and correct pursuant to 28 U.S.C. Section 1746.  Executed on this 8th of May 2008.


_____/ s /_____
Linda Brocato

## AFFIDAVIT OF DR. MARK MITCHELL

I, Mark Mitchell, M.D., of Hartford, Connecticut, swear that the following is true and based upon my personal knowledge:

1.      I am the head of the Connecticut Coalition for Environmental Justice (CCEJ) is a Hartford, Connecticut-based non-profit formed to protect local urban environments, defined as the places where residents in the State live, work, and go to school.

2.      CCEJ  was formed approximately ten years ago, in response to the startling amount of pollution in Connecticut's cities, and its impact on low-income people. CCEJ works by educating the public, lobbying policy-makers, and engaging in dialogue with local business leaders.

3.      As an organization, CCEJ enjoys a healthy budget, six employees, and an 1800-person mailing list. A mailing goes out to membership at least once a month.

4.      On the mercury issue, membership has been kept abreast of local and state issues, as well as national policies involving dental mercury, including a recent State decision to give dentists an exemption from zero-mercury laws aimed at preventing its dissemination.

5.      In the past several years, CCEJ has held workshops on the health effects of mercury and the impact of dental mercury on the local urban environments. We have prepared for and attended public hearings on the issue, conducted a survey of dentists, and created lapel pins in an effort to get the issue across to the public. While we have focused most of our efforts on pollution from trash incinerators, power plants, and aging sewer systems, we have had to divert a considerable amount of resources to fighting the Department of the Environment's refusal to consider mercury from dental amalgam as the type of mercury that was contemplated under the zero-mercury laws. CCEJ has data proving that dental mercury finds its way into the urban environment from dental offices, crematoriums, and households via fecal and urinary excretion.

6.       CCEJ also takes issue with the fact that mercury amalgam is effectively a treatment option reserved for the poor – because the wealthier, less vulnerable populations in our state can afford and are more likely to be aware of the lowered toxicity of tooth-colored composite filling materials.

7.      Once educated as to the considerable dangers of mercury amalgam, our members have had to insist that they and their children be given composite fillings at dental clinics, and the limited number of dentists who accept Medicaid.

8.      Because dental mercury from amalgams is the largest source of

wastewater mercury, CCEJ is concerned that FDA's continuing failure to regulate amalgam will mean increasing amounts of mercury in the urban environment we fight everyday to protect. Mercury in sewage tends to adhere to the solids and is concentrated in sewage sludge that remains after the liquid sewage is treated. In Connecticut, the vast majority of our sewage sludge is incinerated in or near urban centers. A report on mercury in the air conducted for the state of Connecticut attributed the highest airborne emission to the close proximity to a sewage sludge incinerator.

9.       CCEJ also knows that a simple environmental assessment of dental mercury in sewage and sewage sludge will make clear that the benefits of using amalgam are clearly outweighed by its environmental and human costs. If FDA would just look at the consequences of mercury pollution from amalgams, and simultaneously issue a preference for composites and resins while calling for a phase-out of mercury amalgam, CCEJ can focus its energies on pollution sources that have more complex causes.

10.       In addition to CCEJ's interest in amalgam, its members share a more personal experience with this toxic material. For instance, Dawn Simonsen, who now works for CCEJ, began as a member/volunteer. Earlier on, she had no idea that the "silver fillings" in her mouth were actually half mercury. After CCEJ began to spend some time on the dental mercury issue, she soon discovered that she had a mouth full of mercury, almost five grams, or ten fillings.

11.       I know that Dawn feels that the FDA could do more to inform people like her that amalgams contain mercury, and had she been aware, she would never have had them placed. As a member of CCEJ, and as a consumer who has to carry five grams of mercury in her mouth every day, she says that her rights in a functioning, law-abiding FDA would be vindicated if it took steps first to study the impact of dental mercury in the environment, and made it more acceptable to remove amalgam for precautionary reasons. Dawn expresses frustration that women in countries like Canada get warnings while women like her unknowingly elect a mouthful of mercury.

