UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MOMS AGAINST MERCURY,  CONNECTICUT COALITION for ENVIRONMENTAL JUSTICE,  OREGONIANS for LIFE, CONSUMERS for DENTAL CHOICE,  Michael BENDER, Karen JOHNSON,  Karen PALMER,  Anita Vazquez TIBAU, R. Andrew LANDERMAN, Linda BROCATO, | ) ) ) ) ) Case # 1:07- |
| Plaintiffs, | )    cv002332-ESH |
| v. | ) |
| Andrew von ESCHENBACH, Commissioner, Food and Drug Administration, *et al.*, | ) ) |
| Defendants. | ) |

## The Other Plaintiffs Oppose Plaintiff Palmer's Motion to Vacate Settlement

A broad range of consumer groups, public officials, and injured individuals have won a six-year legal battle against the Food and Drug Administration.  Starting with public comments to FDA proposals and petitions to FDA, progressing to hearings before Congress and before FDA scientific advisory committees, and then in the past two years in the courts, the case has accomplished, in words of one plaintiff, "the two greatest achievements in the history of the ban-mercury-fillings movement – in one fell swoop" (Pl Exh 6; see also Pl Exh 7 and 8).

The settlement, reached at an intensive Court-ordered mediation session on May 30 before Magistrate Judge Facciola, has two main aspects -- both breathtaking in scope, both having heretofore having eluded plaintiffs and the entire movement for mercury-free dentistry:

- FDA will classify encapsulated mercury amalgam on a date certain (July 28, 2009, one year following the close of the public comment period on a proposed regulation).

- FDA agreed to rewrite its website, making (according to one plaintiff's affidavit) "a 180-degree reversal from FDA's 30-year policy of protecting mercury fillings." A website formerly claiming, unequivocally, that amalgam is safe, now raises specific concerns about its health risks – from  "mercury exposure" – to

children, pregnant women, lactating women, and others. It included these dramatic statements:

> "Dental amalgams contain mercury, which may have neurotoxic effects on the nervous systems of developing children and fetus."

> "Pregnant women and persons who may have a health condition that makes them more sensitive to mercury exposure, including individuals with existing high levels of mercury bioburden, should not avoid seeking dental care, but should discuss options with their health practitioner."

To its credit, FDA proceeded forward on that second step in good faith, amending its website the very day after the parties inked the contract. The Movant audaciously seeks to keep the benefit of the bargain, the new website, while pushing for a different classification date.

The radical changes in the website drew huge press coverage, all favorable to the movement opposed to mercury fillings. Articles in the Associated Press, Reuters, *Newsweek*, etc., noted that FDA has "reversed course"; gives "warnings" about amalgam; suggests some populations should not get amalgam. Several of those articles are at the top of the website of Consumers for Dental Choice, *www.toxicteeth.org*.

As further evidence of its enormous success for the advocates of mercury-free dentistry, FDA's changed website drew condemnation from our movement's main protagonist, American Dental Association; *www.ada.org/public/media/releases/0806_release03.asp*

All 11 plaintiffs – repeat, all 11 plaintiffs – agreed with this result, recognizing it for the landmark achievement to which they have aspired for years.

One plaintiff who agreed with great enthusiasm Karen Palmer – the plaintiff who two weeks later filed this motion to break the settlement. She wrote her counsel that the settlement is "great"; she called Brown "brilliant"; she expressed thanks that she could

play a role in it.  There's more: Palmer wrote her friends, attached counsel's summary of the settlement, praising the settlement and bragging about her role in bringing it about.  In both e-mails, she astutely noted, with specific examples, the impact the settlement will have in moving forward the cause – against protagonist American Dental Association, and in favor of adopting a fact sheet in Philadelphia in a project with which she works closely with Brown.  Later, after hearing from a settlement critic, she raised questions about it to Brown, which he answered in a phone call, but did not change her position.  Four days later, however, she showed no concern whatsoever with the settlement terms, writing Brown to wish him Happy Birthday, heap praise on his accomplishment, and adding, "you changed my life, Charlie."  (See section I., below.)

Anticipating the difficulty of getting 11 people to agree on anything, Palmer and all other plaintiffs (with one excusable exception[1]) individually signed a contract with counsel Brown promising to accept "reasonable settlement offers."  All other plaintiffs found the settlement offer "reasonable" – actually, as the affidavits show, their enthusiasm is far beyond that.  Palmer's motion doesn't even address the contract, and hence fails to argue why the settlement is unreasonable; that alone should doom her motion.

