UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MOMS AGAINST MERCURY, | ) | |
| CONNECTICUT COALITION; | ) | |
| KAREN PALMER, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case #1:07-cv002332-ESH |
| | ) | Judge Helen S. Huvelle |
| ANDREW VON ESCHENBACH, | ) | Magistrate Judge John M. Facciola |
| Commissioner, Food and Drug | ) | |
| Administration, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**REPLY BRIEF IN SUPPORT OF PLAINTIFF KAREN PALMER'S
MOTION TO VACATE THE DISMISSAL OF HER CLAIMS**

### I.  INTRODUCTION

Plaintiff Karen Palmer ("Ms. Palmer") submits this Reply Brief in Support of her Motion to Vacate the Dismissal of Her Claims.  For the reasons set forth below, this Motion should be granted.

### II. ARGUMENTS AND AUTHORITIES

**A.     This Court Has Authority To Vacate The Dismissal Under Rule 60(b).**

Federal Rule of Civil Procedure 60(b) ("Rule 60(b)") allows a court to relieve a party from a "final judgment" for any reason justifying relief. Because a voluntary dismissal operates as an adjudication on the merits, it is considered a "final judgment" and may be vacated by the Court under Rule 60(b).  *See Randall v. Merrill Lynch,* 820 F.2d 1317, 1320 (D.C. Cir. 1987) ("…nothing in the language of Rule 41(a)(1)(i) exempts voluntary dismissals from the scope of

judicial authority under Rule 60(b)").  A trial court enjoys a large amount of discretion in deciding whether to grant a Rule 60(b) motion.  *Id.*

A consent judgment or voluntary dismissal shown to have been entered by an attorney without express authority from the client or without the client's actual consent may be the subject of relief under Rule 60(b).  *See Surety Insurance Company of California v. Williams,* 729 F.2d 581 (8th Cir. 1984) (holding that parties' claim that their attorney lacked authority to agree to settlement stated a ground for relief from judgment under Rule 60(b)); *Smith v. Widman Trucking & Excavating, Inc.*, 627 F.2d 792, 796 (7th Cir. 1980) ("An attorney may not consent to a final disposition of his client's case without express authority. . . . Although an attorney of record is presumed to have his client's authority to compromise and settle litigation, a judgment entered upon an agreement by the attorney may be set aside on affirmative proof that the attorney had no right to consent to its entry.")

As demonstrated in her moving papers and in this Reply brief, Ms. Palmer has presented more than sufficient evidence to support a finding by this Court that Ms. Palmer's attorney, Charles Brown, lacked authority (express or implied) to enter into a settlement on her behalf, lacked actual authority to sign a settlement agreement on her behalf, and thereafter lacked actual authority to enter a voluntary dismissal of the case.[1]  Accordingly, the Court should grant Ms. Palmer's Motion to Vacate.

---

[1]    Federal Defendants do not assert that Mr. Brown had apparent authority to settle Plaintiff Palmer's claims.  Moreover, there is no basis for such an assertion.  Plaintiff Palmer will therefore refrain from any discussion or analysis concerning the apparent authority issue.

**B. Actual Authority To Settle The Case, Sign The Settlement Agreement, And Dismiss The Case Has Not Been Demonstrated By The Evidence Presented By The Federal Defendants.**

The Federal Defendants claim that Mr. Brown had actual authority to settle Plaintiff Palmer's claims based solely on two communications occurring before the May 29, 2008 settlement conference. Specifically, the Federal Defendants allege that actual authority was present based on the following communications:

> ► Language in the Mr. Brown's retainer agreement which states: "We seek a ban on mercury fillings, but must be prepared to settle the case something less, if it moves us substantially toward that goal and in taking into consideration our own limited resources. Your signing this letter means you are amenable to reasonable settlement offers." [*See* Federal Defendants' Response, pg. 6, relying on Exhibit 4 to Doc. No. 19]

> ► A May 28, 2008, email communication in which Plaintiff Palmer wishes Attorneys Reeves and Brown the "best of luck" at the mediation that was to occur the following day. [*See* Federal Defendants' Response, pg. 7, relying on Exhibit 5 to Doc. No. 19]

Despite the Federal Defendants wishful contentions, it is clear that neither of these pre-settlement agreement communications conferred actual authority on Mr. Brown to settle Ms. Palmer's claims in any manner he saw fit.

### 1. Mr. Brown's Agreement of Representation

Under District of Columbia law, courts analyze two issues to determine if actual authority exists: the authority that the client explicitly gave to the attorney and the totality of the attorney-client relationship. *See Evans v. Skinner*, 742 F.Supp. 30, 32 (D.D.C. 1990). In this case, neither pre-settlement communication relied upon by the Federal Defendants demonstrate that unfettered settlement authority was conferred on Mr. Brown.

The language in the Attorney-Client Agreement retained settlement authority in Ms. Palmer. In requiring Ms. Palmer to be "amenable to reasonable settlement offers," the contract contemplated that the settlement authority was left with her. Otherwise, there would have been no continuing requirement for her to be "amenable to reasonable settlement offers." If this language was intended by the parties to delegate settlement authority to Mr. Brown, there clearly would have been no need for contract language requiring Ms. Palmer to be "amenable" to any type of settlement offer. The Federal Defendants awkward contention that this language constitutes a complete delegation of settlement authority is a clear misinterpretation of the actual contract language.

"It is well-settled that an attorney may not settle a client's claim without specific authority to do so." *Evans*, 742 F.Supp. at 31 (*citing*, *United States v. Beebe*, 180 U.S. 343, 351-52, 21 S.Ct. 371, 374, 45 L.Ed. 563 (1901) (attorney does not receive an implied power to settle a client's claim simply because his or her services have been retained) and *Golden Panagia S.S., Inc. v. Panama Canal Comm'n*, 791 F.2d 1191, 1198 n. 5 (5th Cir. 1986) (unauthorized settlement agreement is void and unenforceable) and *Ashley v. Atlas Mfg. Co.*, 7 F.R.D. 77, 77 (D.D.C. 1946) ("an attorney has no right, without special authority, to make a compromise for his client"), *aff'd,* 166 F.2d 209 (D.C.Cir. 1947) and Annotation, "Authority of Attorney to Compromise Action," 30 A.L.R.2d 944 (1953 & Supps. 1981 & 1990) (rule is almost universal that attorney may not settle action without special authority from client)).

"[E]ven if the plaintiff had given her former attorney authority to discuss settlement without her participation, 'discussing settlement and 'entering' into a binding, enforceable final agreement are two distinct actions." *Evans*, 742 F.Supp. at 32. "[E]ven if an attorney genuinely believes in his or her own authority to negotiate a settlement, the client retains the right to reject it provided the settlement was not authorized. *Id.* (*citing*, *Matzo v. Postmaster General*, 685 F.Supp. 260, 262 (D.D.C. 1987), *aff'd*, 861 F.2d 1290 (D.C.Cir. 1988)). In this case, there is no contention that the settlement agreement was ever presented to Plaintiff Palmer, much less signed by her. Moreover, there is no contention that Attorney Brown was authorized to sign the settlement agreement on her behalf. "[W]hile an attorney may be the only one to sign papers related to procedural matters, some sign of the client's acceptance is necessary for a settlement agreement to take affect." *Evans*, 742 F.Supp. at 34 (*citing*, *Valley Line Co. v. Ryan*, 771 F.2d 366, 376 (8th Cir.1985)). "Clearly, the plaintiff's signature would "convey a clear message of intention to settle." *Id.* (*citing*, *Janneh v. GAF Corp.*, 887 F.2d 432, 436 (2nd Cir.1989)).

## 2. Plaintiff Palmer's Pre-Mediation Communications

Further, while the Federal Defendants do not explain how an expression of "best of luck" prior to the mediation confers actual settlement authority on Mr. Brown, the law is clear that authority to negotiate does not equal authority to settle. *See Evans*, 742 F.Supp. at 31 (reasoning that even the client had given her former attorney authority to discuss settlement without her participation, "discussing" settlement and "entering" into a binding, enforceable final agreement are two distinct actions). Here, Ms. Palmer's good luck wishes and acknowledgment that Mr. Brown would attend the settlement conference on her behalf is, at best, nothing more than Ms.

Palmer's consent for Mr. Brown to negotiate on her behalf.  There is nothing in the email from Ms. Palmer waiving her right to be consulted on the terms of the settlement or waiving her right to approve and sign the final settlement agreement.

### 3.  The Totality of the Attorney-Client Relationship

The Attorney-Client Agreement relied upon by the Federal Defendants reflects the retention of both Robert Reeves and Mr. Brown as counsel for the Plaintiffs.  Contrary to Mr. Brown's contentions, Mr. Reeves had quite a different interpretation of this Agreement and of Mr. Brown's failure to obtain client authority to settle the case.  On the afternoon of May 30, 2008, (the day following the mediation of this case), Mr. Reeves expressed grave concern to Mr. Brown about the latter's failure to obtain settlement authority from their mutual clients.  In his email to Mr. Brown, Mr. Reeves states the following:

> I talked to Sandy this afternoon and was surprised that she had not heard from you. She told me about her email of yesterday to you and me which I just read.  I was also surprised that yesterday you acted as if you were your own client and never called anyone.  I called Sandy during the negotiations but you did not.
>
> ***Did you have authorization from all the clients to settle as you did?***
>
> We did not even request an FDA press release, the changes in the website are good but too limited, you would not even suggest a shorter end date -- agreed to July 28 next year, and over my objection agreed to a contract re the end date of July 28, 2009 rather then putting the date in the Court's order.
>
> I believe we caved in yesterday without authorization from our clients in order to get a settlement.  This is unethical and I am very disturbed.  For now I am limiting this email to Consumers, but I may include all the clients in the very near future.