12.       Another one of our members, Jose Arce, went to the dental clinic at the University of Connecticut to have his amalgam fillings removed. He was first told that there was almost no mercury in dental amalgam. We challenged the dental student who said that and were eventually able to speak to the supervising dentist who stated that amalgam removal was cosmetic dentistry and that it was their policy not to perform cosmetic dentistry. Jose finally went to Peru to have his amalgam fillings replaced at an affordable price.

13.       Other members, who know that FDA has a duty to ensure the safety of amalgam fillings, and would have refused treatment with mercury amalgam had FDA regulated mercury amalgam in compliance with the Federal Food, Drug, and Cosmetic Act and its implementing regulations, are as follows: Nicole Beaucar, who currently has a couple of mercury fillings; June O'Neil, with four mercury fillings that she cannot afford to replace; and Allan Mercado, who has eight mercury fillings currently.

14.    As for myself, my dental insurance reports that they will cover none of the $11,460.00 that it would cost me to replace my twelve amalgam fillings.  I would certainly not have had these fillings placed if I had known that FDA was unsure about their safety, or was told that they release mercury vapor that is easily absorbed into the body and bioaccumulates.

15.    Because of the resulting heightened awareness and educated policies stemming from proper FDA regulation,  I will benefit from the myriad of healthy effects the medical community, the dental community, CCEJ's members and our environment will also benefit from if FDA carries out it statutory duty to conduct environmental assessments and classification of mercury amalgam fillings.

16.    I know that the daily irreparable harm caused by the hosting, handling and disposal of hazardous waste from mercury amalgams will sharply decrease if mercury amalgam is either removed from commerce or at least immediately correctly classified as the environmental and health risk it is, for which other countries have already accordingly so regulated  its use.

        I declare under penalty of perjury that the foregoing is true and correct pursuant to 28 U.S.C. Section 1746.  Executed on this ___ of May 2008.


_____/ s /_____
Mark Mitchell, M.D., MPH

## AFFIDAVIT OF AMY CARSON

I, Amy Carson, of Leicester, North Carolina, swear that the following is true and based upon my personal knowledge:

1.    I am  Co-Founder and President of Moms Against Mercury,  a five-year-old non-profit organization based in Western North Carolina dedicating its time to educating its membership, as well as the larger public about the dangers of mercury exposure, especially from sources like FDA-regulated products containing mercury such as the preservative thimerosol, mercury amalgam, mercurochrome, and various other drugs and biologics.

2.    Mercury amalgam is a particular concern of ours because lactating women are often not aware that mercury vapor is released in not-insubstantial amounts from "silver" fillings during dental work, and in smaller quantities everyday by the act of chewing gum, brushing teeth, or drinking hot liquids.

3.    I know that while other countries are moving to warn mothers against having mercury amalgams placed, FDA continues to abdicate its regulatory responsibilities. Therefore, the task of trying to keep mercury out of the placenta, our breast milk, and the children we love—falls upon our volunteer group.

4.    To that end, Moms Against Mercury sends out roughly three to five blast emails a month to our membership.  One or two of those monthly emails routinely focuses on the amalgam issue, although that number has been higher recently because of this lawsuit, and other state initiatives.  We are also the creators of a public service announcement, available at www.momsagainstmercury.org, which discusses mercury from dental fillings at length.

5.    Although we are alarmed about mercury exposure in general, our membership, horrified by data it learns of being released by other countries and U.S. scientists regarding birth defects and brain damage, is most concerned with mercury from vaccines and dental fillings.

6.    I am aware that one of our members, Karey Williams, who is of childbearing age and otherwise suffers no impediments to conceiving, complains that she cannot afford to have her ten mercury fillings removed and is scared this will affect her pregnancies.

7.    Karey has told me of suffering from acute gastrointestinal, thyroid, and neurological problems stemming from mercury exposure through amalgams.