As with many breakthroughs, initial enthusiasm can evolve into debate, and from there into division.  One of the settlement critics had something others did not – the resources to hire counsel to fight the result.  A dental society called International Academy of Oral Medicine & Toxicology (IAOMT), a mercury-free dental association

---

[1] The exception being Consumers for Dental Choice, for which Brown is national counsel and for whom he labors daily in-house (and for which, hence, no contract was necessary).  The board of directors of Consumers for Dental Choice approved the settlement with but one dissenting vote.

highly respected by the plaintiffs, debated whether *its* lawyers could have gotten a superior settlement. On June 14, a full two weeks after the settlement had been agreed to, the group's executive committee convened, and after an intense debate voted to authorize its attorneys to challenge the settlement. A problem existed for IAOMT: no plaintiffs as of June 14 were challenging the settlement – hence IAOMT lawyers had no way to challenge it. Undeterred, IAOMT lawyers over that weekend talked repeatedly to Palmer, and (see Part V), on June 16 she authorized this motion. The genesis of this motion is therefore a dental society's goal to have different settlement terms than those negotiated by consumers groups.

IAOMT counsel filed this motion for Palmer the same day she engaged them. Not surprisingly, such a quick turnaround left little time to check out the facts of her case. And indeed, that short-cut by Movant's counsel alone dooms this motion. Palmer swore falsely in her affidavit that she never approved the settlement, when in fact, she did, in an e-mail to Brown that her counsel presumably don't know about. Surprisingly, the motion fails even to discuss the contract Palmer had with her counsel, which limited Palmer's right to refuse a settlement if its terms are "reasonable," something that surely her counsel should have read, then argued in the motion. Palmer's demand that the rule be written in 90 days, or a mere 30 days after the public record closes, is more than unreasonable – it is irrational. It is also at odds with her other colleague-plaintiffs, who find giving FDA a year to classify, along with the website change, is a reasonable course of action; surely reasonableness should be measured in part contextually; all other plaintiffs disagree with Palmer's conclusion.

So fourteen days after approving the settlement and noting its finality, fourteen days after praising it to her friends and bragging about her role, thirteen days after FDA complied with one of the two major requirements of the settlement (the website), ten days after again praising Brown for what he had done, Palmer reappears, with adverse counsel hired by a dental group, to set it aside. This Johnny-come-lately motion by a former supporter of the settlement comes after FDA has changed its position by adopting the website (one of the two major requirements), and after the settlement has been recognized as the biggest accomplishment of the movement to ban mercury fillings, is absolutely lacking in merit.

I. <u>Movant Palmer approved the settlement, recognized its finality, noted its usefulness in the future, and bragged about her role in the success --- then wrongly swore to this Court that she did not approve the settlement.</u>

Movant Palmer, aligning herself against nine plaintiffs who support the settlement, claims she "did not approve the settlement." (Movant's Exhibit E). Sadly for Ms. Palmer, the truth is otherwise. She wrote counsel Brown approving the settlement, then wrote her friends saying how proud she was of the settlement. To the undersigned, she wrote on June 2:

> "Dear Charlie,
> How great is this!! Brillant [*sic*], are you! Thank you for the phone call Sat.
> afternoon, really appreciate it!! AND for allowing me to be a small part of it!!
> Look out Phila.........armed with this, we cannot lose! Good luck!!
> Take care,
> Karen P." (Pl Exh1)

Also on June 2, 2008, not only did Palmer approve the settlement, she bragged about it to her friends (Pl Exh 2). She forwarded Brown's memorandum describing the settlement to a list, and stated as follows:

> "Hi everyone! FYI, I was in Wash,D.C. for May 16th Hearing, the only
> Plantiff (*sic*) introduced to Justice Dept. and FDA legal team, present. What a
> day that was! Now, let's see how the ADA scrambles, ie; damage control.
> (the FDA is their "boss") Stay tuned! Very, very exciting! This is what keeps
> me going, truly!
> Take care
> Karen"

Note that Palmer not only speaks of the case as being over, but brags about her central role in the accomplishment – she, and she alone among the [eleven] plaintiffs, attended the oral argument.  Elevating herself, correctly, as one of the players who made this outcome possible, she takes pride when writing her friends about a job well done – and a job that is over.

In both the reply approving the settlement and the letter bragging about it, Palmer expressed unequivocal delight with it, with no reservations whatsoever.   In both e-mails, *she recognized its finality, and refers to the case in the past tense, as a completed project*.

There's more in these e-mails:  *Palmer recognizes the settlement for its value to the movement, even suggesting tactics on how to use it to advance the overall goal to ban mercury fillings*.  She astutely recommends to Brown to use the settlement in Brown's meeting the next day with the Deputy Mayor of Philadelphia.[2]  She notes to her friends that the settlement will have a de-stabilizing effect on the ADA (the American Dental Association, the nation's largest dental group).

Palmer's affidavit to the Court is also incorrect in alleging that Brown and she talked on Sunday (June 1); Palmer's e-mail, coming close in time (Monday after the

---

[2] In December 2007 the City Council of Philadelphia enacted a law mandating a fact sheet on mercury fillings be handed out by all dentists; the fact sheet must be prepared by the City Board of Health in consultation with Consumers for Dental Choice.  The e-mail references the fact that Charles Brown would be meeting with that city's Deputy Mayor/Health Commissioner the next day.  Hardly a stranger to what is going on, Palmer's note is evidence that she works with Brown on more projects than the one lawsuit.

weekend), states Brown called her on Saturday (May 31) – and that she appreciated the call.  While the Saturday v. Sunday error may be inadvertent or inconsequential, *no excuse exists for counsel and Palmer advising this Court that she never approved the settlement.*

II. After advising Brown she approved the settlement, Palmer did not withdraw that approval for 14 days, far too long to take seriously her motion to set it all aside.