[May 30, 2008, email from Robert Reeves to Charles Brown (emphasis in the original), Exhibit A-1 to affidavit of Robert Reeves, attached hereto as Exhibit A]  Far from believing there had

been a delegation of settlement authority--contractually or otherwise-- Mr. Reeves expressed a dire concern for the manner in which the settlement had been handled.  Far from believing the settlement was reasonable, Mr. Reeves expressed his concern that Mr. Brown had "caved in" after Mr. Brown had acted as if he was his own client.

Although Mr. Reeves was a party to the same Attorney-Client Agreement as Mr. Brown, he expressly rejected the attenuated notion that Mr. Brown was conferred with explicit, specific, full, and actual authority to settle this matter on behalf of the eleven plaintiffs.  Furthermore, like Ms. Palmer, other Plaintiffs did not believe that Mr. Brown had actual authority to settle and dismiss this case.  Several communications following the settlement conference establish that Ms. Palmer was not the only Plaintiff who was unaware that Mr. Brown had finalized the settlement and dismissed the case.  For instance, on June 4, 2008, Sandy Duffy with the Plaintiff Consumer Dental Choice ("CDC") wrote to Mr. Brown:

> I understand that you are having a telephone conference ….regarding the settlement of the Moms v. FDA case.
>
> I just want to give you a heads up that I am polling the Board on the settlement and don't want you to communicate to the FDA that there is a settlement before I get responses.

[June 4, 2008 email from Sandy Duffy to Charles Brown, Exhibit B-2 to affidavit of Karen Palmer, attached hereto as Exhibit B]  Thereafter, on June 5, 2008, Ms. Duffy wrote to Mr. Brown:

> Last night the Board for Consumers for Dental Choice had a telephone meeting regarding the settlement of the Moms v. FDA case.  The vote was 6-0…that the settlement must include:

(1) A six (6) month timeline from the date of the settlement to a classification for encapsulated amalgam.

(2) Changes to the FDA Q&A document on the web:
    a. Adding those with compromised kidney function as a susceptible class
    b. Adding dental personnel as a susceptible class

Additionally, we agree that we want you to amend the Complaint to add a Petition for a Ban of Amalgam…Please confirm asap that you will make the changes to the settlement agreement and the amended Complaint.

[June 5, 2008 email from Sandy Duffy to Charles Brown, Exhibit B-3 attached to affidavit of Karen Palmer, Exh. B]

Furthermore, after having already finalized the settlement agreement, Mr. Brown wrote to Ms. Duffy stating that she lacked the votes to support the position of the CDC and indicated that the CDC's instructions would "wreck" the great accomplishment and his "skillful negotiating" in getting a change to the website. [Email from Sandy Duffy dated June 5, 2008 forwarding email from Charles Brown, Exhibit B-4 attached to affidavit of Karen Palmer, Exh. B] These emails between the CDC and Mr. Brown make clear that Mr. Brown did not explain to the Plaintiffs that the settlement agreement was already executed and the case dismissed. Furthermore, the CDC, like Ms. Palmer, understood that the terms of the settlement agreement remained negotiable and required the client's approval. These emails further confirm Mr. Brown's state of mind. If Mr. Brown genuinely believed he had obtained settlement authority from his clients prior to the mediation through the Attorney-Client Agreement, he would have objected to any vote of the

CDC to confirm the settlement.  Instead, he argued with Ms. Duffy about whether she had the votes to reject the settlement.[2]

Furthermore, on June 6, 2008, Mr. Reeves wrote to the Magistrate Judge John Facciola explaining that two Plaintiffs had contacted him with serious concerns regarding the settlement and who were rejecting the settlement.  [Letter from Mr. Reeves to Magistrate Judge Facciola, Exh. A-4 attached to affidavit of Reeves, Exh. A]  Additionally, Mr. Reeves explained that he and most of the Plaintiffs were never informed by Mr. Brown that a stipulation of dismissal had been filed or that the case was already dismissed. [*Id.*; see also June 6, 2008 email from Mr. Reeves to Mr. Brown forwarding stipulation of dismissal, Exh. A-5 attached to affidavit of Mr. Reeves, Exh. A][3]

---

[2]    Federal Defendants emphasize the fact that Ms. Palmer is the only Plaintiff seeking to vacate the dismissal.  However, Mr. Brown has forbidden contact with the other Plaintiffs.  Moreover, he has presumably intimidated the other Plaintiffs in the same manner he sought to intimidate Plaintiff Palmer.  On Sunday, June 15, 2008, Mr. Brown sent an email to Ms. Palmer predicting the following outcome if Ms. Palmer proceeded with the litigation:  "[Mr. Reeves] will lose, and you will face a motion for attorneys fees and costs.  Is Mike's business protected?  Ask Bob to tell you what case he ever won in this movement; I can't name one.  I could tell you quite a few I've won."  Mr. Brown denigrates Mr. Reeves as incompetent, disingenuously threatens Ms. Palmer and her husband with financial ruin, and suggests that Mr. Reeves had sinister motivations in continuing with the lawsuit.  If Mr. Brown threatened other Plaintiffs in a similar manner, it is little wonder that other Plaintiffs have not presented a similar motion.  [Exhibit B-1, attached to affidavit of Karen Palmer, Exhibit B]

[3]    The opposition brief submitted by the other Plaintiffs asserts that the International Academy of Oral Medicine & Toxicology ("IAOMT") "engineered" Plaintiff's Motion.  However the undisputed evidence reveals that Ms. Palmer communicated her objection to the settlement to Mr. Reeves the day after reviewing Mr. Brown's email explaining the terms of the settlement.  [Reeves Affidavit, submitted as Exhibit A; Palmer Affidavit, submitted as Exhibit B]

In this case, the Federal Defendants' contentions simply do not demonstrate the necessary delegation of actual authority. Rather, all the evidence shows complete confusion and lack of communication regarding settlement between Mr. Brown, his co-counsel Mr. Reeves, and the Plaintiffs. Ms. Palmer never delegated actual authority to her attorney to enter into a settlement agreement, and certainly never waived her right to approve and sign the settlement agreement. Indeed, she was never presented with the settlement agreement until after the settlement agreement was signed by Mr. Brown and the case was dismissed. Federal Defendants have demonstrated only that Mr. Brown maintained an undisclosed and unilateral belief that he was both the attorney *and* the client in this matter. His complete and unethical disregard for the rights of his client cannot lead to the enforcement of a settlement agreement that Plaintiff Palmer does not want and did not authorize. Plaintiff Palmer's Motion should be granted.

### C. Delegations Of Settlement Authority In Attorney/Client Agreements Are Void As Against Public Policy.

Even if the contractual language cited by the Federal Defendants could be construed as a delegation of Ms. Palmer's settlement authority, the majority rule is to hold such agreements void. *See e.g., Parents Against Drunk Drivers v. Graystone Pines Homeowners' Assoc.,* 789 P.2d 52 (Utah App. 1990) (reasoning that it would follow the majority rule and holding that a provision in an agreement between attorney and client granting the attorney sole control over the settlement of underlying dispute is void). Under the Federal Defendants' theory, the retainer agreement between Mr. Brown and Ms. Palmer gave Mr. Brown the authority to determine the "reasonableness" of a settlement offer and the authority to accept such an offer without consulting Ms. Palmer or seeking her approval. In other words, settlement could only be made with Mr.

Brown's approval, not the client's approval. Not only does this interpretation ignore the plain language of the retainer agreement, it violates the law of the District of Columbia, which holds that agreements requiring the attorney's consent to settle are unenforceable. *See Jacobsen v. Oliver*, ____ F.Supp.2d ____, 2008 WL 2069299 (D.D.C. May 16, 2008) (recognizing that clauses which require a client to obtain the attorney's consent before a settlement offer are unenforceable under District of Columbia law and its rules of professional conduct); *see also* District of Columbia Rules of Professional Conduct, 1.2(a) ("A lawyer shall abide by a client's decision whether to accept an offer of settlement of a matter.") and Rule 1.4(c) ("A lawyer who receives an offer of settlement in a civil case … shall inform the client promptly of the substance of the communication."); *Jones v. Feiger, Collinson & Killmer,* 903 P.2d 27, 35 (Colo. Ct. App. 1994) *rev'd on other grounds*, 926 P.2d 1244 (Colo. 1996) (holding void a representation agreement that included a provision prohibiting the client from "unreasonably" refusing settlement and permitting the attorney to withdraw and collect fees if the client refused a reasonable settlement). Accordingly, even if the retainer agreement between Mr. Brown and Ms. Palmer could be interpreted as giving Mr. Brown the authority to accept a "reasonable" offer, the agreement is void as a matter of law.