8.    I know that had FDA taken appropriate, timely action on regulating mercury fillings, by giving directly to her the same amalgam labeling that dentists receive, for example, or otherwise making public the risk she faces from mercury amalgams, she would have elected not to have mercury amalgams placed.

9.      I am sure, as is Karey, that increased regulation of amalgam by FDA will make her concerns more widespread, thereby making it easier for her to receive treatments for her mercury burden, including the removal of amalgams.

10.     I know that if the FDA were forced to do its job, our members such as Karey will not have to deal with the frightening type of problem Karey currently faces, which is that she has not been able to remove her mercury fillings because her dentist refuses to remove them; her insurance company will not pay for the removal of intact, although mercury-containing, amalgams; and the dentists that could remove her fillings at a competitive price may not do so because FDA continues to claim that they are safe, except for those who are "allergic" to mercury.

11.     Raising an autistic child in an age where a wealth of solid scientific data connects mercury exposure to autism, I know first-hand the irremediable neurotoxic effects of mercury exposure, even in so-called miniscule amounts, has on children and adults.

12.     Based on the amount of people we have as members who are concerned about mercury and possess this knowledge as well, I am sure that the number of people supposedly "allergic" to mercury is actually huge, and that mercury poisoning is not to be dismissed as a mere "allergy" when children are being born with neurological problems, mothers are nursing babies with contaminated milk, and mothers risk bearing grotesquely deformed children if mercury vapor reaches their reproductive organs, which, along with brain tissue, mercury has actually been proven most likely to harm.

I declare under penalty of perjury that the foregoing is true and correct pursuant to 28 U.S.C. Section 1746.  Executed on this 8th day of May 2008.


_____/ s / _____
Amy Carson

## AFFIDAVIT OF DR. ANDREW LANDERMAN

I, R. Andrew Landerman, D.D.S, of Sebastopol, California, swear that the following is true and based upon my personal knowledge:

1.      I currently practice dentistry in Sebastopol, California, and have been practicing since 1967.

2.      While I do not place mercury amalgam any longer, I remove approximately 10-20 amalgams in any given week. Each mercury amalgam is roughly 50% mercury, and therefore I am confronted with the task of removing and handling 5-10 grams of mercury every week.

3.      In order to handle mercury safely, and thus minimize its exposure to everyone who walks into my practice, including my employees, I follow precautions outlined by the American Dental Association, as well as the International Academy of Oral Medicine and Toxicology.

4.      Because the fibers in carpet absorb mercury vapors, which are difficult to remove, even with a steam cleaner, I was required to pay for the linoleum floor in my present office. Linoleum does not trap mercury particulate in the same way that carpet does. I also had amalgam separators installed at a cost of approximately $2500. Separators prevent the mercury in the amalgam removal process from being washed down into the sink, where it would later end up in wastewater, and then our public waterways. Maintenance for separating mercury is $100 to $500 per year, and involves routinely changing separator filters, as well as mercury disposal by a company specializing in hazardous materials.

5.       I also have two chair-side systems designed to address mercury vapors from amalgam, a high vacuum system and a negative ion generator. The vacuum system is placed in the patient's mouth during the amalgam removal process, and works by removing and filtering the particulate-laden air in the mouth. I paid close to $1000 for this necessary precaution. The ion generator actually blows the residual, mercury-filled air across the patient's mouth, where it is picked up on the other side of the room. The generator is about $600.

6.      Finally, I expend sums on rubber dams, pieces of rubber that are stretched across the mouth in the mercury amalgam removal process. This ensures that my patients are not swallowing mercury, or inhaling its vapors.

7.      I believe that if FDA had done more to recognize the burden that dentists suffer because they have to handle mercury, either by mandating industry-wide controls, or by acknowledging that dental mercury is an unjustified environmental pollutant and has no place in dentistry, I would not be part of a large and growing group of dentists who must expend a considerable amount of money protecting ourselves, our employees and our patients from mercury exposure.