Just hours after Ms. Palmer sent Brown the two previous emails, she talked to the other attorney who had negotiated the settlement, but who has inexplicably changed his mind to become a settlement opponent.  Hence, she raised a number of questions about the settlement, questions that (she admits in her brief) Brown addressed in an oral conversation. (Movant's Exhibit B)  But N.B.:  *Palmer did not withdraw the approval she gave hours earlier; she merely asked questions*.

Four days later, on June 6, Palmer made clear any concerns she had were now a thing of the past.  She sent Brown birthday greetings (Pl Exh 3), adding the following:

> "You changed my life, Charlie.  Thank you ever-so-much!! Just want you to
> know I care deeply about you. My hope and prayer is that we will continue to
> work together to end the Hg madness ASAP, even if getting there is not the
> way you had envisioned it. Change is hard, but it also can be a good thing, in
> the end :)"[3]

After that burst of praise for Brown and the work he had just done, Palmer never writes Brown.  She does not change her position.  She lets stand her latest message, which is fulsome praise.  The only logical conclusion: she still agrees with the settlement.

Ten days later, Palmer writes Brown:  She will challenge the settlement.  It has been 17 days since Brown wrote her, 16 days since he called her, 14 days since Palmer

---

[3] According to common internet practice in the U.S., a semicolon followed by an end of parentheses facing the semicolon designated a happy face, an expression of pleasure or approval by the sender to the recipient.

accepted the settlement, 14 days since she bragged to her friends about her role in winning the case, and ten days since she last wrote Brown, which was a letter thanking him for "chang[ing] my life" and looking forward to continuing the battle to "end the mercury madness."

This sudden emergence of Palmer as an opponent can be explained by the entry of a dental group who engaged counsel on June 12, including one of the lawyers who negotiated the settlement two weeks earlier, to fight for new settlement terms. Those lawyers, though aware Brown was her lawyer, talked to Palmer over the weekend, and she enlisted.

A TV quiz show constantly asks contestants if that is "your final answer." In settlement approvals, no such gamesmanship is allowed. The settlement is approved, the case is over. At some point or another in perhaps everyone's life comes a point of "buyers remorse," regret over agreeing to a contract or a deal. The agreement having been made, maturity demands – and the law requires – the regretful assenter to accept her/his earlier judgment, and move on.

III. <u>Palmer had agreed in the contract with counsel not to refuse "a reasonable settlement offer."</u>

In engaging Brown as her counsel (Pl Exh 4), Palmer delegated substantial authority to him to reach a settlement, agreeing with this sentence:

> "Your signing this letter means you are amenable to reasonable settlement offers."

Realistically, counsel had to have a contract to avoid having one litigant blocking a reasonable remedy. Eleven plaintiffs are in the case, not for money but for a remedy. They all understood, in signing up, that *Brown could negotiate only one remedy – not 11*.

Yes, damages – money – could have 11 different numbers; a change in agency policy can have but one. No damages aspect existed in this case at any time.

Severely limited resources in the nonprofit arena – at least in *this* movement – play a major role too. The 11 plaintiffs come from nine states; the case was financed by Consumers for Dental Choice, which has a quite small budget. Consumers for Dental Choice plainly could have flown 11 plaintiffs to Washington, house them, and assemble them next door to the mediation session. But none so requested. E*very one of the 11 has worked closely with Brown for years*, some as long as twelve years. All of them, including Palmer (see section IV, below) were quite willing to give deference to Brown.

Here are six reasons why Palmer is unreasonable for refusing to accept the July 28, 2009, classification date – and counsel reminds the Court that Palmer proffered not a single reason why she is being reasonable insisting on three months to classify:

> 1. Palmer is outnumbered nine to one on the issue of whether the settlement is reasonable. Indeed, affidavits from plaintiffs call the settlement "much more than we could have asked for" and "far beyond what anyone has ever done battling FDA"; and "absolutely everything we could have gotten from the Judge, then doubled." The latter references the point that Judge Huvelle said she would only set a date to classify, while *counsel got an entirely unexpected accomplishment the Judge would not have ordered, the re-writing of FDA's official position on mercury amalgam*!

> 2. The settlement got the very remedy asked for in this lawsuit: for FDA to classify; the complaint's remedy section, at the end, makes that clear. It's as if the settlement counsel sues for a million dollars, receives and accepts the offer, and returns to proclaim success, but has the client saying: Even though my demand was one million dollars, I now want two million dollars. (Actually, other plaintiffs feel they *did* get double the demand, because of the website change too.)

> 3. Three months to classify (the demand Palmer decided she wanted two weeks after the case was over) is a preposterously short period of time. FDA needed to use up two months to hear public comment (which ends July 28), then must write it up. There is no way FDA could even begin to write the rule within three months.