### D. Actual Authority To Settle A Case Cannot Be Conferred By The Attorney/Client Communications Occurring After The Settlement Of The Case

The Federal Defendants assert that Mr. Brown had actual authority to settle Ms. Palmer's claims based on several communications that occurred *after* the settlement agreement was consummated and executed by Mr. Brown and counsel for the Federal Defendants. Specifically, these communications include the following:

► A May 30, 2008, email communication from Mr. Brown to Ms. Palmer sent at 8:28 p.m. communicating some (but not all) of the details concerning the settlement that was already in place and executed by Mr. Brown.  [*See* Federal Defendants' Response, pg. 7, relying on Exhibit 1 to Doc. No. 19]

► A May 31, 2008 phone conversation between Mr. Brown and Ms. Palmer briefly explaining the settlement conference.[4] [*See* Federal Defendants' Response, pg. 7, relying on Exhibit 1 to Doc. No. 19]

The Federal Defendants cite to no authority supporting the contention that these two communications could be viewed as retrospectively granting Mr. Brown actual authority to settle the case.  It is undisputed that the settlement agreement was finalized and executed by Mr. Brown and counsel for the Federal Defendants at least as of May 30th – the day after the settlement conference.  Indeed, the fax banner at the top of the settlement agreement (Exhibit D to the Plaintiff's moving papers) reveals that a fully executed settlement agreement was transmitted at 7:51 p.m. on May 30th.  Thus, the May 30th email from Mr. Brown to his clients occurred ***after*** the execution of the settlement agreement.  Clearly, Mr. Brown signed the settlement agreement ***prior*** to advising his clients of its terms.

Furthermore, the undisputed testimony demonstrates that Ms. Palmer first saw Mr. Brown's May 30, 2008, email on Sunday evening — ***after*** the settlement agreement had been signed and ***after*** the stipulation of dismissal had been filed with the Court.  Even if Ms. Palmer had seen the May 30th email on that date, it is clear that the settlement had already been reached

---

[4]     Karen Palmer's Affidavit attached as Exhibit E to Palmer's Motion to Vacate incorrectly reflects that this discussion took place on June 1, 2008.  The discussion took place on May 31, 2008.  Her new affidavit, attached hereto as Exhibit B corrects this inadvertent mistake.  In any event, the discussion took place after Mr. Brown had executed the written agreement on behalf of the Plaintiffs.

and the settlement agreement executed.  None of these communications demonstrate that Mr. Brown had actual and specific authority to settle Ms. Palmer's claims at the mediation or had authority to execute the settlement agreement on May 30th.  Indeed, Mr. Brown failed to advise Ms. Palmer in either the May 30th email communication or during the May 31st telephone conversation that he intended to imminently dismiss the case.  [*See*, second Affidavit of Karen Palmer, attached hereto as Exhibit B]  He further failed to advise Ms. Palmer that he had already signed the settlement agreement, and that any opportunity to review the terms of the settlement had passed.  Finally, in neither communication did Mr. Brown specifically advise of the nature of the terms of the settlement.  As the Court can see from Mr. Brown's May 30th email communication and Ms. Palmer's second Affidavit, there was no disclosure of the specific changes that would be made to the FDA website.  Moreover, Mr. Brown did not reveal that the terms of the settlement would not be included in or referenced in a consent decree.

Rule 1.4(c) of the District of Columbia Rules of Professional Conduct requires that:  "[a] lawyer who receives an offer of settlement in a civil case. . . shall inform the client promptly of the substance of the communication."  The word "promptly" is subject to interpretation, but in the context of this case, certainly means that a settlement offer will be communicated before the case is settled and dismissed.

The Comments to Rule 1.4 provide that:

The client should have sufficient information to participate intelligently in decisions concerning the objectives of the representation and the means by which they are to be pursued, to the extent the client is willing and able to do so.  For example, a lawyer negotiating on behalf of a client should provide the client with facts relevant to the matter, inform the client of communications from another party, and ***take other reasonable steps that permit the client to make a decision***

> *regarding a serious offer from another party*. A lawyer who receives from
> opposing counsel an offer of settlement in a civil controversy or a proffered plea
> bargain in a criminal case is required to inform the client promptly of its substance.
> See Rule 1.2(a). Even when a client delegates authority to the lawyer, the client
> should be kept advised of the status of the matter.

(Emphasis added.)  It is clear that Mr. Brown failed to abide by the requirements of Rule 1.4.  It is

obvious that disclosure of the terms of a settlement offer must occur before the offer is accepted,

and certainly before the settlement agreement is signed and the case dismissed.  The Federal

Defendants' efforts to build a post-hoc rationalization where settlement authority is derived from

post-settlement communications is patently flawed and should be rejected by this Court.

### E.  The Communications Between Mr. Brown And Ms. Palmer Occurring After The Filing Of The Dismissal Do Not Demonstrate A Ratification Of The Settlement Agreement.

The Federal Defendants also assert that communications between Mr. Brown and Ms.

Palmer occurring *after* the finalized and executed settlement and *after* the filing of the dismissal

by Mr. Brown constituted a ratification of the settlement.  Specifically, these communications--

which all occurred after the execution of the settlement agreement and the dismissal of the case--

include the following:

> ► A June 2, 2008 email sent at 11:41 a.m. from Ms. Palmer to a friend forwarding
> Mr. Brown's email explaining the settlement. [*See* Federal Defendants' Response,
> pg. 8, relying on Exhibit 2 to Doc. No. 19]

> ► A June 2, 2008 email sent at 12:27 p.m. in which Ms. Palmer thanks Mr. Brown
> for calling her on Saturday. [*See* Federal Defendants' Response, pg. 8, relying on
> Exhibit 1 to Doc. No. 19]

There is no merit to the assertion that these two communications demonstrate that Ms.

Palmer "ratified" the settlement agreement.  Ratification may occur when a person affirms "a

14

prior act which did not bind him but which was done or professedly done on his account, whereby the act…is given effect as if originally authorized by him." *See Lewis v. Washington Metro. Area Transit Authority,* 463 A.2d 666, 627 n.12 (D.C. 1983). There cannot be effective ratification without intent and full knowledge of the facts. *See Russell v. Washington Savings Bank,* 23 App.D.C. 398, 1904 WL 19054 *5 (App. D.C. 1904) ("There can be no ratification unless the principal has full knowledge of the facts."); *Absar v. Jones, M.D.,* 833 S.W.2d 86, 90 (Tenn. App. 1992) ("There cannot be effective ratification without intent.")

In this case, neither of the communications indicates an intention by Ms. Palmer to affirm the settlement agreement or its terms. In fact, Ms. Palmer did not even copy Mr. Brown on the email sent to her friend at 11:41 a.m. Furthermore, the email sent by Ms. Palmer to Mr. Brown a few hours later in the day on June 2nd demonstrates that Ms. Palmer had no intention of ratifying the settlement agreement. Specifically, Ms. Palmer wrote in pertinent part:

> I can't help but wonder, if there wasn't an opportunity to have had this resolved before July 2009. It is more than a year away and alot [*sic*] of people are going to be poisoned between now and then, don't you think?
>
> AND, for me and the other 266,000 dental assistants; where is that language in respect to them-being the "first" to be exposed?
>
> In retrospect, now, Charlie, as a Plaintiff, I really wish I could have been there last week, as I was on May 16, to voice my concerns to this settlement. I feel the Judge, on June 2, would have not allowed more than 6 months, maximum, for the FDA to classify AND was really "for us", at least, that is what my instincts were telling me.
>
> I know you now have Phila. on your mind and are most likely on your way up there, but I want to talk with you about my concerns ASAP and hope and pray it is not to late to move this process along for all those already affected and for all the future, unsuspecting patients/dental staff everywhere.

[Exhibit B to Ms. Palmer's Motion to Vacate]  This email was preceded by a telephone call to Attorney Reeves on the same day in which Ms. Palmer expressed her objection to the settlement agreement.  Mr. Reeves did not encourage Ms. Palmer to object; however, he did encourage her to contact Mr. Brown to express any objections that she had.[5]

Additionally, at the time Ms. Palmer sent the emails she had not been informed of at least the following:

- The fact that the settlement agreement had already been signed by Mr. Brown;

- The fact that the dismissal had already be filed with the Court on Sunday, June 1st;

- The fact that Mr. Brown would not require the Federal Defendants to reference the terms of the settlement in a consent decree;

- The changes to the FDA's website had not been explained in any detail.

Ms. Palmer's complete lack of information regarding the specific terms of the settlement, the finality of the settlement, and the dismissal of the case coupled with her nearly immediate disapproval of the settlement agreement establishes that Ms. Palmer did not ratify the settlement agreement or the dismissal filed in this case.