8.      Despite the added cost, and increased risk of mercury exposure—it has been worth it to remove mercury fillings. It is my experience that patients see clinically significant improvements in their health after amalgam removal.

9.      I know that mercury is unnecessary in modern dentistry, and should FDA finally see to it that this form of mercury exposure is something my patients should be protected from, or at a minimum, be made aware of, I will rejoice in the day where I no longer have to handle mercury, or expose my staff or patients to it.

I declare under penalty of perjury that the foregoing is true and correct pursuant to 28 U.S.C. Section 1746.  Executed on this ___ of May 2008.


_____/ s / _____
R. Andrew Landerman, D.D.S.

### AFFIDAVIT OF KAREN PALMER

I, Karen Palmer, of Bethlehem, Pennsylvania, swear that the following is true and based upon my personal knowledge:

    1. I was a dental hygienist for over twenty years until I was diagnosed with heavy metal toxicity from mercury in May 2004, from which I still suffer.

    2. As a young woman, I had 9 mercury amalgam fillings placed in my teeth.

    3. My illness began  September 1998, when I experienced a very sudden onset of a combination of stroke and heart attack symptoms, including full body tremors, that I now know to be caused from chronic mercury vapor exposure.

    4. After a 5-day hospital stay and numerous tests by specialists attempting to treat the above, I was given a prescription, but no explanation for these symptoms other than "we see this sometimes, we really don't know why."  I continued to suffer from episodes of numbness, dizziness and severe low energy.

    5. In July of 2003, I was struck with such pain, numbness, tingling, facial and later full-body burning sensations, I had to see a neurologist.

    6. The neurologist provisionally diagnosed MS due to "sensory disturbances," but eventually decided, in January 2004, that my brain was "misfiring."

    7. However, in May of 2004, after seeking comprehensive health history evaluation and testing from a chiropractor and doctor specializing in environmental medicine, I was diagnosed as carrying 1275% total mercury body burden above baseline normal, and had received a definitive diagnosis of mercury poisoning.

    8. Because of the severe parasthesia, chronic fatigue syndrome and peripheral neuropathy from which I suffered, as well as memory loss and depression, I could no longer work, and won a workman's compensation suit for these occupationally-caused illnesses in April 2005.  I still cannot work in my field because I am too sick from having been mercury poisoned.

    9. I continue to suffer from toxicity, experiencing memory loss, depression, loss of tendon reflexes along with other symptoms of demyelination that is the hallmark of progressive neurodegenerative autoimmune diseases like MS.

    10. I am now aware of, and experienced firsthand, is that all dental hygienists release vapor from fillings when they scale and scrape teeth with hand or electronic instruments and when they polish teeth with a rubber cup or bristle brush.  As dentists drill fillings, even more significant levels of vapor pour off of the fillings. The dust and particles created from the drilling process contaminate the patients, doctor, staff and surrounding countertops, wall and floors, and, in fact, mercury vapor goes right through

the mask and gloves I was told were protecting me.

     11. However, I know that because the FDA does not report the accurate science on this neurotoxin, does not properly classify or warn about the mercury in mercury fillings, it is very difficult for me to receive the medical care I need to fully recover, because so many mainstream doctors do not even know that mercury lodges in the brain where it stays for year after year, suppressing the immune system and killing neurons by destroying their myelin sheath. If doctors don't know what's caused a disease, they will know even less about how to treat it.

     12. I am sure that if FDA restricted the use of this toxic substance through proper classification, I would neither have such a difficult time getting medical care I need to recover, nor would I, along with the 266,000 dental assistants serving millions of patients, lack the serious full-body protections I need to work in my field assisting during the removal of this toxic substance from patients' teeth if I become well enough to work again.

     I declare under penalty of perjury that the foregoing is true and correct pursuant to 28 U.S.C. Section 1746. Executed on this ___ of May 2008.


_____/ s /_____
Karen Palmer