4. Assuming *arguendo* that taking a year to classify *is* too generous, it must be balanced against the other achievement of the negotiators: the website change, the event that drew worldwide attention and acclaim.

5. The risks must be taken into account, and Palmer must recognize Brown's experience representing nonprofit groups in the District of Columbia. For such clients, standing is a major barrier. Plaintiffs won that motion in the District Court; whether that would hold up in a Court of Appeals whose majority has created new barriers for standing for nonprofit groups was a risk not worth taking.

6. The time to litigate must also be taken into account. If Brown had walked out and litigated, the classification date could well have stretched into 2010, under a scenario of the government appealing the Judge's date while it appealed. As with (5), above, Brown's legal knowledge of the risk must be factored in, and taking the bird in the hand was the far superior move, according to all but Palmer.

IV. Palmer gave Brown actual authority to settle the case.

Palmer's lawyers are misleading this Court by claiming Palmer expected to be consulted for every specific of the settlement. The opposite is true. The day before the settlement conference, she voiced full support for Brown to act, and to use his discretion to make the best choice for all plaintiffs (Pl Exh 5).

> "I'll be thinking of you tomorrow afternoon ..........best of luck! I know you'll do great !!
> Can't wait to hear all about it! You and Bob can't lose! Glad you both will be there to support one another!
> It is our time...........
> --Karen P."

If it is true that Palmer never gave Brown settlement authority, as she swears in Movant's Exhibit E, then it makes little sense that she wrote Brown that she could not "wait to hear all about" the settlement. If she had any doubt as to Brown's ability to settle the case, she was also "glad" that Brown and Reeves would be at the mediation to "support one another."

Movants argue that this case should be recognized as a situation where an attorney without actual settlement authority has bound his client to an agreement after

leading the opposing party to believe he has such authority. Movants ask this Court to rely on *Makins v. District of Columbia*, 861 A.2d 590 (D.C.Ct.ofApp. 2004), to find that Brown had no authority to settle this case. In *Makins*, however, the settling attorney and the client did not have a written retainer. The client in *Makins* wanted her job back, something a $99,000 settlement could not deliver. The client in *Makins* did not affirm the settlement offer after negotiation. In *Makins*, there is nothing more than representations made by an attorney that he had settlement authority; conversely, there is nothing more than representations made by the client that the settlement was not authorized. *Makins v. District of Columbia*, 277 F.3d 544, 545-546 (C.A.D.C. 2002). Because there was nothing more, the lower court found that while there was no evidence of actual authority, the attorney had apparent authority to settle—a decision that was reversed on appeal.

This case is different. Here, Palmer gives Brown the authority to "settle the case for something less"; she agreed when hiring him to be "amenable to reasonable settlement offers" (Pl Exh 4). This is not just an agreement between lawyer and client, or a simple retainer; indeed, the retaining agreement goes to the heart of this matter, i.e., whether Brown has actual settlement authority. A derivation of "settle" is found twice in the retainer. No such agreement is found in *Makins*. Also, Palmer wants the same remedy as her counsel—the classification of mercury amalgam. Brown agrees to one year. Palmer, depending on whether you read Movant's Exhibit B or Movant's Sec. IV, allegedly desired a 3-6 month classification period. The factual differentiation with *Makins* continues: Palmer, unlike the client in *Makins*, spoke with Brown about the settlement afterwards, on Saturday May 31. Even two days later, on Monday June 2, 2008, Palmer responds to the news of the settlement by email, saying that it is "great,"

that she was thankful to be a "small part of it," and that they are "armed" with the

negotiated agreement (Pl Exh 1).

In *Makins*, the case turned on whether the attorney had the apparent authority to

settle, because there was nothing beyond representations made by counsel and client.

Because there is virtually no local law on the question of apparent authority, and because

of the "importance of determining when a lawyer has apparent authority to settle a case,"

*Makins*, 277 F.2d at 553, the United States Court of Appeals for the District of Columbia

Circuit certified to the District of Columbia Court of Appeals the very same question

contained in the "legal issue presented" portion of Movant's motion to vacate.

This is not a case where the "client has not given the attorney actual authority to

settle the case," as Movant would have you believe. S*ee Makins v. District of Columbia*,

389 F.3d 1303 (C.A.D.C. 2004); Movant's Sec. IV.  Indeed, this is not a case that turns

on the client's communication to the FDA, implicating apparent authority. *See Makins,*

277 F.3d at 550.  Therefore, the question presented by the Movant in her brief is

inapplicable.

This is instead a case that "depends on communication between the client and the

attorney…" *Id.* As such, it is a case that turns on whether Brown had actual authority to

settle the case against FDA. Whether there is actual authority is determined under a

"reasonableness" standard, a standard that reveals that actual authority is created "by

written or spoken words or other conduct of the principal, which reasonably interpreted,

causes the agent to believe that the principal desires him so to act on the principal's

account."  *Evans v. Skinner,* 742 F.Supp. 30 (D.D.C. 1990) (quoting Restatement

(Second) of Agency Sec. 26).