---

[5]        At the mediation, the parties agreed that the settlement would be referenced in a consent decree that would be filed with the Court.  There was no discussion of whether the Plaintiffs would be permitted to apply for an award of attorneys' fees.  The next day, without notice to his co-counsel or to his clients, Mr. Brown apparently agreed that the settlement would only be reflected in a written settlement agreement, not in a consent decree to be filed with the Court.  Mr. Brown also waived any right of the Plaintiffs or their attorneys to apply for and recover attorneys' fees.  [Affidavit of Robert E. Reeves, attached hereto as Exhibit A]

**F.    Vacating The Dismissal Of The Case Presents No Prejudice To The Federal Defendants.**

Citing *Randall v. Merrill Lynch*, 820 F.2d 1317 (D.C. Cir. 1987), Federal Defendants argue that they will be prejudiced if the Court vacates the dismissal of this case.  In considering whether to affirm the District Court's decision to vacate a dismissal pursuant to Rule 60(b), the *Randall* Court merely concluded that "the passage of time between the second dismissal and the district court's order.  But that period-just over a year-was not so lengthy as to have prejudiced Defendant's ability to defend itself in court." *Id*. at 1321.  *Cf. Washington v. Penwell*, 700 F.2d 570, 572-73 (9th Cir.1983) (four-year delay not unreasonable in light of extraordinary circumstances); *Twentieth Century-Fox Film Corp. v. Dunnahoo*, 637 F.2d 1338, 1341 (9th Cir.1981) (six-year delay unreasonable in case of liquidated-damages decree and no extraordinary circumstances).  In their opposition brief, the Federal Defendants do not (and cannot) argue that the passage of time is prejudicial.  Instead, they claim prejudice "by changing the FDA's website and by establishing a schedule and rearranging their priorities to meet the agreed-upon deadline." By comparison, Plaintiff Palmer would be forced to accept a settlement that she did not authorize.

Federal Defendants are not blameless.  They accepted a settlement agreement signed solely by counsel for the Plaintiffs without any representation in the agreement that counsel had authority to sign on behalf of the Plaintiffs.  They could have insisted on an agreement that was signed by all Plaintiffs to assure that counsel had actual authority to enter into the settlement; however, they chose not to.  In proceeding in this manner, Federal Defendants ran the risk that Plaintiffs' counsel was proceeding without actual authority.

Federal Defendants' argument about their website, priorities, and schedule are sophistic. This lawsuit was commenced because the Federal Defendants' priorities and schedule did not conform to law. Federal Defendants cannot claim that they have been prejudiced because they agreed to do that which the law already requires them to do. Federal Defendants are in a special position of utmost importance and are obligated to protect the public. Agreeing to undertake steps to fulfill this important role cannot be construed as prejudice.[6]

### III. CONCLUSION

For the foregoing reasons, Plaintiff Karen Palmer respectfully requests that this Court grant Plaintiff Palmer's Motion to Vacate the Dismissal.

*Respectfully submitted by counsel for Plaintiff Karen Palmer this July 8, 2008.*

> /s/ James R. Klimaski #243543
> James R. Klimaski
> Klimaski & Associates, P.C.
> 1625 Massachusetts Avenue, N.W., Suite 500
> Washington, District of Columbia 20036
> Telephone: 202-296-5600
> Fax: 202-296-5601
> klimaski@klimaskilaw.com
> **Local Counsel to Plaintiff Karen Palmer**

---

[6] Federal Defendants also argue that the only consideration given by the Plaintiffs for the settlement agreement was the dismissal of the case. Apparently, their argument is that if the dismissal is set aside, the agreement will be unsupported by any consideration. While that might be an important consideration if Plaintiff Palmer was seeking to enforce the settlement, it is of no significance where she is seeking to set the agreement aside. This argument is nonsensical.

James M. Love
TITUS HILLIS REYNOLDS LOVE
DICKMAN & McCALMON
3700 First Place Tower
15 East Fifth Street
Tulsa, Oklahoma 74103-4334
Telephone: 918-587-6800
Fax: 918-587-6822
jlove@titushillis.com

***Counsel to Plaintiff Karen Palmer***

CERTIFICATE OF SERVICE

This will certify that the foregoing was served this day upon the parties hereto by delivering a true copy of same to the following on July 8, 2008 :

Drake Cutini
Consumer Litigation
US Dept. of Justice
PO Box 386
Washington, DC 20044
(202) 307-0044
Fax: 202-514-8742
Email: drake.cutini@usdoj.gov

Jeffrey M. Senger
Deputy Chief Counsel
Office of the Chief Counsel
5600 Fishers Lane, Rm. 6A05
Rockville, MD 20857
(301) 827-7138
Fax: 301-827-7145
Email: Jeffrey.Senger@fda.gov

Wendy Vicente
Office of the Chief Counsel
5600 Fishers Lane, Rm. 6A05
Rockville, MD 20857
(301) 827-7138
Fax: 301-827-7145
Email: wendy.vicente@fda.gov

Charles G. Brown
Counsel for Some Plaintiffs
316 F St., N.E., Suite 210
Washington DC 20002
Phone 202.884-0315
Fax 202-544-6331
Email:  charlie@toxicteeth.org

s/James R. Klimaski
James R. Klimaski

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MOMS AGAINST MERCURY, | ) | |
| CONNECTICUT COALITION; | ) | |
| KAREN PALMER, *et al.,* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case #1:07-cv002332-ESH |
| | ) | Judge Helen S. Huvelle |
| ANDREW VON ESCHENBACH, | ) | Magistrate Judge John M. Facciola |
| Commissioner, Food and Drug | ) | |
| Administration, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

**AFFIDAVIT OF ROBERT E. REEVES IN SUPPORT OF PLAINTIFF KAREN PALMER'S MOTION TO VACATE DISMISSAL OF HER CLAIMS**

| | |
|---|---|
| District of Columbia | ) |
| | ) **ss:** |
| | ) |

I, Robert E. Reeves, being first duly sworn upon oath, state as follows:

1.      I am an attorney licensed to practice law in the State of Kentucky, and admitted in the U.S. Court of Appeals for the District of Columbia but not the U.S. District Court for the District of Columbia.  Along with co-counsel Charles G. Brown, I was retained as counsel for the Plaintiffs in the referenced matter.  Although I was not admitted to this Court *pro hac vice,* my intention was to seek such admission if the case proceeded past the mediation of May 29, 2008.  My name appears on some of the papers submitted to this Court on behalf of the Plaintiffs.

2.      Pursuant to the request of Plaintiff Karen Palmer's new counsel, James M. Love, I submit this affidavit in support of Ms. Palmer's Motion to Vacate the Dismissal of her Claims.

3.      I have personal knowledge regarding the statements contained herein, and if called as a witness, could and would competently testify thereto.

4.      I attended the May 29, 2008, mediation of this case on behalf of the Plaintiffs.  I assumed that lead counsel Charles Brown had obtained client authority to settle this matter, or if not, would obtain such authority during the mediation by placing telephone calls to obtain that authority.  I admittedly did not give much thought to the question of client settlement authority, because I assumed that Mr. Brown had obtained such authority in some form or manner.  I attended the mediation to support and assist Mr. Brown.  At the mediation, I argued repeatedly

**Exhibit "A"**

with Mr. Brown about the terms of settlement. However, he would not listen to me and proceeded to settle the case on his terms. A settlement in principle was reached by the parties during the mediation. I left the mediation with grave concern that Mr. Brown could have obtained more favorable agreements from FDA in settling the case. I was not pleased with the settlement.

5.      At the mediation, the parties agreed that the settlement would be reduced to a contract and referred to in an Order of Dismissal that would be submitted to the Court. There was no discussion of whether the Plaintiffs would be permitted to apply for an award of attorneys' fees. The next day, without notice to me as his co-counsel or to his clients, Mr. Brown apparently agreed that the settlement would only be reflected in a written settlement agreement, and there would be no order to be filed with the Court. Mr. Brown also waived any right of the Plaintiffs or their attorneys to apply for and recover attorneys' fees without my knowledge, and I would have absolutely refused to agree with that.

6.      Despite my disappointment at the outcome of the mediation, I decided to accept the results and to say nothing to anyone about my concerns. I decided I would not call anyone. Nevertheless I began to get a number of calls. I got my first phone call about the outcome of the mediation shortly after leaving the Federal Courthouse. The individual who called was not a Plaintiff, but was an individual who was very much in favor with the Plaintiff's litigation. When I told them the outcome they expressed deep disappointment. Despite this I did not express anything but a positive outlook on the settlement. I had decided that I would not call anyone and I did not expect to get further calls. Nevertheless, the next morning I got calls from several people, some of whom were involved as Plaintiffs and some who were not, but all expressed considerable disappointment in the outcome. Later that afternoon, I prepared and forwarded an email to Mr. Brown in which I posed the question: "Did you have authorization from all the clients to settle as you did?" I further stated that "I believe we caved in yesterday without authorization from our clients in order to get a settlement." I communicated my belief that "[t]his is unethical and I am very disturbed." [A true and correct copy of my May 30 email is attached hereto as Exhibit A-1.] Mr. Brown responded: "[t]o suggest I have been working through this process without constant communication with clients is incorrect." [A true and correct copy of this email is attached hereto as Exhibit A-2.] I challenged this assertion and asked Mr. Brown to provide me with copies of those communications. [A true and correct copy of this email is attached hereto as Exhibit A-3.] I received nothing in response to this request.

7.      Later that evening, on Friday, May 30, 2008, I received an email from Mr. Brown reporting some but not all details concerning the settlement. This email appears to have been sent to all of the Plaintiffs.  Mr. Brown's email did not report that he intended to contemporaneously sign the settlement agreement on behalf of the Plaintiffs or that he intended to file a stipulation of dismissal before the weekend was concluded. I did not learn that Mr. Brown dismissed the case until June 6, 2008; I did not learn that he had signed the settlement agreement on behalf of the Plaintiffs until June 8, 2008.