Two issues are determinative: the authority that the client expressly gave to the attorney, and the totality of the relationship between the two. *See id* at 32 (looking for direction to *Edwards v. Born, Inc.,* 792 F.2d 387, 391 (3d Cir. 1986)).  It is also crucial that there be "proof that the client initially authorized a settlement upon terms offered (or terms left to the discretion of counsel), or that the client initially approved a proposed settlement and later had a change of mind." *Matzo v. Postmaster General*, 685 F.Supp. 260, 262 (D.D.C. 1987).

Here, Palmer gave Brown express authority to settle the case, as evidenced in the retainer.  That authority was acknowledged after Palmer learned of the settlement, spoke to Brown on May 31, 2008, and then by an email dated June 2, 2008 expressed gratitude that she played a small part in it all.  It is clear from this, and from the silence of all other plaintiffs that settlement terms were to be left to Brown.  Furthermore, this wasn't the type of attorney/client relationship where counsel was hard to find, reach, or talk to. They talked often by phone, email, and even exchange birthday wishes.  Along among the plaintiffs, Palmer attended the oral hearing, then had lunch with Brown afterwards. Observing the Court, she must have been aware that Brown's negotiating changes in the website was a coup, one that could not have been achieved at a trial.  A full four days after settlement, all plaintiffs were satisfied. And Palmer was not dissatisfied until other counsel, with another client (see below) told her she could have the settlement vacated with better results.  Indeed, given all of the above, it is clear that Brown's belief that he had actual authority to settle was reasonable "based on the client's communications and in light of the totality of the attorney-client relationship." *Evans v. Skinner,* 742 F.Supp at 32.

V.  <u>This motion came about because an interested group not party to the litigation</u>
<u>authorized its counsel to wedge off a plaintiff and go fight the settlement.</u>

The International Association of Oral Medicine & Toxicology ("IAOMT") is a
splendid organization, a dental society that has financed scientific research and which
stands steadfastly for mercury-free dentistry.  Its president, Dr. Pierre Larose; its
chairman, Dr. Jack Kall; and its other leadership are men and women of high integrity.
Its members are in the main highly idealistic, dentists who have courageously stood up
against tradition in their communities; indeed, Consumers for Dental Choice, of which
Brown is national counsel, has recognized a number  of them as "pioneers for mercury-
free dentistry."

But IAOMT was not part of this case; this case was brought solely by consumer
groups, state public officials, and individuals.  To allow a dental society, even one with
the vision of IAOMT, to engineer the undoing of a settlement between FDA and
consumer groups, et al., in order that the dental society lawyers may negotiate or litigate a
result more pleasing to the dental society, would be unjust the other plaintiffs, and
injurious to the public interest.

Two weeks after the case was settled, the executive committee of IAOMT
convened, and after an intense debate, directed its lawyers to initiate a legal action to re-
open the settlement.  But as of that day, no plaintiff supported breaking the settlement –
hence no motion could be filed until a plaintiff be found.  Meanwhile counsel Brown had
polled every single plaintiff, none of whom wanted to move forward against the
settlement; he asked an IAOMT counsel to cease and desist from contacting any clients.
Undeterred, IAOMT counsel called Palmer on June 14.  She had further such
conversations on June 15.  On June 16, ten days after her last e-mail to Brown which

14

praised his work, Palmer wrote Brown to advise she was switching sides.  Later the same

day, her new counsel filed the motion and affidavit.

VI. Equities as well as facts argue for rejection of the motion.

The facts show Palmer has waited far too long to switch sides.  Her initial

approval of the settlement binds her.  If it does not, then the contract, disallowing an

unreasonably refusal to settle, binds her.  And if not that, her open-ended instructions to

counsel on the mediation, sent the day before, provided counsel needed discretion,

prudently used, to achieve an historic settlement.

The equities are equally compelling.  Ten plaintiffs have achieved a great victory.

It would be most unfair to take it away.  Nor is it fair to FDA for it to change its position

by putting up a website, because of the settlement, then have the rug pulled out.  The fact

that this settlement challenge came about because a dental society – albeit a respected

part of the movement for mercury-free dentistry – seeks to change the settlement

engineered by consumer groups also should factor heavily in this issue.

Submitted this 26th day of June 2008

Counsel for Plaintiffs:


_____/ s /_____
Charles G. Brown, DC Bar #930-248
316 F St., N.E., Suite 210
Washington, DC 20002
202-544-6333
charlie@toxicteeth.org


Plaintiffs' Eight Exhibits Follow

*Plaintiffs Exhibit 1*

From: pmikekaren@aol.com [mailto:pmikekaren@aol.com]
Sent: Monday, June 02, 2008 12:27 PM
To: charlie@toxicteeth.org
Subject: Re: We did it...FDA agrees to classify, and even to re-write its website

Dear Charlie,

How great is this!! Brillant, are you! Thank you for the phone call Sat. afternoon, really appreciate it!! AND for allowing me to be a small part of it!! Look out Phila.........armed with this, we cannot lose! Good luck!!