2

8.    On Monday June 2, 2008 I remained concerned about the outcome of the mediation as all the response I had gotten from anyone, other than Charlie Brown, were negative. To the best of my knowledge at that point I had not called anyone about the settlement.  I decided to call Karen Palmer, one of the individual plaintiffs whom I had met about three months previously. At that time I talked to her extensively, not only about this litigation, but the overall issue of the problems caused my mercury as dental material, particularly to those individuals who work in dental offices, just as she had.  When she answered the phone I asked her what she thought of the settlement and she asked me to read her email that she had just sent. I looked in my emails and in fact had gotten an email from her in which she had stated in part:

> "Just wondering still, about the occupational exposure; mainly the dental assistants who are the first to be exposed, repeatedly, hence - chronic mercury vapor exposure, still not being told how to really protect themselves with a mercury vapor mask!
> ***
> If the manufacturer doesn't tell them and the ADA and OSHA don't, as well.....then who?????? Your thoughts, Please."

After reading the email I told Karen if she had reservations about the settlement she should state them clearly in an email to Charlie Brown and me. I told her to look at the email Mr. Brown had sent her on Friday as at the bottom Mr. Brown asks about objections.  I tried to remain neutral and do not believe at that time I shared much in regard to my disappointment or concerns about the outcome of the mediation with Karen Palmer.  I did emphasize the fact that whatever objections or concerns she had should be conveyed to Mr. Brown as soon as possible. I know that I pointed out to her that he asked for a phone call. I also know I told her if she chose to do it by email she should send it to both of us.

9.    On June 6, 2008, I wrote a letter to Magistrate Judge John Facciola, who presided over the May 29, mediation, explaining that two Plaintiffs had contacted me expressing a desire to reject the settlement.  [A true and correct copy of my letter to Magistrate Judge Facciola, is submitted herewith as Exhibit A-4]  Additionally, I explained that I was never informed, and most of the Plaintiffs were never informed, that a stipulation of dismissal had been filed or that the case was already dismissed.

10.    Late on June 6, 2008, upon learning that the lawsuit had been dismissed, I sent an email to Mr. Brown forwarding the stipulation of dismissal, and inquiring why he had not informed me, or any other Plaintiff, concerning the dismissal of the case.  [A true and correct copy of my email to Mr. Brown is attached hereto as Exhibit A-5]

11.    I was upset upon learning that Mr. Brown had dismissed the case without providing notice to anyone.  The dismissal did not refer to a settlement, and I was aware that no settlement agreement had been circulated for the approval of the Plaintiffs, much less signed and returned.  However, I learned on June 8, 2008, that Mr. Brown had signed a settlement agreement on behalf of the Plaintiffs.  I was unaware that any Plaintiff had authorized Mr. Brown

to sign a settlement agreement on their behalf.  Certainly, no Plaintiff authorized me to sign such an agreement.

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct pursuant to 28 U.S.C. § 1746.  Executed on this July 8, 2008.


s/Robert E. Reeves
Robert E. Reeves

4

**Jim Love**

| | |
|---|---|
| **From:** | Robertereeves@aol.com |
| **Sent:** | Monday, June 16, 2008 3:53 PM |
| **To:** | jlove@titushillis.com |
| **Subject:** | to CB 5/30 Re: I AM VERY DISTURBED BY SETTLEMENT Re: mediation |

In a message dated 5/30/2008 3:18:11 P.M. Eastern Daylight Time, Robertereeves writes:

Charlie,

I talked to Sandy this afternoon and was surprised that she had not heard from you. She told me about her email of yesterday to you and me which I just read.  I was also surprised that yesterday you acted as if you were your own client and never called anyone.  I called Sandy during the negotiations but you did not.

### _Did you have authorization from all the clients to settle as you did?_

We did not even request an FDA press release, the changes in the website are good but too limited, you would not even suggest a shorter end date -- agreed to July 28 next year, and over my objection agreed to a contract re the end date of July 28,2009 rather then putting the date in the Court's order.

I believe we caved in yesterday without authorization from our clients in order to get a settlement.  This is unethical and I am very disturbed.  For now I am limiting this email to Consumers, but I may include all the clients in the very near future.

Bob    copy: Sandy, Bernice and Freya

**EXHIBIT A-1**

**Jim Love**

| | |
|---|---|
| **From:** | Charlie Brown [charlie@toxicteeth.org] |
| **Sent:** | Friday, May 30, 2008 5:27 PM |
| **To:** | Robertereeves@aol.com |
| **Cc:** | sandra.n.duffy@co.multnomah.or.us; robertgreaves@comcast.net; Sourcebwu@aol.com; FreKoss@aol.com |
| **Subject:** | claim I wasn't talking to clients is NOT CORRECT |

To suggest I have been working through this process without constant communication with clients is incorrect.
---charlie

---

**From:** Robertereeves@aol.com [mailto:Robertereeves@aol.com]
**Sent:** Friday, May 30, 2008 3:18 PM
**To:** charlie@toxicteeth.org
**Cc:** sandra.n.duffy@co.multnomah.or.us; robertgreaves@comcast.net; Sourcebwu@aol.com; FreKoss@aol.com
**Subject:** I AM VERY DISTURBED BY SETTLEMENT Re: mediation

Charlie,

I believe we caved in yesterday without authorization from our clients in order to get a settlement.  This is unethical and I am very disturbed.

Bob    copy: Sandy, Bernice and Freya

I



**EXHIBIT A-2**

**Diana Gaddy**

| | |
|---|---|
| **From:** | pmikekaren@aol.com |
| **Sent:** | Wednesday, June 18, 2008 6:58 PM |
| **To:** | jlove@titushillis.com |
| **Subject:** | Fwd: Refuting Charlie Brown's Claims I reneged etc. in MOMS vs. FDA |

**EXHIBIT A-3**

In a message dated 6/2/2008 1 Robertereeves writes

Charlie,

You have done a wonderful job persevering all these years and bring us to this point.  I am as disappointed on myself as I am with you about the outcome yesterday.

BUT I MUST SAY YOU GENERALLY DID NOT LISTEN TO ME.  WE MADE ONLY A FEW  DECISIONS AFTER TALKING TO EACH OTHER.
DURING THE MEDIATION YOU SOUGHT VERY LITTLE INPUT FROM ME AND NONE FROM ANY CLIENT.

It was not a horrible settlement but it at best was fairly good **but should have been GREAT AND WAS NOT**.  You left too much on the table, particularly when you had the Judge and the mediator on your side and the FDA was kowtowed.

Despite my fervent suggestions you:

1) refused to insist on a press release.  I had said during a session how important a press release was to us.  Earlier you told the Magistrate-Judge who was the mediator that we need a press release because people seldom looked at the website. *** (*this is now immaterial because we have gotten such good coverage*)

2) refused to get all the proposed settlement terms in writing and to put off a final agreement for a week or two so we could examine and consider it.   You said we needed to get it all done immediately.

3) refused to try to shorten the time for a final classification.  You claim July 28 of next year is a great victory.  There was little or no quid pro quo for giving them that much time.  I am sure, as the FDA was also, that Judge Huvelle would have given them much less time.  If we had gotten a strong press release in return, maybe it would have been a good trade off.

4) declined to get the agreement incorporated into the order when that was what the mediator first suggested.  Before we went back into the room, I had told you we

6/23/2008

needed the deadline in the order . **Nevertheless, you did not even try to get it in the Order**.  Now if they fail to met the deadline it will be more difficult then if it was in the Order.  If it was in the Order, they would have to go to the Judge for any extension and they do not want to ask her anything.

5)  I did **_not_** bring this up at the end of the negotiations but we should have required the FDA to include kidney patients and dental personnel on the website.

**You said repeatedly you did not want to make the  FDA mad and that was why you did not want to push for my suggestions.**  You said they would get mad and sit on it.  BALONEY  -- they are forced to act.  Like Hitler they will not respond to appeasement but will respond to  power.  We had the power and gave too much away.

I suspect that both the Judge and the mediator Magistrate-Judge may be disappointed in how we caved in, but hope I am wrong.  I am mad at myself because I was not more insistent on being heard by you.  I came to just support you.  Based on your actions, I should have fought with you.  I was having a harder time negotiating with you then the FDA.  Towards the end I pretty much gave up.

It was my fault as much as yours.  I have been told and new you did not listen or take advice well.  I should have been more strident.  I can understand given you nature, that you thought I was in agreement, but I told you I was not.  You just did not hear me.

### re: claim I wasn't talking to clients is NOT CORRECT

Charlie, when the did you consult with a single client during mediation about any of the decisions we were making?

Anytime I have represented a group I have had them designate a few members to serve as a legal liaison committee so that I could call one or more persons during the process to get feed back and have them contact others.  You contacted no one, not even Sandy.  Sandy is a very competent attorney and like me has been in many mediations.  This was your first and it showed.  Your lack of seeking counsel from Sandy, other clients or me showed up badly.