Take care,
Karen P.


-----Original Message-----
From: Charlie Brown <charlie@toxicteeth.org>
To: Charlie Brown <charlie@toxicteeth.org>
Sent: Fri, 30 May 2008 8:28 pm
Subject: We did it...FDA agrees to classify, and even to re-write its website

Dear Clients

　　　　We have gotten an incredible settlement w. FDA.  (1) We have met the goal of getting a date by which FDA will classify mercury fillings.  (2) The bonus, and it's a huge one, is that FDA has dramatically re-written its website, taking out its propaganda and false claims and replacing it with the fact that mercury fillings raises health questions, especially for children and for unborn babies, and for immuno-sensitive and high-mercury-body-burdened persons.  **We got FDA to change its position on amalgam,** just at the point it begins to write the rule.

　　　　Our motion for an injunction (April 22) led to a court hearing (May 16), where Judge Ellen Huvelle ordered FDA and us into mediation.  We met with the mediator, Magistrate Judge Facciola, on Thurs. (May 29), where over four hours we hammered out an agreement.  FDA will classify mercury amalgam within one year of the close of public comments on its rule, on July 28, 2009.  Rule-making takes a long time, unfortunately; they have so many hurdles that Congress and the Office of Management & Budget have piled on.  So I insisted that FDA announce a new policy now, while it writes the rule, and FDA lawyers agreed.  Hence the drastic shift in the website, which I believe will be posted by the end of this week.

　　　　Our cause has fought for so many years to get FDA to classify.  My work started in 2005, with petitions, then in 2006, with our first lawsuit.  Most of you were plaintiffs in that case too.  Then in 2007 came the current case.  The turning point was our motion for a preliminary injunction, because the Judge told FDA it would have to classify.

I deeply appreciate not only your emotional support, but also the authority you gave me to make the critical decisions to reach the lawsuit's goal:  that FDA classify mercury amalgam.  We have met that goal, and then some.

If you have objections, call me right away.  If you have questions, call me whenever you want.

Charlie

30 May 2008

ph. 202.544-6333

Charles G. Brown, National Counsel

Consumers for Dental Choice

316 F St., N.E., Suite 210, Washington, DC 20002

Ph. 202.544-6333; fax 202.544-6331

charlie@toxicteeth.org, www.toxicteeth.org

*Plaintiffs Exhibit 2*

From: Eliz Wright [mailto:ewright953@yahoo.com]
Sent: Monday, June 02, 2008 2:13 PM
To: pmikekaren@aol.com
Cc: Charlie Brown
Subject: We did it...FDA agrees to classify, and even to re-write its website

Karen, I can't thank you enough for keeping me in the loop.  If you have a chance, let me know when you expect to come to DC.  May 16th- my calendar reminds me it was a rainy day & I rode my bike to work!  It was Nat'l Bike to Work day.

*[Personal information about Ms. Wright and her employment status deleted]*

Elizabeth

*--- On Mon, 6/2/08, pmikekaren@aol.com <pmikekaren@aol.com> wrote:*

From: pmikekaren@aol.com
Date: Monday, June 2, 2008, 11:41 AM

Hi everyone! FYI, I was in Wash,D.C. for May 16th Hearing, the only Plantiff introduced to Justice Dept. and FDA legal team, present. What a day that was! Now, let's see how the ADA scrambles, ie; damage control. (the FDA is their "boss") Stay tuned! Very, very exciting! This is what keeps me going, truly!

Take care
Karen


-----Original Message-----
From: Charlie Brown <charlie@toxicteeth.org>
To: Charlie Brown <charlie@toxicteeth.org>
Sent: Fri, 30 May 2008 8:28 pm
Subject: We did it...FDA agrees to classify, and even to re-write its website

Dear Clients
       We have gotten an incredible settlement w. FDA.  (1) We have met the goal of getting a date by which FDA will classify mercury fillings.  (2) The bonus, and it   s a huge one, is that FDA has dramatically re-written its website, taking out its propaganda and false claims and replacing it with the fact that mercury fillings raises health questions, especially for children and for unborn babies, and for immuno-sensitive and high-mercury-body-burdened persons.  **We got FDA to change its position on amalgam,** just at the point it begins to write the rule.
       Our motion for an injunction (April 22) led to a court hearing (May 16), where Judge Ellen Huvelle ordered FDA and us into mediation.  We met with the mediator, Magistrate Judge Facciola, on Thurs. (May 29), where over four hours we hammered out an agreement.  FDA will classify mercury amalgam within one year of the close

of public comments on its rule, on July 28, 2009.  Rule-making takes a long time, unfortunately; they have so many hurdles that Congress and the Office of Management & Budget have piled on.  So I insisted that FDA announce a new policy now, while it writes the rule, and FDA lawyers agreed.  Hence the drastic shift in the website, which I believe will be posted by the end of this week.

Our cause has fought for so many years to get FDA to classify.  My work started in 2005, with petitions, then in 2006, with our first lawsuit.  Most of you were plaintiffs in that case too.  Then in 2007 came the current case.  The turning point was our motion for a preliminary injunction, because the Judge told FDA it would have to classify.