What "constant communication with clients" did you have during the mediation???   What authorization did you have going into the negotiations.  What emails did you send to the clients re goals before hand and what email report did you send to them about the results.  **Send me copies!!!**

Now, I have said my piece and it is time to get this all behind us.  **\*\*\***  I strongly believe that this can work out for the best. but not if you continue to ignore me and others.  As I said a the outset you can handle a lot of this brilliantly and I am sure you can continue.

Bob                    Copy Charlie and Jim.
Robert  E. Reeves
REEVES LAW OFFICE
167 West Main St., Suite 1310
Lexington, KY 40507
o) 859-226-0700, Fax-0711

6/23/2008

h) 266-0364  Cell 619-7001

This E-mail (including attachments) is covered by the Electronic Communications
Privacy Act, 18 U.S.C. §§ 2510-2521, is confidential and legally privileged.  If you are
not the intended recipient, you are hereby notified that any retention, dissemination,
distribution, or copying of this communication is strictly prohibited.  Please reply to
the sender that you have received the message in error; then delete it.   Thank you.

Vote for your city's best dining and nightlife. City's Best 2008.

Get the Moviefone Toolbar. Showtimes, theaters, movie news, & more!

Get the Moviefone Toolbar. Showtimes, theaters, movie news, & more!

## Diana Gaddy

| | |
|---|---|
| **From:** | pmikekaren@aol.com |
| **Sent:** | Wednesday, June 18, 2008 4:11 PM |
| **To:** | jlove@titushillis.com |
| **Subject:** | Fwd: LETTER TO Magistrate Judge John M. Facciola SAYING PROBLEMS WITH SETTLEM... |
| **Attachments:** | MAGISTRATE JUDGE-080606 NO SETTLEMENT.doc |

-----Original Message-----
From: Robertereeves@aol.com
To: Mark.Mitchell@environmental-justice.org
Sent: Sat, 7 Jun 2008 11:30 am
Subject: Fwd: LETTER TO Magistrate Judge John M. Facciola SAYING PROBLEMS WITH SETTLEM...

Dr. Mitchell,   I thought I had added you to the emails to all Plaintiffs but had not.  I apologize.
Bob

Robert E. Reeves
REEVES LAW OFFICE
167 West Main St., Suite 1310
Lexington, KY 40507
o) 859-226-0700, Fax-0711
c) 619-7001  h) 266-0364

---

Get trade secrets for amazing burgers. Watch "Cooking with Tyler Florence" on AOL Food.

| Attached Message | |
|---|---|
| From: | Robertereeves@aol.com |
| To: | AMYC444@aol.com; angelamedlin@nc.rr.com; Daisy940@aol.com; Pmikekaren@aol.com; Dr.Landerman@sbcglobal.net; anitatibau@hotmail.com; cjcrowe@earthlink.net; Mercurypolicy@aol.com; SANDRA.N.DUFFY@CO.MULTNOMAH.OR.US; sandyduffy@comcast.net; KJohnson@azLeg.gov; marystarrett@hotmail.com |
| Cc: | charlie@toxicteeth.org |
| Subject: | LETTER TO Magistrate Judge John M. Facciola SAYING PROBLEMS WITH SETTLEMENT |
| Date: | Fri, 6 Jun 2008 8:11:17 PM Eastern Daylight Time |

This was faxed to Magistrate Judge John M. Facciola and the attorneys for the FDA, copy to Charlie at about 5:30 PM today.   It is attached as a WORD document.  I have also pasted below in case you cannot open the attachment.

Bob
Robert E. Reeves
REEVES LAW OFFICE



**EXHIBIT A-4**

# Robert E. Reeves

### Attorney at Law

First National Building
167 West Main St., Ste. 1310
Lexington, KY 40507-1398

Phone: (859) 226-0700
FAX: (859) 226-0711
Rereeveslaw@aol.com

June 6, 2008

Magistrate Judge John M. Facciola            VIA FAX (202) 354-3132 & MAIL
333 Constitution Ave NW, Room 2321
Washington, DC 20001

     RE:   Moms Against Mercury, et al. v Andrew von Eschenbach, et al. (FDA, et al.)
             Case # 1:07-cv002332-ESH

Dear Magistrate Judge Facciola:

Yesterday I was informed by two Plaintiffs that they have serious concerns regarding the
proposed settlement which have not been resolved and which cause them to reject the settlement
as it now stands. Today I was informed that one of those Plaintiffs, an organization is
reconsidering its position. Also, today three more Plaintiffs contacted me rejecting the
settlement. There are others who have expressed serious reservations but have not made a final
decision to the best of my knowledge.

I attempted to contact Charles Brown about this several ways yesterday and delayed
communicating this to you for that reason. I have been informed that Mr. Brown has his elderly
mother in from out of town visiting, which is probably the reason I was not able to reach him
yesterday. Mr. Brown and I have been able to talk today and he has also been able to talk to a
number of the clients, but this has been interrupted several times by his obligations to his mother.
We have yet to resolve the position of all the clients (Plaintiffs) in this case.

There are several factors concerning Plaintiffs, but the main issues are that there has never been a
clear statement of the final terms of the settlement and the (objectionable) language of Questions
and Answers on Dental Amalgam (Q&A) #7 was not available at the mediation. Also, because of
the number of Plaintiffs, many of them did not get a full presentation of the proposed settlement
until after our mediation.

At the mediation it was agreed there would be a contractual agreement, but none has come to my
attention or to the best of my knowledge to any Plaintiffs. Additionally, there have been

objections expressed to some of the language inserted and omitted from the Q&A.

As expected, we did not receive Answer # 7 until after the mediation was over. While this is almost verbatim the notice language in the Federal Registry, all the wording is not appropriate to this answer according to the first two Plaintiffs objecting to the settlement. As previously stated, this was not available to us at the mediation and has been rejected by some of the Plaintiffs. I have gone over this in some detail with the first two objecting Plaintiffs and can provide more detail if needed.

Additionally, at one point in the mediation, all references were to "mercury amalgam" but this is not consistent throughout the Q&A as presented. There was an earlier reference during the mediation to Kidney compromised individuals, but that did not make it anywhere into the Q&A. There is a reference to "lactating women" in #7 but this should have been included in #3. And in #7 there is a question: "What is the current exposure to mercury ... For professionals?" but nothing is mentioned in #3 in regard to the risk of harm to dental personnel. This is a serious omission according to at least one objecting Plaintiff, however I do not believe that this was brought up by me or Mr. Brown at the mediation. In conclusion, I cannot say how many Plaintiffs ultimately will reject this settlement but it is clear that at least four of them are in that position.

This afternoon, as I was about to send this letter to you, I heard that Mr. Brown told a Plaintiff that there had been a stipulation of dismissal. In none of my discussions with Mr. Brown last week or this week did he mention that there was any stipulation of dismissal. At 4:30 p.m. today I checked Pacer and found that there is one that shows a date of May 30, which appears to have been filed on Sunday June 1 and entered on Tuesday June 3. Frankly, I am surprised by this, because Mr. Brown has never informed me or most of the Plaintiffs of his signing of this document. Additionally, it was agreed at the mediation that there would be an order of dismissal and it would refer to a contractual agreement between the parties. I have seen no order nor any contractual agreement. I do not know where this leaves us at this time, but I think it is fair to say that at least some of the Plaintiffs will move the Court to set the Stipulation of Dismissal aside.

Respectfully,

Robert E. Reeves

cc:  Drake Cutini                                          Via Fax and Email
     US Dept. of Justice - Consumer Litigation
     PO Box 386
     Washington, DC 20044
     (202) 307-0044

Fax: 202-514-8742
Email: drake.cutini@usdoj.gov

Jeffrey M. Senger                                    Via Fax and Email
Deputy Chief Counsel
Office of the Chief Counsel
5600 Fishers Lane, Rm. 6A05
Rockville, MD 20857
(301) 827-7138
Fax: 301-827-7145
Email: Jeffrey.Senger@fda.gov

Wendy Vicente                                        Via Fax and Email
Office of the Chief Counsel
5600 Fishers Lane, Rm. 6A05
Rockville, MD 20857
(301) 827-7138
Fax: 301-827-7145
Email: wendy.vicente@fda.gov

Charles G. Brown                                     Via Fax and Email
Counsel for Plaintiffs
316 F St., N.E., Suite 210
Washington DC 20002
Phone 202.884-0315
Fax 202.544-6331
Email: charlie@toxicteeth.org

D:\m-drive\CLIENTS\MOMS V. FDA\LETTERS\MAG JUDGE-080606 NO SETTLEMENT.wpd

**Diana Gaddy**

| | |
|---|---|
| **From:** | pmikekaren@aol.com |
| **Sent:** | Wednesday, June 18, 2008 4:09 PM |
| **To:** | jlove@titushillis.com |
| **Subject:** | Fwd: DISMISSAL MOMS v FDA SIGNED BY CHARLIE LAST FRIDAY 5/30/08 |
| **Attachments:** | DISMIS~1.PDF |

-----Original Message-----
From: Robertereeves@aol.com
To: charlie@toxicteeth.org; brownchas@erols.com
Cc: AMYC444@aol.com; angelamedlin@nc.rr.com; Daisy940@aol.com; Pmikekaren@aol.com;
Dr.Landerman@sbcglobal.net; anitatibau@hotmail.com; cjcrowe@earthlink.net;
Mercurypolicy@aol.com; SANDRA.N.DUFFY@CO.MULTNOMAH.OR.US;
sandyduffy@comcast.net; KJohnson@azLeg.gov; marystarrett@hotmail.com
Sent: Fri, 6 Jun 2008 6:45 pm
Subject: DISMISSAL MOMS v FDA SIGNED BY CHARLIE LAST FRIDAY 5/30/08

Charlie,

Why did you do this and not tell anyone until today?  Why are there are no terms of settlement
or reference to a separate settlement agreement?