I deeply appreciate not only your emotional support, but also the authority you gave me to make the critical decisions to reach the lawsuit␣s goal:  that FDA classify mercury amalgam.  We have met that goal, and then some.

If you have objections, call me right away.  If you have questions, call me whenever you want.

Charlie

30 May 2008

ph. 202.544-6333

Charles G. Brown, National Counsel
Consumers for Dental Choice
316 F St., N.E., Suite 210, Washington, DC 20002
Ph. 202.544-6333; fax 202.544-6331
charlie@toxicteeth.org, www.toxicteeth.org

*Plaintiffs Exhibit 3*

From: pmikekaren@aol.com [mailto:pmikekaren@aol.com]
Sent: Friday, June 06, 2008 4:35 PM
To: brownchas@erols.com
Subject: hey Charlie

I hear it is your Birthday!!  Could not let this day pass by without wishing you..................

# A-WOO-HOO!!!

# Happy Birthday!!!!

How special is that, your Mom in town, too. Please try to enjoy your quality- bonding time. Life can be so short. We all have our issues, but need to take time out to relax and be present, in the moment.

So here is a prayer for you:

> Do not worry about anything; but in everything, prayer and supplication, and thanksgiving.
> Let your requests be made known to God.

> Amen

You changed my life, Charlie.  Thank you ever-so-much!! Just want you to know I care deeply about you. My hope and prayer is that we will continue to work together to end the Hg madness ASAP, even if getting there is not the way you had envisioned it. Change is hard, but it also can be a good thing, in the end :)

Take care of you,
Karen

*Plaintiffs Exhibit 4*

## Charles G. Brown, Lawyer
1725 K St., N.W., Suite 511
Washington, DC 20006
Ph. 202.884-0315; fax 822-6309
charlie@toxicteeth.org

To:    Karen Palmer, Dental Assistant
From:  Charles G. Brown, Member of the Bar of the District of Columbia.  5/3/07
Re:  Legal representation

Robert E. Reeves, Esq., and I agree to represent you in a case to be filed against the Food and Drug Administration seeking a ban on mercury fillings.  Our cause has merit on four grounds:  FDA has chosen not to classify encapsulated amalgam for the past two decades; FDA has kept amalgam legal via a dubious "substantial equivalence" test that pretends it is equivalent to a non-mercury material; and FDA has not done an Environmental Impact Statement to address the colossal impact; and FDA no longer asserts that it amalgam is safe.

The nonprofit group Consumers for Dental Choice, of which I am National Counsel, will pay the attorneys fees and costs of this proceeding.  You will not be charged anything.

We seek a ban on mercury fillings, but must be prepared to settle the case something less, if it moves us substantially toward that goal and in taking into consideration our own limited resources.  Your signing this letter means you are amenable to reasonable settlement offers.  I look forward to working with you.

Mark box of your choice and sign.

1. _____ I accept the terms of this letter.
            *Fax this form to me at 202.822.6309, or mail to above address*

2. _____ Instead of accepting the above terms, I propose the following modification(s):

3. _____ I decline the representation.

_____    _____
Signed:  Karen Palmer                Date

*Plaintiffs Exhibit 5*

From: pmikekaren@aol.com [mailto:pmikekaren@aol.com]
Sent: Wednesday, May 28, 2008 11:45 PM
To: charlie@toxicteeth.org
Subject: mediation

I'll be thinking of you tomorrow afternoon ..........best of luck! I know you'll do great !!

Can't wait to hear all about it! You and Bob can't lose! Glad you both will be there to

support one another!

It is our time...........

--Karen P.

*Plaintiffs Exhibit 6*

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

MOMS AGAINST MERCURY, et al., Plaintiffs,   )
                          v.   ) Case # 1:07- cv002332-ESH
Andrew von ESCHENBACH, Commissioner,   )
Food and Drug Administration; et al., Defendants.   )

Affidavit of Plaintiff R. Andrew Landerman

I am a plaintiff in this case and am a mercury-free dentist. Based on the principle of mercury-free dentistry, I was so far ahead of my time, and so outspoken against mercury, that I lost my dental license.  My license was restored, and I remain active in the cause of mercury-free dentistry.

For three decades, I have been involved in the movement to end mercury in dentistry.  Without a doubt, the settlement engineered by our lawyer Charlie Brown combines the two greatest achievements in the history of the ban-mercury-fillings movement – in one fell swoop.  It forces FDA to classify amalgam.  And it changes FDA's position from amalgam advocate to stressing the risks of mercury exposure from amalgam.

I trust Charlie's judgment as a lawyer -- that's why I am back in practice as a dentist -- and hence heed his advice that we took a risk of losing later if we did not settle with FDA right then and there.  Indeed, given what he accomplished, he was most prudent not to walk out of the settlement without an agreement, lest FDA get cold feet and pull back from what it agreed to.