Bob


UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
MOMS AGAINST MERCURY, et al., )
                              Plaintiffs, ) Case # 1:07-
v.                                   ) cv002332

Andrew von ESCHENBACH, Commissioner, Food and Drug ) (ESH/JMF)
                              Administration; et al., )
                              Defendants. )


Stipulation of Dismissal

Plaintiffs and Defendants have conferred, and pursuant to Rule 41(a)(1)(A)(ii),
Fed.R.Civ.P., the parties hereby stipulate and agree to the dismissal of all claims –
without prejudice. Each party shall bear its own costs and attorneys fees.

Dated: 30 May 2008
For Plaintiffs: For Defendants
_____/ s /_____          _____/ s /_____          **EXHIBIT A-5**
CHARLES G. BROWN                            DRAKE CUTINI

316 F St., N.E., Suite 210
Washington, DC 20002
202-544-6331

Office of Consumer Litigation
United States Department of Justice
P.O. Box 386
   Washington DC 20044
   202-307-0044

Case 1:07-cv-02332-ESH Document 16 Filed 06/01/2008 Page 1 of 1
(ALSO ATTACHED)


Bob
Robert E. Reeves
REEVES LAW OFFICE
167 West Main St., Suite 1310
Lexington, KY 40507
o) 859-226-0700, Fax-0711

This E-mail (including attachments) is covered by the Electronic Communications
Privacy Act, 18 U.S.C. §§ 2510-2521, is confidential and legally privileged.  If you are
not the intended recipient, you are hereby notified that any retention, dissemination,
distribution, or copying of this communication is strictly prohibited.  Please reply to
the sender that you have received the message in error; then delete it.   Thank you.


Get trade secrets for amazing burgers. Watch "Cooking with Tyler Florence" on AOL Food.

Get the Moviefone Toolbar. Showtimes, theaters, movie news, & more!

6/19/2008

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MOMS AGAINST MERCURY, *et al.*,<br>  Plaintiffs,<br>      v.<br>Andrew von ESCHENBACH, Commissioner, Food and Drug<br>Administration; *et al.*,<br>  Defendants. | ) <br>) Case # 1:07-<br>)   cv002332<br>)   (ESH/JMF)<br>)<br>)<br>) |

## Stipulation of Dismissal

Plaintiffs and Defendants have conferred, and pursuant to Rule 41(a)(1)(A)(ii),

Fed.R.Civ.P., the parties hereby stipulate and agree to the dismissal of all claims –

without prejudice.  Each party shall bear its own costs and attorneys fees.

Dated:  30 May 2008

For Plaintiffs:                                      For Defendants

_____/ s /_____               _____/ s /_____
CHARLES G. BROWN                        DRAKE CUTINI
316 F St., N.E., Suite 210                    Office of Consumer Litigation
Washington, DC 20002                       United States Department of Justice
202-544-6331                                       P.O. Box 386
                                                           Washington DC 20044
                                                           202-307-0044

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

MOMS AGAINST MERCURY,　　　　　)
CONNECTICUT COALITION;　　　　　)
KAREN PALMER, *et al.*,　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　Plaintiffs,　　)
v.　　　　　　　　　　　　　　　　　)　Case #1:07-cv002332-ESH
　　　　　　　　　　　　　　　　　　)　Judge Helen S. Huvelle
ANDREW VON ESCHENBACH,　　　　)　Magistrate Judge John M. Facciola
Commissioner, Food and Drug　　　　)
Administration, *et al.*,　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　Defendants.　)

## SECOND AFFIDAVIT OF KAREN PALMER

**DISTRICT OF COLUMBIA**　　　)
　　　　　　　　　　　　　　　) ss:
　　　　　　　　　　　　　　　)

　　　　I, Karen Palmer, of lawful age, being first duly sworn upon oath state as follows:

　　　　1.　　　I submit this affidavit in support of Plaintiff Karen Palmer's Motion To Vacate The Dismissal in the referenced matter.

　　　　2.　　　I have personal knowledge regarding the statements contained herein.

　　　　3.　　　I am a Plaintiff in this case. I am a Certified Dental Assistant, who is disabled from mercury to which I was exposed occupationally.

　　　　4.　　　I did not approve the settlement entered in this case, did not give my attorney, Charles G. Brown, authority to enter into the settlement, and did not give Mr. Brown the authority to dismiss this case. Moreover, I did not give Mr. Brown the authority to sign the settlement agreement on my behalf. I was not aware that Mr. Brown signed the settlement agreement on my behalf until June 8, 2008. I was not aware that Mr. Brown dismissed the case until June 6, 2008. At the time I sent the post-May 30 communications expressing in various ways my appreciation for the settlement, I did not understand that the case would be imminently dismissed, or already had been dismissed. I did not understand that Mr. Brown had already signed a settlement agreement on my behalf. I had not been informed that I would not be allowed to sign, or even see, the settlement agreement prior to the dismissal of the case. Moreover, I was not aware of the changes that were to be made to the FDA website.

**Exhibit "B"**

5.     I first learned of the settlement when Mr. Brown called me on Saturday, May 31st and told me quickly of a great victory which took place by way of settlement at the mediation on the previous Thursday, May 29th. My first affidavit in this matter incorrectly reflects that this conversation took place on June 1, 2008, but the conversation actually occurred on May 31, 2008. Mr. Brown apparently sent me an email on Friday evening, May 30th at 8:20 p.m. explaining certain aspects of the settlement. However, I did not see his email until Sunday evening.

6.     I reviewed Mr. Brown's contention that I ratified the settlement through two emails that I sent on June 2, 2008. These emails were not intended to constitute a final approval of the settlement reached on Thursday. I had not been informed at this point of the specific changes that would be made to the FDA website. Moreover, I had not been advised that I would not have an opportunity to review the settlement agreement reflecting the terms of the settlement.

7.     A few hours after sending my first email to Mr. Brown on June 2, 2008, I sent an email to Attorney Robert Reeves raising concerns about the settlement. He placed a telephone call to me just as I sent the email. During this conversation, I asserted my objections to the settlement. Mr. Reeves did not encourage me to object to the settlement, but he did encourage me to contact Mr. Brown and make my objection known to him. I therefore sent an email to Mr. Brown raising several concerns about the settlement. [A true and correct copy of my June 2, 2008, email was submitted as Exhibit B to Karen Palmer's Motion to Vacate] In this email, I informed Mr. Brown that I wanted to speak with him "about my concerns ASAP and hope and pray it is not to [sic] late to move this process along for all those already affected and for all the future, unsuspecting patients/ dental staff everywhere. By June 6, 2008, I had expressed my outrage to Mr. Reeves regarding Mr. Brown's actions in dismissing the case. [A true and correct copy of my June 6, 2008 email is attached hereto as Exhibit B-5] Obviously, I did not intend for any prior email to constitute a final statement of my approval for the settlement. The first time anyone ever claimed that my prior email constituted a final statement of my approval of the settlement was after I filed a motion to vacate the dismissal of this case.

8.     Following my decision to file the instant motion and proceed with this case, Mr. Brown sent an email that threatened me and my husband with devastating financial consequences if I did not acquiesce in the settlement that was reached on May 29, 2008. The email also denigrated Mr. Reeves's and Mr. Love's motivations for becoming involved in this case. [A true and correct copy of Mr. Brown's email is submitted as Exhibit B-1.]

9.     I received an email from Sandy Duffy dated June 4, 2008, and addressed to Attorney Charles Brown. She reported the following:

> I understand that you are having a telephone conference… regarding the settlement of the Moms v. FDA case.

> I just want to give you a heads up that I am polling the Board on the settlement and don't want you to communicate to the FDA that there is a settlement before I get responses.

[A true and correct copy of this email is attached hereto as Exhibit "B-2"]

     10.    Thereafter, I received an email from Ms. Duffy dated June 5, 2008, also addressed to Mr. Brown, which stated as follows:

> Last night the Board for Consumers for Dental Choice had a telephone meeting regarding the settlement of the Moms v. FDA case. The vote was 6-0…that the settlement must include:
>
> (1)    A six (6) month timeline from the date of the settlement to a classification for encapsulated amalgam.
>
> (2)    Changes to the FDA Q&A document on the web:
>
> a. Adding those with compromised kidney function as a susceptible class
> b. Adding dental personnel as a susceptible class
>
> Additionally, we agree that we want you to amend the Complaint to add a Petition for a Ban of Amalgam…Please confirm asap that you will make the changes to the settlement agreement and the amended Complaint.

[A true and correct copy of this June 5, 2008 email from Sandy Duffy to Charles Brown, is attached hereto as Exhibit "B-3"] Clearly, Plaintiff CDC understood that the terms of the settlement agreement remained negotiable and must be approved by the CDC.