I cannot understand why any plaintiff would challenge this settlement.  We now have a reversal of FDA's 30-year opposition to disclosing risks of mercury in dentistry. We have a road map to classification, and we appear on the way to protecting our most vulnerable, children, pregnant women, and lactating mothers.

If the Court listens to one plaintiff and against the ten of us, we ten will all be horribly harmed.  We have worked together for years to reach this point; we ask the Court not to snatch it away.  Worse than the harm to plaintiffs is the harm to pregnant women and unborn children, and young children.  They finally have warnings, and when FDA classifies, probably even more.  It's time to warn everyone about the health risks of amalgam, a first step in the march to ending use of this 19th century anachronism.  To allow one plaintiff to undo this great settlement would be a massive injustice.

I swear under penalty of perjury that the above is true to the best of my knowledge and belief.

_____ s _____6.25.08_____
R. Andrew Landerman

*Plaintiffs Exhibit 7*

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

MOMS AGAINST MERCURY, et al.,                )
        Plaintiffs,                              )
        v.                                       ) Case # 1:07- cv002332-ESH
Andrew von ESCHENBACH, Commissioner,         )
Food and Drug Administration; et al.,        )
        Defendants.                              )

## Affidavit of Mary Starrett of Plaintiff Oregonians for Life

The mission of Oregonians for Life is to protect the lives and health of unborn children. Our group focuses not only on ending abortions, but also on preventing toxins from injuring or killing babies. It is undeniable that mercury is a neurotoxin that can harm, or even kill, an unborn baby, and it is undeniable that amalgam is 50% mercury.

Oregonians for Life was honored to be a plaintiff in the most important case ever filed to challenge the ongoing use of mercury fillings. The settlement negotiated by Charlie Brown achieves a result that is much more than we could have asked for. FDA has actually changed positions. It is now sending out this warning: "Dental amalgams contain mercury, which may have neurotoxic effects on the nervous systems of developing children and fetus."

Our lawsuit was about getting a date for FDA to classify. This settlement brings us absolutely everything we could have gotten from a Judge, then doubled, because FDA changed its website too.

I have worked with Charlie Brown on this cause in Oregon and in Arizona, and have no doubt that he took the right course of action. He kept us informed of our goals and of the possible remedies.

This settlement takes a huge step toward warning pregnant women and all young women not to get mercury fillings. To undo it risks pulling back on that warning. Oregonians for Life asks the Court to keep the settlement intact. Ten of us agree with what Charlie did. It's hard to figure out how he could have gotten more, without the risk and time involved in doing a trial and an appeal.

I swear under penalty of perjury that the above is true to the best of my knowledge and belief.

                               _____ s _____
                                  Mary Starrett

*Plaintiffs Exhibit 8*

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

MOMS AGAINST MERCURY, et al., Plaintiffs,　)
　　　　　v.　　　　　　　　　　　　　　　　　) Case # 1:07- cv002332-ESH
Andrew von ESCHENBACH, Commissioner,　　　)
Food and Drug Administration; et al., Defendants.　)

Affidavit of Sue Ann Taylor, Consumers for Dental Choice

I am a board member of Consumers for Dental Choice, a plaintiff in the action. Our organization spearheaded the case against FDA. Consumers for Dental Choice was founded based on my idea, which I took to lawyers Jim Turner and Charlie Brown in Washington DC in 1996; I have worked closely with Charlie on this cause ever since.

At the outset our movement was defensive, trying to keep mercury-free dentists from being shut down by dental boards. We then took the offensive in the states. In California, thanks to an effort led by Charlie, the Legislature to shut down the dental board; in Arizona, he saved a prominent dentist's license – bold strokes that ended harassment of dentists in the West, and which led to dismantling of organized dentistry's gag rule against mercury. Step by step, we progressed, with Charlie leading the way.

The battleground shifted to Washington. FDA was totally against us; it would not even tell consumers that silver fillings are mainly mercury. Through grassroots action, through petitions, through media, through Congressional hearings, and finally through this lawsuit, we have now achieved by far our biggest victory. In one bold stroke, Charlie reached a settlement far beyond what anyone has ever done battling FDA.

To suggest that plaintiffs were not kept informed is incorrect. Charlie kept a stream of e-mails going to all, and talked to each plaintiff about the progress. At the settlement conference, the iron was hot, and Charlie struck. He achieved the goal of the lawsuit, a date to classify. But he also negotiated FDA to an entirely new position, one consistent with modern science, unlike what FDA had been saying in favor of mercury in dentistry. Sadly, some in our movement don't comprehend the massive significance of FDA's change of position. But our opponents in organized dentistry do.

I plead with this Court not to undo this settlement. That one plaintiff, a dental assistant, has been led to believe that a new set of lawyers can do better strains credibility. Charlie Brown has been the lead lawyer for this movement, and all the other plaintiffs believe in what he has achieved. If other lawyers think they can do better, let them file their own cases! But please don't let them come in and destroy what we did.

I swear under penalty of perjury that the above is true to the best of my knowledge and belief.



_____ s _____6.26.08
　　　Sue Ann Taylor