     11.    Mr. Brown responded to Ms. Duffy's email by asserting that she did not have the votes necessary to carry a majority of the CDC Board. [A true and correct copy of this email from Charles Brown to Sandy Duffy is attached hereto as Exhibit "B-4"] Significantly, Mr. Brown did not respond that he already had obtained settlement authority through the attorney-client agreement. Until I filed her Motion to Vacate Dismissal, I never heard Mr. Brown assert that the attorney-client agreement represented a delegation of client settlement authority. He certainly did not make such an assertion in response to Ms. Duffy's June 5 email asserting that the settlement had been rejected.

     I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct pursuant to 28 U.S.C. § 1746. Executed on this July 8, 2008.

               s/Karen Palmer
               Karen Palmer

## Jim Love

| | |
|---|---|
| **From:** | pmikekaren@aol.com |
| **Sent:** | Wednesday, June 18, 2008 9:25 PM |
| **To:** | jlove@titushillis.com |
| **Subject:** | Fwd: Don't make this 9 against one; don't let those lawyers use you, Karen |
| **Attachments:** | Bob's admission sinks it.doc |

-----Original Message-----
From: Charlie Brown <charlie@toxicteeth.org>
To: Karen Palmer <pmikekaren@aol.com>
Sent: Sun, 15 Jun 2008 7:57 pm
Subject: Don't make this 9 against one; don't let those lawyers use you, Karen

Karen:

1. Reeves made an admission this afternoon that sinks his case, that his primary goal isn't breaking the settlement; he's using the motion as a tactic to keep the same judge. That will engage the Court. If Bob is such a great lawyer, how come he sent me Sandy Duffy's admissions and his own admissions --- in the same day? I attach the letter about what Bob foolishly wrote.

2. Thus, he will lose, and you will face a motion for attorneys fees and costs. Is Mike's business protected? Ask Bob to tell you what case he ever won in this movement; I can't name one. I could tell you quite a few I've won.

3. Why doesn't Reeves sign an agreement that he will pay all attorneys fees and costs? It's win-win for Bob: you take the risks; Bob makes the money. He gets a healthy fee from IAOMT if, only if, he finds a client. It's in his economic interest for you to cave in. (I work by the month; I have no such incentive.)

4. FDA isn't OSHA. I took on the OSHA project because of you and Karen. Below is Jon Bombadiere's e-mail; our momentum is real. We can win the OSHA fight in NJ or CA, but we can't make FDA into OSHA. But not if Reeves and Love tie me up here in DC. I've already had to shelve NJ OSHA battle while I deal with this rear guard action by lawyers who accomplish nothing themselves but are great at tearing down.

5. You will divide the movement, nine against one. The other plaintiffs will oppose your motion. Do you REALLY want to be fighting Moms Against Mercury, Consumers for Dental Choice, Anita Vazquez Tibau, Linda Brocato, Michael Bender, etc.?

6. It is outrageous that Reeves continued to talk to you when you were not his lawyer. He will have to explain how he solicited you. (No, it's not a defense if you called him; he isn't supposed to take the call.)

7. We could lose it all, on appeal. If so, Karen Palmer will be known as the person who caused the movement to collapse. We have a great victory. Let's keep it.

**EXHIBIT B-1**

8. What Bob is seeking is modest. He is not seeking a ban; that must go back to FDA. After his big promises to everyone of what a big man he was, now those promises are laid bear, so he now must secure some victory. Everyone else turned him down. Two lawyers in DC, so far, refused to take the case. He has to win something. So he is using you.

9. Read the newspapers, google this issue, or our website. This is making worldwide news. We will look like idiots challenging our media victory. Like idiots.

10. You've seen my work. You've never seen Bob's. Trust me, it's the best settlement we could have gotten. The website change is a victory like no other.

Charlie
6/15/08

**Diana Gaddy**

| | |
|---|---|
| **From:** | pmikekaren@aol.com |
| **Sent:** | Wednesday, June 18, 2008 3:36 PM |
| **To:** | jlove@titushillis.com |
| **Subject:** | Fwd: don't want you to communicate to the FDA that there is a settlement before I get |

In a message dated 6/4/2008 1:11:36 P.M. Eastern Daylight Time, sandyduffy@comcast.net writes:

Charlie:

I understand that you are having a telephone conference with Bernice and Sue Ann at 2:00 p.m. regarding the settlement of the Moms v. FDA case.

I just want to give you a heads up that I am polling the Board on the settlement and don't want you to communicate to the FDA that there is a settlement before I get responses.

Sandy

**EXHIBIT B-2**

**Diana Gaddy**

| | |
|---|---|
| **From:** | pmikekaren@aol.com |
| **Sent:** | Wednesday, June 18, 2008 6:53 PM |
| **To:** | jlove@titushillis.com |
| **Subject:** | Fwd: Canadian Dentists don't even know about or ignore restrictions on mercury use |


>
> On 6/5/08 9:13 AM, "Sandy Duffy" <sandyduffy@comcast.net> wrote:
>
> > Charlie:
> >
> > Last night the Board for Consumers for Dental Choice had a telephonic meeting
> > regarding the settlement of the Moms v. FDA case.  The vote was 6-0 (Mark
> > Briener did not participate) that the settlement must include:
> >
> > (1)  A six (6) month timeline from the date of the settlement to a
> > classification for encapsulated amalgam.
> > (2)  Changes to the FDA Q & A document on the web:
> >       a.  Adding those with compromised kidney function as a susceptible
> > class
> >       b.  Adding dental personnel as a susceptible class
> >
> > Additionally, we agreed that we want you to amend the Complaint to add a
> > Petition for a Ban of Amalgam.  If we can get this judge to make that
> > determination, we could short circuit the entire process.  Amalgam is
> > inherently unsafe and cannot be made safe through a Class II nor proven to be
> > safe through a Class III.
> >
> > Please confirm asap that you will make the changes to the settlement agreement
> > and the amendment to the Complaint.
> >
> > Sandy
>



**Diana Gaddy**

| | |
|---|---|
| **From:** | pmikekaren@aol.com |
| **Sent:** | Wednesday, June 18, 2008 3:45 PM |
| **To:** | jlove@titushillis.com |
| **Subject:** | Fwd: like British Queen, FDA's von Eschenbach reigns but does not rule over bureaucracy |
| **Attachments:** | Mercury Lawsuit Likens Von E to British Queen.doc |

-----Original Message-----
From: sandyduffy@comcast.net
To: pmikekaren@aol.com; robertereeves@aol.com
Cc: sourcebwu@aol.com
Sent: Thu, 5 Jun 2008 6:50 pm
Subject: Re: Fwd: like British Queen, FDA's von Eschenbach reigns but does not rule over bureaucracy

Karen and Bob:

As I was reading the email below from Charlie, he called and raved for 15
minutes.  He is calling everyone and convincing them to change their votes.  I
am at a point where I am seriously considering resigning as President.  He
basically told me I was stupid because I didn't understand that this judge
cannot classify.  That simply infuriates me.

FROM CHARLIE:

Sandy and Bernice ---

1.     Your instructions lack majority support.  You now only have three votes;
you need four.


                    Sue Ann was never on the call --- it is disappointing
you could claim she was.

                    Eccles & Sullivan have decided to reconsider it.

                    Breiner never voted.


        2. Your instructions would wreck our greatest accomplishment.



        3. It is disappointing you told the board that the issue was between
a Class II and a Class III.  If you had read the TR., you would know that the
Judge said she could not order how to classify. The max. reach of the Judges
order would be when to classify.   Only one person has paid attention to the
details of this case.



        4. Through skillful negotiating, I got a change in FDAs position on
the website something we could never get in court.



6/19/2008

    5. Bernice suggested a board meeting ---- meaning only the board and
me --- on Tues. night at 8 pm eastern time. Thats fine with me.  We can talk it
all through then.


Charlie

**Jim Love**

---

**From:** pmikekaren@aol.com
**Sent:** Wednesday, June 18, 2008 6:53 PM
**To:** jlove@titushillis.com
**Subject:** Fwd: Canadian Dentists don't even know about or ignore restrictions on mercury use

-----Original Message-----
From: pmikekaren@aol.com
To: Robertereeves@aol.com
Sent: Fri, 6 Jun 2008 10:08 pm
Subject: Re: Canadian Dentists don't even know about or ignore restrictions on mercury use

Bob: I ditto all comments made by IAOMT President Larose!  In light of Charlie's latest stunt, the "dismissal", to say that I am neither amused or impressed is gross understatement!  Outraged would be more the case!  How can it even be, in this day and age of all the litigation that is so prevalent everywhere, that Plaintiffs are not even notified and have no input to an "agreement", language and terms! I cannot help but feel duped by Charlie and I am not at all happy about this. I tried very hard all week to try to continue to give Charlie the benefit of the doubt, despite all that was becoming apparent to me, but that is really starting to wear thin. I for one, am ready to move forward without Charlie, if need be, sad to say, but fixed on the ultimate goal, a BAN!!! Enough of the drama!! Let's do this!!!

Karen Palmer, PLAINTIFF?? What does that even mean? I hope and pray it means we have a recourse, and soon!

**EXHIBIT B-5**